## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

James E. Cecchi
Melissa E. Flax
**CARELLA, BYRNE, BAIN, GILFILLAN,
CECCHI, STEWART & OLSTEIN**
5 Becker Farm Road
Roseland, New Jersey 07068
Telephone: (973) 334-1700
Facsimile: (973) 994-1744

Kim E. Miller
**KAHN GAUTHIER SWICK, LLC**
12 East 41st Street – 12 Floor
New York, NY 10017
Telephone: (212) 696-3730
Facsimile: (504) 455-1498

Lewis Kahn
**KAHN GAUTHIER SWICK, LLC**
650 Poydras Street - Suite 2150
New Orleans, LA 70130
Telephone: (504) 455-1400
Facsimile: (504) 455-1498

**Attorneys for Plaintiff & the Class**

| | |
|---|---|
| Michael Volpe, Individually And On Behalf of All Others Similarly Situated, ) ) ) ) | |
| Plaintiff, ) | **CIVIL ACTION NO. _____** |
| vs. ) ) ) | |
| DANIEL H. SCHULMAN, DOUGLAS B. LYNN, JONATHAN MARCHBANK, MARK POOLE, JOHN D. FEEHAN, FRANCES BRANDON-FARROW, ROBERT SAMUELSON, L. KEVIN COX, THOMAS O. RYDER, KENNETH T. STEVENS, SPRINT NEXTEL CORP., CORVINA HOLDINGS LIMITED, LEHMAN BROTHERS, INC., MERRILL LYNCH, PIERCE, FENNER & SMITH, INC., BEAR, STEARNS & CO., INC., RAYMOND JAMES & ASSOC., INC., THOMAS WEISEL PARTNERS, LLC and VIRGIN MOBILE USA, INC., ) ) ) ) ) ) ) ) ) ) ) ) ) ) | **CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS**  <br><br><br>  **JURY TRIAL DEMANDED** |
| Defendants. ) ) | |

1

## NATURE OF THE ACTION

1.     This is a federal securities class action lawsuit brought on behalf of the purchasers of Virgin Mobile USA, Inc. ("VM USA" or the "Company") common stock pursuant to its October 11, 2007 Initial Public Offering ("IPO" or the "Offering") of 27.5 million shares of common stock. In connection with this Offering defendants raised gross proceeds of at least $412.5 million.

2.     VM USA, its entire Board of Directors, its Chief Financial Officer and the Underwriters involved in the Offering (including, Lehman Brothers, Inc. ("Lehman Bros."), Merrill Lynch, Pierce, Fenner & Smith, Inc. ("Merrill Lynch"), Bear, Stearns & Co., Inc. ("Bear Stearns"), Raymond James & Assoc., Inc. ("Raymond James") and Thomas Weisel Partners, LLC ("Thomas Weisel")), in addition to certain other controlling shareholders, are each charged with creating or distributing a materially false and misleading Registration Statement and Prospectus in connection with the Company's October 2007 IPO, in direct violation of the Securities Act of 1933. Specifically, defendants each failed to conduct an adequate due diligence investigation into the Company prior to the IPO, and they also each failed to reveal, at that time of the IPO, that Virgin Mobile was also not performing according to plan and that results for the third quarter of 2007 - - *the period ended a full <u>2 weeks prior</u> to the VM USA IPO* - - showed growing losses as expenses rose and business slowed, indicating that the Company would be forced to revise downward, its near-term forward financial and operational guidance.

3.     It was only on November 16, 2007, approximately one month after the IPO, however, that investors learned the truth about VM USA's financial and operational condition, after

2

defendants revealed that the Company had suffered a widening loss for the third quarter, the period ended September 30, 2007, as a result of rising expenses. For 3Q:07, the Company reported a *loss* of $7.3 million, or ($0.15) per share, compared with a loss of only $5.1 million, or ($0.10) per share, in the same period the prior year. These results also contrasted the $28.9 million in net income, and *profits* of $0.55 per share reported in the first six months of 2007 reported *prior* to the IPO. At that time, Defendants also revealed that fourth-quarter 2007 outlook called for between 350,000 and 400,000 net customer additions, an anemic amount analysts described as "weak," and that 4Q:07 guidance would be, what was described as, "well below" expectations.

4.      Following these belated disclosures of lower then expected 3Q:07 results, higher expenses and slowing sales, on November 16, 2007, shares of Company stock declined precipitously. That day, shares of VM USA fell almost 30% in intra-day trading - - declining from an opening trading price of $11.09 per share, to a trading low of $8.07 per share before closing the trading day at $9.10 per share. That trading day VM USA also experienced exceptionally heavy trading volume, with over 6.512 million shares traded - - more than five times the Company's recent average daily trading volume.

5.      The precipitous decline in the price of VM USA shares following defendants' belated disclosures was evidence of the eradication of the prior artificial inflation in the price of Company shares caused as a result of defendants' publication of a materially false and misleading Registration Statement and IPO Prospectus. As a result of their purchases of VM USA stock in connection with the October 2007 IPO, including those who purchased shares traceable to the Offering in the public markets immediately thereafter, plaintiff and other members of the Class suffered economic losses, *i.e.* damages under the federal securities laws.

3

## JURISDICTION AND VENUE

6.     The claims asserted herein arise under §§11 and 15 of the Securities Act of 1933 (the "Securities Act"). Jurisdiction is conferred by §22 of the Securities Act.

7.     Venue is proper in the United States District Court, Newark Vicinage, pursuant to §22 of the Securities Act, as defendant VM USA maintains its chief executive offices and principle place of business in this District, and/or the Individual Defendants and Underwriter Defendants - - Lehman Bros., Merrill Lynch, Bear Stearns, Raymond James and Thomas Weisel - - all conduct business in, and the wrongful conduct took place in, this District and in the Newark Vicinage.  In addition, three of the Underwriter Defendants maintain offices in the Newark Vicinage.

## THE PARTIES

### Plaintiff

8.     Plaintiff Michael Volpe purchased shares of VM USA common stock pursuant and/or traceable to the Company's materially false and misleading Registration Statement and Prospectus issued by defendants in connection with the October 2007 IPO, including those shares detailed in the attached Certification, incorporated herein by reference, and was damaged thereby.

### Corporate Defendants

9.     Defendant **VIRGIN MOBILE USA, INC.** is a Delaware corporation headquartered in Warren, New Jersey, and formed in April 2007 in anticipation of the October 2007 IPO. According to Internet website *Yahoo.com/Finance's* Company profile, VM USA provides wireless communications services, offering prepaid services to the youth market in the United States.  The Company also develops content and has relationships with third parties to procure and offer customized content, music, and other services, including short message services.  The Company sells

4

its products through direct and third-party distribution channels and, as of March 31, 2007, reported

approximately 4.88 million customers.

10.    Defendant **SPRINT NEXTEL, CORP.** (including affiliated entities, hereinafter

"Sprint"), a Kansas corporation is, and at the time of the IPO was, one of the largest shareholders of

the Company. Following the IPO, Sprint owned or controlled at least 18.5% of VM USA's shares

issued and outstanding and, prior to the IPO, Sprint owned 46.63% of the Company's shares, or over

23.012 million shares. In connection with the October 2007 IPO, Sprint sold over 14.8% of its

interest back to the Company, in addition to selling over 1.33 million shares to public investors in the

Offering.    Accordingly, in connection with the October 2007 IPO, gross proceeds to Sprint for

payment of equity was approximately $155 million, in addition to the repayment of debt owed to

Sprint Ventures of $45 million. In connection with the IPO, defendant Sprint sold almost $20

million of its privately held Company stock.

11.    Defendant **CORVINA HOLDINGS LIMITED** ("Corvina") is, and at the time of the

IPO was, the largest shareholder of the Company, owning and controlling at least 35.14% of the

Company's combined voting power following the October 2007 IPO. Prior to the IPO, Corvina

controlled over 46.6% of VM USA's voting power. Corvina is a holdings company organized under

the laws of the British Virgin Islands. Approximately 87% of Corvina is held by Virgin Group

Holdings Limited ("VGHL"), and the remaining 13% of Corvina is owned jointly by Gamay

Holdings Limited ("Gamay") and certain senior executives of the Virgin Group - - including Richard

Branson, founder of Virgin Group.[1]   The address of each of the above referenced persons and entities

---

1 Gamay is a wholly-owned subsidiary of VGHL. VGHL is jointly owned by (i) Sir Richard Branson,
(ii) Cougar Investments Limited ("Cougar"), (iii) Plough Investments Limited ("Plough"),
(iv) Deutsche Bank Trustee Services (Guernsey) Limited, solely in its capacity as trustee on behalf of

is c/o La Motte Chambers, La Motte Street, St. Helier, Jersey, JE1 1BJ , Channel Islands, Attention:

Abacus Secretaries (Jersey) Limited.

**Individual Defendants**

12.     The individuals identified below are referred to collectively herein as the "Individual

Defendants."   The Individual Defendants are each liable for the false statements contained in the

materially false and misleading Registration Statement and Prospectus, as alleged herein, as those

statements were "group-published" information.  The Individual Defendants include the following:

| NAME | POSITION |
|---|---|
| **DANIEL H. SCHULMAN** ("Schulman") | Chief Executive Officer and Director |
| **JONATHAN MARCHBANK** ("Marchbank") | Chief Operating Officer |
| **JOHN D. FEEHAN JR.** ("Feehan") | Chief Financial Officer |
| **FRANCES BRANDON-FARROW** ("Brandon-Farrow") | Director |
| **DOUGLAS B. LYNN** ("Lynn") | Director |
| **MARK POOLE** ("Poole") | Director |
| **ROBERT SAMUELSON** ("Samuelson") | Director |

the Virgo Trust, The Libra Trust, the Jupiter Trust, the Mars Trust, the Venus Trust, the Leo Trust and The Gemini Trust (such trusts collectively referred to as the "DB Trusts"), and (v) RBC Trustees (C.I.) Limited, solely in its capacity as trustee on behalf of The Aquarius Trust, The Aries Trust, the Capricorn Trust, The Pisces Trust and The Saturn Trust (such trusts collectively referred to as the "RBC Trusts"). The principal beneficiaries of the DB Trusts and the RBC Trusts are Sir Richard Branson and/or certain members of his family.

6

**L. KEVIN COX**
("Cox")                                    Director – Member Audit Committee

**THOMAS O. RYDER**
("Ryder")                                  Director – Chairman Audit Committee

**KENNETH T. STEVENS**
("Stevens")                                Director – Member Audit Committee

13.     The IPO Registration Statement identified as the sole members of the Audit

Committee, defendants Cox, Stevens and Ryder (Chair) - - three Board members who had *not* yet

even joined the Board, as of September 12, 2007.   Regardless of the late addition of these three

defendants to the Board and to the Audit Committee - - at least by the time of the IPO - - the

Prospectus outlined the duties and responsibilities of these defendants, as members of the Audit

Committee, in part, as follows:

> **Audit Committee**. *We anticipate that our audit committee <u>will consist</u> of Messrs.*
> *Cox, Ryder and Stevens and that Mr. Ryder will serve as its chair*. All the members
> of our audit committee will qualify as "independent" in accordance with the rules
> promulgated by the NYSE. Each member of our audit committee will also satisfy the
> criteria for "independence" under special standards established by the SEC for
> members of audit committees. In addition, *Mr. Ryder meets the qualifications of an*
> *"audit committee financial expert"* in accordance with the SEC rules, as determined
> by our board of directors.
>
> *The audit committee will be responsible, among other things*, for (1) recommending
> the hiring or termination of independent auditors and approving any non-audit work
> performed by such auditor; (2) recommending the overall scope of the audit;
> (3) *assisting the board in monitoring the integrity of our financial statements*, the
> independent auditors' qualifications and independence, the performance of the
> independent auditors and our internal audit function and our compliance with legal
> and regulatory requirements; (4) annually reviewing an independent auditors' report
> describing the auditing firms' internal quality-control procedures, any material issues
> raised by the most recent internal quality-control review, or peer review, of the
> auditing firm; (5) *discussing the annual audited financial and quarterly statements*
> *with management and the independent auditor; (6) discussing earnings press*
> *releases, as well as financial information and earnings guidance provided to*
> *analysts and rating agencies;* (7) *discussing policies with respect to risk assessment*
> *and risk management;* (8) meeting separately and periodically with management,

internal auditors and the independent auditor; (9) *reviewing with the independent auditor any audit problems or difficulties and managements' response*; (10) setting clear hiring policies for employees or former employees of the independent auditors; (11) annually reviewing the adequacy of the audit committee's written charter; (12) handling such other matters that are specifically delegated to the audit committee by the board of directors from time to time; (13) reporting regularly to the full board of directors; and (14) evaluating the board of directors' performance.

[Emphasis added.]

14.     Each of the Individual Defendants, by virtue of their high-level positions with the Company, directly participated in the management of the Company, was directly involved in the day-to-day operations of the Company at the highest levels and was privy to confidential proprietary information concerning the Company and its business, operations, products, growth, financial statements, and financial condition, as alleged herein. Accordingly, the Individual Defendants were also involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, and approved or ratified these statements, in violation of the federal securities laws.

15.     As officers and controlling persons of a publicly-held company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, and was traded on the New York Stock Exchange (the "NYSE"), and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to disseminate promptly, accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings and present and future business prospects, and to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly-traded common stock would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and

omissions made in connection with the issuance of common stock in October 2007, violated these specific requirements and obligations.

16.     The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company at the time of the Offering. Each Individual Defendant was provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected. Accordingly, each of the Individual Defendants is responsible for the accuracy of the public reports and releases detailed herein and are therefore primarily liable for the representations contained therein.

**IPO Underwriter Defendants**

17.     The investment banks listed below are named as defendants in this action and are referred to collectively herein as the "Underwriter Defendants."  In connection with the October 2007 IPO, the Underwriter Defendants acted as "Lead Underwriters" of the Offering - - distributing 27.5 million shares of VM USA stock to investors, and initiating the first public market for VM USA shares.  The distribution of the VM USA shares awarded the Underwriter Defendants in the IPO occurred, as follows:

| Underwriters | Number of Shares |
| --- | --- |
| **LEHMAN BROTHERS INC.** | 8,525,000 |
| **MERRILL LYNCH, PIERCE, FENNER & SMITH INC.** | 8,112,500 |
| **BEAR, STEARNS & CO. INC.** | 8,112,500 |
| **RAYMOND JAMES & ASSOCIATES, INC.** | 1,375,000 |
| **THOMAS WEISEL PARTNERS LLC** | 1,375,000 |

9

Total                                    27,500,000

18.     In connection with the October 2007 IPO, the Underwriter Defendants were paid over

$23.718 million in gross fees - - paid indirectly by purchasers of the Company's shares.  The

Underwriter Defendants were paid at least $0.8625 per share in connection with the sale of the 27.5

million shares.

19.     In addition to the millions of dollars in compensation they received as Underwriters,

defendants Merrill Lynch and Bear Stearns also had a large, direct financial interest in the VM USA

IPO to the extent that they received approximately 20% of net proceeds of the Offering itself as

repayment of prior debt.  As evidence of the foregoing, the "Use of Proceeds" section of the IPO

Prospectus stated, in part, the following:

> **USE OF PROCEEDS**
>
> The Operating Partnership will use the sale proceeds (1) to repay a $150 million
> portion of the term loan outstanding under our senior secured credit facility, (2) to
> repay approximately $45 million of indebtedness owed to Sprint Nextel under the
> terms of our subordinated secured revolving credit facility and (3) for general
> corporate and other purposes.
>
> * * *
>
> ***Affiliates of Merrill Lynch and Bear Stearns are lenders under our senior secured
> credit facility and will receive approximately 9.4% and 11.7%, respectively, of the
> proceeds to us of this offering....***

[Emphasis added.]

20.     Shareholders were willing to, and did, pay over $23.7 million in combined fees to

compensate the Underwriter Defendants for conducting a purported significant "due diligence"

investigation into VM USA in connection with the IPO.  In addition, investors were also willing to

allow over $80 million of IPO proceeds to be paid directly to Underwriters Bear Stearns and Merrill

Lynch, because investors believed these payments would assure that the Underwriters conducted a

reasonable due diligence investigation to determine that the IPO was conducted in accordance with SEC rules, and state and federal regulations. The Underwriter Defendants due diligence investigation was, therefore, a critical component of the VM USA IPO, and this was supposed to provide investors with important safeguards and protections.

21.    The due diligence investigation that was required by the Underwriter Defendants included a detailed investigation into VM USA sales, accounting, controls, procedures and it also required defendants to test the assumptions and verify the projections adopted or ratified by defendants, to the extent a reasonable investor with access to such confidential corporate information would. A reasonable due diligence investigation would have extended well beyond a mere casual view of VM USA books and records, and its accounting, financial report and operational and financial controls. The failure of the Underwriter Defendants to conduct an adequate due diligence investigation was a substantial contributing factor leading to the harm complained of herein.

22.    Moreover, based on the special circumstances surrounding the VM USA IPO, defendants' due diligence investigation was of critical importance because, as defendants were well aware, material deficiencies in the Company's operating controls and accounting procedures were detected at the end of the second quarter of 2007, the period ended June 30, 2007. Evidence that the circumstances surrounding the VM USA IPO demanded from all defendants the most heightened due diligence pre-offering investigation appeared in the Registration Statement, in part, as follows:

> *We identified material weaknesses in our internal controls and procedures over financial reporting*. A material weakness is defined by the standards issued by the Public Company Accounting Oversight Board as a reasonable possibility that a material misstatement of the annual or interim financial statements will not be prevented or detected. *Our controls failed to detect the inaccurate reporting resulting from system interface failures for recovery fees for certain airtime taxes and regulatory charges and accrued revenues which affected several financial accounts including net service revenue, cost of sales, deferred revenue and accrued taxes.*

During the preparation of our financial statements for the six months ended June 30, 2007, we identified errors in our financial statements in the amount of $0.5 million, $(0.3) million, $(0.3) million and $3.8 million to our net income/(loss) for the years ended December 31, 2006, 2005, 2004 and for the three months ended March 31, 2007, respectively. *These errors, which we have determined to be material weaknesses in our internal controls over financial reporting, were primarily the result of system interface failures for recovery fees for certain airtime taxes and regulatory charges and accrued revenues, which overstated our net service revenue and overstated our cost of service in each period, except for the three month period ended March 31, 2007, which understated our net service revenue and overstated our cost of service....*

[Emphasis added.]

23.     Like the Individual Defendants, it is also appropriate to treat the Underwriter Defendants as a group for pleading purposes and to presume that the false, misleading and incomplete information conveyed in the Company's public filings, press releases and other publications as alleged herein are the collective actions of the narrowly defined group of defendants identified above.   Moreover, because of the Underwriter Defendants' and Individual Defendants' positions with the Company, they each had access to the adverse undisclosed information about VM USA's business, operations, products, operational trends, financial statements, markets and present and future business prospects *via* access to internal corporate documents (including the Company's operating plans, budgets and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof and *via* reports and other information provided to them in connection therewith.

### MATERIALLY FALSE AND MISLEADING STATEMETNS IN THE IPO REGISTRATION STATEMENT AND JOINT PROXY/PROSPECTUS

24.     At the time of the IPO, the Registration Statement and Proxy-Prospectus filed with the SEC and made available to investors described VM USA as a company with a unique business

plan to sell no-contract wireless telecom services, and a company that was experiencing strong

demand and consistent growth in subscribers, revenues and earnings. As evidence of this, the IPO

Prospectus stated, in part, the following:

> We are a leading national provider of wireless communications services, offering prepaid, or pay-as-you-go, services targeted at the youth market. Our customers are attracted to our products and services because of our flexible monthly terms, easy to understand pricing structures, stylish handsets offered at affordable prices and relevant mobile data and entertainment content. We believe that the appeal of our brand and products and services extends beyond our target audience and estimate that approximately half of our current customers are ages 35 and over. We offer our products and services on a flat per-minute basis and on a monthly basis for specified quantities, or buckets, of minutes purchased in advance—in each case without requiring our customers to enter into long-term contracts or commitments.

> We were founded as a joint venture between Sprint Nextel and the Virgin Group and launched our service nationally in July 2002, reaching one million customers in November 2003, within eighteen months of our national launch. *We have continued to grow our customer base rapidly and, as of December 31, 2006, we served approximately 4.57 million customers,* which we estimate represented approximately a 15% share of the pay-as-you-go market and *a 19.0% increase over the 3.84 million customers we served as of December 31, 2005.* As of June 30, 2007, we served approximately 4.83 million customers. *Our revenues and net loss for the year ended December 31, 2006 were approximately $1.1 billion and $(36.7) million, respectively. Our revenues and net income for the six months ended June 30, 2007 were approximately $666.9 million and $26.5 million, respectively.* As of June 30, 2007 and December 31, 2006, our members' accumulated deficit was approximately $(614.4) million and $(643.9) million, respectively.

[Emphasis added.]

25.     The IPO Registration Statement also reported the significant growth opportunities that

would continue to allow defendants to expand the Company's business in the foreseeable near-term,

including the factors that distinguished VM USA from its competitors, in part, as follows:

> We believe *that two key factors distinguish us from many of our competitors: our focus on the youth and pay-as-you-go segments of the U.S. wireless market and our mobile virtual network operator, or MVNO, business model.* Our focus on the youth and pay-as-you-go segments of the U.S. wireless market allows us to tailor our products and services, advertising, customer care, distribution network and overall operations to the needs and desires of our target market, which we believe is underserved by wireless providers. We control our customers' experience and all

customer "touch points," including brand image, pricing, mobile content, marketing, distribution and customer care. As an MVNO, however, *we do not own or operate a physical network, which frees us from related capital expenditures and allows us to focus our resources and compete effectively against the major national wireless providers in our target market.*

[Emphasis added.]

26.     The IPO Registration Statement also identified several "Competitive Strengths" that were purportedly allowing VM USA to compete effectively in the U.S. wireless telecom market including, in part, the following:

*Differentiated Market Approach.* We have been pioneers in the U.S. wireless industry, offering innovative, youth-oriented pay-as-you-go plans without long-term contracts or commitments....

*Strong Brand.* Virgin Mobile is the number one brand for prepaid wireless services in the United States in awareness and purchase consideration among 14-34 year-olds...

*Extensive and Efficient Distribution.* Our nationwide distribution network is comprised of 130,000 third party retail stores that offer account replenishment....

*Award-winning Customer Service.* ...In both 2006 and 2007, we were the sole recipient of the J.D. Power and Associates Award for wireless prepaid customer satisfaction.

*Capital Efficient Business.* Our mobile virtual network operator, or MVNO, business model, easy-to-understand products and services, cost-efficient distribution channels and focused marketing strategy have made us *one of the lowest cost operators in the wireless industry*..... In addition, we pay Sprint Nextel for wireless services only to the extent of our customers' usage. As a result, *we have a highly variable cost structure, which we believe has allowed us to reach profitability faster than if we were to maintain our own network.*

*Proven and Committed Management Team.* We are led by a highly experienced management team....

[Emphasis added.]

27.     The IPO Registration Statement also reported that the Company's "Business Strategy," would purportedly allow VM USA to "continue [its] growth and improve [its] profitability," in the foreseeable near-term, in part, as follows:

> ***Focus on Fast-growing Segments of U.S. Wireless Market.*** We focus on two fast-growing segments of the U.S. wireless market: youth and pay-as-you-go. We believe there is substantial demand in the United States for our straightforward and fun wireless communication services. According to the Yankee Group, in 2006, there were approximately 29.5 million pay-as-you-go wireless customers in the United States and such number is expected to grow to approximately 53.0 million by 2011, representing a 12.4% compound annual growth rate over the same period. ***We plan to*** <u>***continue to***</u> ***penetrate the youth segment and grow our market share by continuing to tailor our products, services and advertising message to this market, leveraging our brand through new and existing distribution channels and utilizing select youth-oriented media channels that specifically resonate with our target market***, such as MTV, Vice, Facebook.com, MySpace.com and outdoor billboards and postings in key trendsetting neighborhoods.
>
> ***Continue Product and Service Innovation.*** We have a proven ability to innovate and adapt to our customers' needs…. ***We intend*** <u>***to continue***</u> ***our efforts to address our market's evolving needs*** and to offer innovative and popular products and services ahead of our competitors.
>
> ***Enhance our Brand Strength.*** We <u>aim</u> <u>***to maintain and strengthen***</u> ***a vibrant brand image*** that resonates with our customers and distinguishes us from other wireless service providers….
>
> ***Leverage Our Scale and Infrastructure to Drive Profitable Growth.***     As of June 30, 2007, in five years since our national launch, we had grown our customer base to approximately 4.83 million. ***We have built the infrastructure to support future growth in customers and usage*** <u>***while leveraging the advantages of our predominantly variable cost structure***</u>. As we continue to scale the business, we expect our growing customer base to translate into ***improved cost economies without the need for substantial capital investment.***

[Emphasis added.]

28.     The IPO Registration Statement also reported the Company's financial results for the full years 2004, 2005 and 2006 and for the first six months of 2007. These results demonstrated the Company's purported financial strength -- as well as the positive revenue and earnings growth trends in VM USA's business -- in part, as follows:

| (in thousands, except share per share data and Other data unless otherwise indicated) | Virgin Mobile USA, LLC Fiscal Year Ended December 31, | | | Virgin Mobile USA, LLC Six Months Ended June 30, | | Pro Forma Consolidated Virgin Mobile USA, Inc. | |
|---|---|---|---|---|---|---|---|
| | 2004 | 2005 | 2006 | 2006 | 2007 | Year Ended December 31, 2006 | Six Months Ended June 30, 2007 |
| | | | | (Unaudited) | | (Unaudited) | |
| **Income statement data:** | | | | | | | |
| Operating revenue: | | | | | | | |
| Net service revenue | $ 567,006 | $ 883,816 | $1,020,055 | $ 508,345 | $ 632,050 | $ 1,020,055 | $ 632,050 |
| Net equipment revenue | 123,632 | 106,116 | 90,524 | 33,141 | 34,852 | 90,524 | 34,852 |
| Total operating revenue | 690,638 | 989,932 | 1,110,579 | 541,486 | 666,902 | 1,110,579 | 666,902 |
| Operating expenses: | | | | | | | |
| Cost of service (exclusive of depreciation and amortization) | 229,283 | 309,321 | 299,130 | 143,084 | 183,979 | 299,130 | 183,979 |
| Cost of equipment | 364,042 | 361,655 | 378,981 | 157,679 | 193,024 | 378,981 | 193,024 |
| Selling, general and administrative (exclusive of depreciation and amortization) | 253,178 | 346,470 | 401,732 | 187,365 | 219,405 | 405,763 | 220,372 |
| Loss (gain) from litigation | — | 29,981 | (15,384) | — | — | (15,384) | — |
| Depreciation and amortization | 12,891 | 19,413 | 28,381 | 13,124 | 16,731 | 28,381 | 16,731 |
| Total operating expense | 859,394 | 1,066,840 | 1,092,840 | 501,252 | 613,139 | 1,096,871 | 614,106 |
| Operating (loss)/income | (168,756) | (76,908) | 17,739 | 40,234 | 53,763 | 13,708 | 52,796 |
| Interest expense | 5,427 | 25,008 | 52,178 | 25,672 | 27,447 | 35,503 | 17,480 |
| Other (income)/expense | (305) | 949 | 2,268 | 1,445 | (200) | 2,268 | (195) |
| Minority interest | — | — | — | — | — | (4,407) | 6,606 |
| (Loss)/income before taxes | (173,878) | (102,865) | (36,707) | 13,117 | 26,516 | (19,656) | 28,905 |
| Income tax expense | — | — | — | — | — | — | — |
| Net (loss)/income | $(173,878) | $(102,865) | $ (36,707) | $ 13,117 | $ 26,516 | $ (19,656) | $ 28,905 |
| Net (loss)/income per share: | | | | | | | |
| Basic | N/A | N/A | N/A | N/A | N/A | $ (0.37) | $ 0.55 |

29.     The positive statements concerning the Company's, business, operations, competitive strengths and growth strategy, as well as its reported results from operations painted an unrealistically positive picture of the Company's operations and its foreseeable prospects at the time of the October 2007 IPO.  In fact, at the time of the IPO, VM USA had already reported a wider than expected loss for 3Q:07, defendants already knew that expenses were increasing above plan, and they

16

knew that VM USA would be forced to adjust guidance downward for 4Q:07 and full year 2007.  In addition to the foregoing, these statements were also materially false and misleading because they materially misstated or omitted to disclose, in part, the following:

(a)      At the time of the IPO, the Company had *already* completed its 3Q:07 and knew or recklessly or negligently disregarded that VM USA had reported wider then expected losses, and that defendants would be forced to lower guidance for 4Q:07 and full year 2007;

(b)      At the time of the IPO, the Company had failed to disclose that expenses were *already* rising above plan and that losses were widening, such that these material omissions rendered the Registration Statement and Prospectus, in light of the statements made by defendants and contained therein, materially false and misleading and in violation of GAAP, SEC reporting rules and the Company's own disclosure policies and procedures;

(c)      At the time of the IPO, VM USA's control deficiencies were much more sever than revealed, and the Company did not even maintain minimum standards of good Corporate Governance or controls and procedures, as is required by the SEC and the Company's own internal guidelines and standards of business conduct; and

(d)      At the time of the October 2007 Offering, defendants had *not* conducted an adequate due diligence investigation into VM USA, that would have revealed many of the adverse conditions complained of herein, and that would most likely have prevented the sale of this Company to shareholders through the public equity markets at that time, or at the inflated price at which these shares were originally sold.

**MATERIALLY FALSE & MISLEADING STATEMENTS**
**REGARDING GAAP & SEC ACCOUNTING RULE COMPLIANCE**

30.      In addition to the foregoing, the Registration Statement and Prospectus also contained misrepresentations and omissions related to VM USA's reporting in conformity with Generally

Accepted Accounting Principles, SEC accounting rules and the Company's own stated reporting

procedures. As evidence of this, the VM USA IPO stated, in part, the following:

### Critical Accounting Policies and Estimates

***Our consolidated financial statements are prepared in accordance with GAAP.***
Preparation of these consolidated financial statements requires us to make judgments,
estimates and assumptions which affect the reported amounts of assets and liabilities
and the disclosure of contingent assets and liabilities at the date of the consolidated
financial statements as well as the reported revenue and expenses during the
reporting periods. These estimates and judgments are subject to an inherent degree of
uncertainty. We believe that the estimates and judgments upon which we rely are
reasonable based upon information available to us at the time that these estimates and
judgments are made. ***We continually evaluate our judgments, estimates and
assumptions. To the extent there are material differences between these estimates
and actual results, our consolidated financial statements will be affected***.

### 2. Summary of Significant Accounting Policies

*Accounting Principles*

The financial statements and accompanying notes are prepared in accordance with
accounting principles generally accepted in the United States.

*Use of Estimates*

The preparation of financial statements in conformity with accounting principles
generally accepted in the United States requires management to make estimates and
assumptions that affect the reported amounts of assets and liabilities and the
disclosure of contingent liabilities at the date of the financial statements and reported
amounts of revenues and expenses during the reporting period…… Estimates and
assumptions are reviewed periodically and the effects of revisions are reflected in the
Financial Statements in the period they are deemed to be necessary. Actual results
could differ from those estimates.

\* \* \*

### VIRGIN MOBILE USA, LLC
### Notes to Financial Statements (Unaudited)

### Basis of Presentation

***The accompanying unaudited Financial Statements of Virgin Mobile USA, LLC
(the "Company") have been prepared in accordance with accounting principles
generally accepted in the United States of America and with Article 10 of Regulation
S-X.*** Accordingly, they do not include all information and disclosures necessary for a

presentation of the Company's financial position, results of operations and cash flows in conformity with accounting principles generally accepted in the United States of America. In the opinion of management, the interim financial information provided herein reflects all adjustments (consisting of normal and recurring adjustments) necessary for a fair presentation of the Company's financial position and its results of operations and cash flows for the interim periods presented on a basis consistent with the Company's historical audited financial statements and the accompanying notes included elsewhere in this prospectus. ***The results of operations for the six months ended June 30, 2007 are <u>not necessarily indicative</u> of the results to be expected for the full year….***

[Emphasis added.]

31.    Regarding the Company's accounting and financial reporting, the IPO Registration

Statement also stated, in part, the following:

### SUMMARY FINANCIAL AND OTHER DATA

The following table sets forth the summary historical and other data for Virgin Mobile USA, LLC and pro forma financial data for Virgin Mobile USA, Inc. as of the dates and for the periods indicated. Virgin Mobile USA, Inc. is a recently formed holding company which has not engaged in any business or other activities except in connection with its formation and the reorganization transactions described elsewhere in this prospectus. Accordingly, all financial and other information herein relating to periods prior to the completion of the reorganization transactions is that of Virgin Mobile USA, LLC. The summary balance sheet data as of December 31, 2005 and 2006 and the statement of operations data for each of the years ended December 31, 2004, 2005 and 2006 have been derived from Virgin Mobile USA, LLC's audited financial statements included elsewhere in this prospectus. ***The summary balance sheet data as of June 30, 2007 and the statement of operations data for the six months ended June 30, 2006 and 2007 have been derived from Virgin Mobile USA, LLC's unaudited financial statements included elsewhere in this prospectus….***

***The summary unaudited pro forma financial information has been developed by application of pro forma adjustments to the historical consolidated financial statements appearing elsewhere in this prospectus….. <u>The unaudited pro forma adjustments are based upon available information and certain assumptions that we believe are reasonable under the circumstances.</u>*** The summary unaudited pro forma financial information is presented for informational purposes only and is not necessarily indicative of and does not purport to represent what our financial position or results of operations would actually have been had the transactions been consummated as of the dates indicated. In addition***, the summary unaudited pro forma financial information is <u>not necessarily indicative</u> of our future financial condition or results of operations.***

19

[Emphasis added.]

32.     Unbeknownst to investors, however, the IPO Registration Statement and Prospectus were materially false and misleading and contained untrue statements of material fact and omitted to disclose material facts necessary to make defendants' statements, as set forth herein, not false and misleading.  Specifically, the Company's statements regarding VM USA's GAAP and SEC rule compliance failed to disclose that, at the time of the IPO, defendants violated and caused or allowed the Company to violate GAAP and SEC rules by failing to disclose that, prior to the IPO, the Company had posted a larger than expected loss in 3Q:07, expenses were rising above plan, and that the remainder of the year would not meet the Company's growth expectations.

33.     GAAP consists of those principles recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practice at the particular time.  Regulation S-X, to which the Company is subject as a registrant under the Exchange Act, 17 C.F.R. 210.4-01(a)(1), provides that financial statements filed with the SEC which are not prepared in compliance with GAAP, are presumed to be misleading and inaccurate.  SEC Rule 13a-13 requires issuers to file quarterly reports.

34.     However, pursuant to GAAP and pursuant to SEC Rule 12b-20, the Company's periodic reports must contain information that is necessary to make the required statements, ***in light of the circumstances under which they are made***, ***not misleading***.  In addition, Item 303 of Regulation S-K requires that, for interim periods, the Management Division and Analysis Section ("MD&A") must include, among other things, ***a discussion of any material changes in the registrant's results of operations*** with respect to the most recent fiscal year-to-date period for which an income statement is provided.

35.    *Instructions to Item 303 require that the this discussion identify any significant elements of registrant's income or loss from continuing operations that are __not__ necessarily representative of the registrant's ongoing business*. Item 303(a)(2)(ii) to Regulation S-K requires the following discussion in the MD&A of a company's publicly filed reports with the SEC:

> *Describe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations. If the registrant knows of events that will cause a material change in the relationship between costs and revenues (such as known future increases in costs of labor or materials or price increases or inventory adjustments), the change in relationship shall be disclosed*.

Paragraph 3 of the Instructions to Item 303 states in relevant part:

> *The discussion and analysis shall focus specifically on material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results or of future financial condition*. This would include descriptions and amounts of (A) matters that would have an impact on future operations and have not had an impact in the past. .

[Emphasis added.]

36.    The GAAP requirement for recognition of an adequate provision for foreseeable costs and an associated allowance applies to interim financial statements as required by Accounting Principles Board Opinion No. 28. Paragraph 17 of this authoritative pronouncement states that:

> The amounts of certain costs and expenses are frequently subjected to year-end adjustments even though they can be reasonably approximated at interim dates. *To the extent possible such adjustments should be estimated and the estimated costs and expenses assigned to interim periods so that the interim periods bear a reasonable portion of the anticipated annual amount.*

[Emphasis added.]

37.    The Company's financial statements contained in the IPO Registration Statement and Prospectus were presented in a manner that violated the principle of fair financial reporting and the following GAAP, among others:

(a)    The principle that financial reporting should provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit

21

and similar decisions (FASB Statement of Concepts No. 1).

      (b)     The principle that financial reporting should provide information about an enterprise's financial performance during a period (FASB Statement of Concepts No. 1).

      (c)     The principle that financial reporting should be reliable in that it represents what it purports to represent (FASB Statement of Concepts No. 2).

      (d)     The principle of completeness, which means that nothing material is left out of the information that may be necessary to ensure that it validly represents underlying events and conditions (FASB Statement of Concepts No. 2).

      (e)     The principle that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered (FASB Statement of Concepts No. 2).

      (f)     The principle that contingencies and other uncertainties that affect the fairness of presentation of financial data at an interim date shall be disclosed in interim reports in the same manner required for annual reports (APB Opinion No. 28).

      (j)     The principle that disclosures of contingencies shall be repeated in interim and annual reports until the contingencies and have been removed, resolved, or have become immaterial (APB Opinion No. 28).

      (k)     The principle that management should provide commentary relating to the effects of significant events upon the interim financial results (APB Opinion No. 28).

    38.    In addition, at the time of the October 2007 IPO, defendants also violated SEC disclosure rules and the Company's own stated disclosure policies and procedures, as follows:

      (a)     defendants failed to disclose the existence of known trends, events or uncertainties that they reasonably expected would have a material, unfavorable impact on net

revenues or income or that were reasonably likely to result in the Company's liquidity decreasing in a material way, in violation of Item 303 of Regulation S-K under the federal securities laws (17 C.F.R. 229.303), and that failure to disclose the information rendered the statements that were made at the time of the October 2007 IPO, materially false and misleading; and

(b)     by failing to file financial statements with the SEC that conformed to the requirements of GAAP, such financial statements were presumptively misleading and inaccurate pursuant to Regulation S-X, 17 C.F.R. §210.4-01(a)(1).

39.     Defendants were required to disclose, in the IPO Registration Statement and Prospectus, the existence of the material facts described herein - - including the adverse results for 3Q:07, ended September 30, 2007 - - and to appropriately recognize and report assets, revenues, and expenses in conformity with GAAP. The Company failed to make such disclosures and to account for, and to report, its financial statements in conformity with GAAP. Defendants knew, or were reckless in not knowing, the facts which indicated that the IPO Registration Statement and Prospectus which were disseminated to the investing public in connection with the IPO, were materially false and misleading for the reasons set forth herein.

40.     Had the true financial position and negative results of operations for the Company's 3Q:07 been disclosed prior to the IPO, defendants would not have been able to sell 27.5 million shares VM USA common stock at $15.00 per share, if at all.

## MATERIALLY FALSE & MISLEADING RISK DISCLOSURES

41.     In addition to the materially false and misleading statements and omissions regarding the Company's accounting, the Registration Statement and Prospectus also contained almost 25 pages of purported "Risk Disclosures," that were *not* designed or intended to alert investors to the true risk of investing in VM USA common stock - - including the risk that the Company's operations

23

were *already* behind plan, and that defendants *already* knew that the Company could not achieve the growth models that they forecast or adopted.  In fact, rather than disclose the risks that defendants *already* knew existed, the Registration Statement was designed to, and did, obfuscate the true risks facing investors, by diverting investors' attention to, in part, the following:

### Selected Risk Factors and Potential Conflicts of Interest

*Competition in the wireless industry*. The wireless communications market is extremely competitive, and competition for customers is increasing....

*Competitive pressure to reduce prices for our products and services*. To remain competitive with existing and future competitors, we may be compelled to offer greater subsidies for our handsets, reduce the prices for our services or increase the available minutes that we offer under our prepaid monthly, or hybrid, service plans....

*New service offerings*. We cannot be certain that our new service offerings will be profitable or successful....

*Customer turnover.* Our rate of customer turnover, or "churn," may be affected by several factors...

*Significant amount of debt*. The level of our indebtedness and restrictive debt covenants in our credit agreements could materially adversely affect our business....

*Tax receivable agreements*. We will be required to compensate Sprint Nextel and the Virgin Group for certain tax benefits....

*Large number of shares eligible for future sale and for exchange.* The market price of our Class A common stock could decline as a result of sales of a large number of shares of Class A common stock in the market after this offering....

*Use of proceeds.* Affiliates of Merrill Lynch and Bear Stearns are lenders under our senior secured credit facility and will receive a significant portion of the proceeds that we will receive in this offering and use to repay those borrowings.

*Dilution.*  The book value of shares of our Class A common stock purchased in this offering will be immediately diluted.

[Emphasis added.]

42.     The only purported selected risk disclosure that even discussed the Company's financial performance said nothing of the actual sub-par performance of 3Q:07 and, instead, it alerted investors only to contingencies that could possibly have an adverse impact VM USA, at some point in the unknown future, as follows:

> ***Short operating history***. We have a limited operating and financial history and cannot be certain that our MVNO business model will be profitable or competitive. We have experienced, and ***may continue*** to experience, operating losses and significant fluctuations in our revenues and cash flows. ***If*** our revenues and earnings growth are not sustainable, we ***may not*** be able to generate the earnings necessary to fund our operations, continue to grow our business, satisfy our debt covenants or repay our debt obligations.

[Emphasis added.]

43.     The expanded Risk Disclosure section was also designed to obfuscate the true risk of investing in the Company, and added little more insight into the actual risks concerning the Company's operational and/or financial performance, other than the following:

**Risks Related to Our Business**

> ***We have a short operating history which may not be indicative of our future performance and, if our revenue and earnings growth are not sustainable, we may not be able to generate the earnings necessary to fund our operations, continue to grow our business or repay our debt obligations.***

> We launched our service nationally in July 2002 and had no revenues before that time. Consequently, we have a limited operating and financial history upon which to evaluate our business model, financial performance and ability to succeed in the future. ***You should consider our prospects in light of the risks we may encounter, including risks and expenses faced by new companies competing in rapidly evolving and highly competitive markets***. We cannot be certain that our MVNO business model or any specific products or services ***will be*** profitable or competitive in the long-term against larger, facilities-based wireless providers or other MVNOs. We also cannot predict whether our MVNO model ***will allow*** us to offer the wireless services that customers may demand in the future. We have experienced, and ***may continue to experience***, significant fluctuations in our revenues and cash flows. If we are unable to achieve sufficient revenues and earnings from operations, our financial results ***will be*** adversely affected and we will not have sufficient cash to fund our current operations, sustain the continued growth of our business, satisfy our debt covenants or repay our debt obligations. Failure to satisfy our debt covenants (as has

25

occurred in the past) or make any required payments could result in defaults under our credit agreements. We have experienced, and *may* continue to experience, operating losses. In the event that we do become profitable, *we can provide no assurances that such profitability can or will be sustained in the future.*

\* \* \*

*Our business is seasonal, and we depend on fourth quarter customer additions; our results of operations for future periods will be affected negatively if we fail to deliver strong customer growth in the fourth quarter of any year.*

The wireless business in the United States generally, and in the prepaid business in particular, is seasonal and is often disproportionately dependent on fourth quarter results. *Our business has experienced a similar pattern and we expect this pattern to continue in the future.* If our fourth quarter customer additions fail to meet our expectations, it could adversely affect our results of operations and cash flows.

[Emphasis added.]

44.     In addition to the foregoing, other examples of non-relevant "risk disclosures" contained in the Registration Statement also included, in part, the following: (a) *Competition in the wireless industry could adversely affect our revenues and profitability*; (b) *We may face competitive pressure to reduce prices for our products and services, which may adversely affect our profitability and other financial results*; (c) *Failure to develop future service offerings may limit our ability to compete effectively and grow our business;* (d) *Higher than expected customer turnover could result in increased costs and decreased revenues, which would have an adverse effect on our profitability*; (e) *We may lose customers if we fail to keep up with rapid technological change occurring in the wireless industry*; (f) *Bulk handset purchase and trading schemes may curtail our ability to offer handsets at subsidized retail prices and thus limit our ability to acquire new customers or result in significant additional costs*; (g) *We have a significant amount of debt and are subject to restrictive debt covenants which could have important consequences related to the success of our business*; (h) *Our products and services are sold primarily through third party retail distribution partners, and the success of our business will depend in part on maintaining our*

relationships with these partners; (i) **As an MVNO, we are dependent on Sprint Nextel for our wireless network and any disruptions to such network may adversely affect our business and financial results**; (j) *Payments made to Sprint Nextel pursuant to the PCS services agreement are based on estimates, which may cause our reported quarterly results to be less reflective of our actual performance during a given period*; and (k) **We are dependent on our license agreement with the Virgin Group to use the Virgin Mobile brand**. (Emphasis added.)

45.    The purported "Risk Disclosures" contained in the Registration Statement and Prospectus were *not* designed or intended to alert investors to the true risk of investing in VM USA common stock - - including the risk that the Company's operations were *already* adversely impacted and behind plan, and that defendants *already* knew that the Company could not achieve the growth that they forecast.  In addition, these statements were also materially false and misleading for the reasons stated, herein, in ¶¶ 29, 32 - 39, *supra*.

## MATERIALLY FALSE & MISLEADING
## FORWARD-LOOKING STATEMENTS

46.    As a result of defendants' failure to report the below-plan results for 3Q:07, and their failure to revise guidance for the remainder of 2007, at the time of the October 2007 IPO the statements contained in the Registration Statement that purported to define which statements were "forward looking" were also false and materially misleading.  The statements identified as forward looking again portrayed the adverse conditions that were *already* impacting the Company, and that were already known by defendants at the end of 3Q:07, as mere contingencies or possibilities.  As evidence of the foregoing, the Registration Statement also stated, in part, the following:

### SPECIAL NOTE REGARDING FORWARD-LOOKING STATEMENTS

*This prospectus contains certain forward-looking statements and information relating to us that are based on the beliefs of our management as well as assumptions made by, and information currently available to, us*. These statements

27

include, but are not limited to, statements about our strategies, plans, objectives, expectations, intentions, expenditures, and assumptions and other statements contained in this prospectus that are not historical facts. When used in this document, words such as "anticipate," "believe," "estimate," "expect," "intend," "plan" and "project" and similar expressions, as they relate to us are intended to identify forward-looking statements. ***These statements reflect our current views with respect to future events***, are not guarantees of future performance and involve risks and uncertainties that are difficult to predict. Further, certain forward-looking statements are based upon assumptions as to future events that ***may not*** prove to be accurate.

Many factors ***could*** cause our actual results, performance or achievements to be materially different from any future results, performance or achievements that ***may*** be expressed or implied by such forward-looking statements. These factors include, among other things:

* changes to our business resulting from increased competition;

* our ability to develop, introduce and market innovative products, services and applications;

* our customer turnover rate, or "churn";

* bulk handset purchase and trading schemes;

* changes in general economic, business, political and regulatory conditions;

* availability and cost of the nationwide Sprint PCS network and Sprint Nextel's costs associated with operating the network;

* potential liability resulting from pending or future litigation, or from changes in the laws, regulations or policies;

* the degree of legal protection afforded to our products;

* changes in interest rates;

* changes in the composition or restructuring of us or our subsidiaries and the successful completion of acquisitions, divestitures and joint venture activities; and

* the various other factors discussed in the "Risk Factors" section of this prospectus.

Many of these factors are macroeconomic in nature and are, therefore, beyond our control. Should one or more of these risks or uncertainties materialize, or should underlying assumptions prove incorrect, our actual results, performance or

achievements may vary materially from those described in this prospectus as anticipated, believed, estimated, expected, intended, planned or projected. We neither intend nor assume any obligation to update these forward-looking statements, which speak only as of their dates.

[Emphasis added.]

47.     The statements in the Registration Statement and Prospectus intended to identify and define which statements were "forward looking" were also false and materially misleading. The statements identified as forward looking again portrayed the adverse conditions that were *already* impacting the Company, and which were known by defendants at the end of 3Q:07, as mere contingencies or possibilities. In addition, these statements were also materially false and misleading for the reasons stated, herein, in ¶¶ 29, 32 - 39, *supra*.

## INTERNAL CONTROLS

48.     As stated herein, *supra*, the October 2007 VM USA IPO required an extremely detailed due diligence investigation as a result of the aforementioned control deficiencies that were detected at the end of 2Q:07. Thus, at the time of the IPO, it was again critical to investors that defendants stated that the control defects detected earlier had been cured, and that the Company had sufficient controls and procedures in place such that VM USA complained with, at least, the minimum standards of good corporate governance required by practice and procedure. As evidence of this, the Registration Statement stated, in part, the following:

> …*We corrected these errors* through a restatement of our results for the three month period ended March 31, 2007 and an out-of-period net adjustment amounting to $(0.1) million (comprised of the cumulative effect of the prior year errors in the amount of $0.5 million, $(0.3) million and $(0.3) million for the years ended December 31, 2006, 2005 and 2004, respectively) reflected in our financial statements for the six months ended June 30, 2007 included in this prospectus. We have not restated our financial statements for any period ended on or prior to December 31, 2006, as *we do not believe these errors were material to any interim or annual prior periods. The impact of the out-of-period adjustments in 2007 are not material to our financial statements for the three month period ended March 31, 2007, the six month period ended June 30, 2007 and our projected*

*financial results for the year ending December 31, 2007*. Additionally, we plan to restate our interim results previously reported for the three months ended March 31, 2007 when we file our quarterly report on Form 10-Q for the period ending March 31, 2008 to reflect those out-of-period charges.

*We are in the process of implementing procedures to remediate the material weaknesses that include an external assessment of our revenue flows and control points*, the implementation of additional monitoring controls in the periodic reconciliations of the affected accounts and corrections to the interfaces responsible for the errors....

[Emphasis added.]

49.     The statements concerning the Company's controls and procedures, as well as the statements concerning the remedial actions taken by defendants to cure the defects that they knew, or recklessly or negligently disregarded at the time of the IPO, were materially false and misleading and omitted to disclose material facts necessary to make defendants' statements true and correct, because VM USA's control deficiencies were much more sever than revealed, and the Company did not maintain the most minimum standards of good corporate governance or controls and procedures, as is required by the SEC and the Company's own internal guidelines and standards of business conduct.   Moreover, at the time of the October 2007 Offering, defendants had *not* conducted an adequate due diligence investigation into VM USA, that would have revealed many of these adverse undisclosed conditions, and that would most likely have prevented the sale of this Company to shareholders through the public equity markets at that time, or at the inflated price at which these shares were originally sold.

## THE TRUE FINANCIAL AND OPERATIONAL CONDITION OF VM USA IS BELATEDLY DISCLOSED

50.     It was only on November 16, 2007, however, that investors learned the truth about VM USA's true financial and operational condition, after defendants revealed that the Company had suffered a widening loss for the third quarter, the period ended September 30, 2007, as a result of

unexpectedly high expenses.  For 3Q:07, the Company reported a loss of $7.3 million, or ($0.15) per share, compared with a loss of only $5.1 million, or ($0.10) per share, in the same period the prior year.  These results also contrasted the $28.9 million in net income and profits of $0.55 per share reported in the first six months of 2007, reported prior to the IPO.  At that time, defendants also revealed that fourth-quarter 2007 outlook called for approximately 350,000 to 400,000 net customer additions, an anemic amount analysts described as "weak," and that 4Q:07 guidance was "well below" expectations.

51.     Following the belated disclosure of lower then expected 3Q:07 results and higher then expected expenses, on November 16, 2007, the Company's stock price declined precipitously.  That day, shares of VM USA fell almost 30% in intra-day trading - - declining from an opening trading price of $11.09 per share to a trading low of $8.07 per share, before closing the trading day at $9.10.  That trading day, VM USA shares also experienced exceptionally heavy trading volume with over 6.512 million shares traded - - more than five times recent average daily trading volume.

52.     As investors realized, after the publication of these shocking and belated adverse revelations and admissions, the true but undisclosed negative conditions that existed at the time of the October 2007 IPO, and that continued to adversely impact the Company after that time included, in part, the following:

(a)     At the time of the IPO, the Company had *already* completed its 3Q:07 and knew, or was reckless or negligent in not knowing, that VM USA had reported wider then expected losses, and higher then expected expenses, and that defendants would be forced to lower guidance for 4Q and full year 2007;

(b)     At the time of the IPO, the Company had failed to disclose that expenses were *already* rising above plan and that losses were widening, such that these material omissions rendered

31

the Registration Statement and Prospectus, in light of the statements made by defendants and contained therein, materially false and misleading and in violation of GAAP, SEC reporting rules and the Company's own disclosure policies and procedures;

(c)     At the time of the IPO, VM USA's control deficiencies were much more severe than revealed and the Company did not maintain minimum standards of good corporate governance or controls and procedures, as is required by the SEC and the Company's own internal guidelines and standards of business conduct; and

(d)     At the time of the October 2007 Offering, defendants had *not* conducted an adequate due diligence investigation into VM USA, that would have revealed many of the adverse conditions complained of herein, and that would most likely have prevented the sale of this Company to shareholders through the public equity markets at that time, or at the inflated price at which these shares were originally sold.

## CAUSATION AND ECONOMIC LOSS

53.     In connection with the October 2007 VM USA IPO, defendants signed a materially false and misleading Registration Statement and filed with the SEC and made available to shareholders a materially false and misleading Prospectus. These filings were essential in allowing defendants to complete the Initial Public Offering of 27.5 million VM USA shares and raise over $412.5 million, and to create a public market for trading in Company stock, immediately thereafter.

54.     On November 16, 2007, when defendants' prior misrepresentations and illegal and improper conduct came to be revealed and was apparent to investors, shares of VM USA declined precipitously - - evidence that the prior artificial inflation in the price of Company shares was eradicated. As a result of their purchases of VM USA stock in connection with the IPO, including those who purchase shares traceable to the Offering in the public markets immediately thereafter,

32

plaintiff and other members of the Class suffered economic losses, *i.e.* damages under the federal securities laws.

55.     By improperly characterizing the Company's financial results and misrepresenting its prospects, the defendants presented a misleading image of VM USA's business and future growth prospects. The IPO Prospectus and Registration Statement emphasized the Company's operating controls and reporting procedures, and at the time of the October 2007 IPO defendants reported results that purported to show the Company's financial condition was improving both sequentially and year over year. These claims caused and maintained the artificial inflation in VM USA's stock at the time of the October 2007 IPO and, thereafter, until the truth about the Company was ultimately revealed to investors.

56.     On November 16, 2007, however, as investors learned the truth about the Company, and learned that the Company had reported a wider then expected loss for 3Q:07, the period ended September 30, 2007 - - ***two full weeks prior to the IPO*** - - and that growth had slowed such that the Company would be forced to lower guidance for 4Q and full year 2007, shares of the Company declined precipitously. Defendants' belated disclosures had an immediate, adverse impact on the price of VM USA shares.

57.     As a direct result of investors learning the truth about the Company, on November 16, 2007, VM USA's stock price collapsed to just above $8.00 per share, from above $11.00 per share - - a decline of almost 30%, on very heavy trading volume of over 6.51 million shares - - almost five times its average daily trading volume, and almost 25% of all shares issued in the October 2007 IPO. This dramatic share price decline eradicated much of the artificial inflation from VM USA's share price, causing real economic loss to investors who purchased this stock in, or in connection with, the VM USA IPO.

33

58.     The decline in VM USA's stock price following the revelation of defendants' belated disclosures on November 16, 2007, was a direct result that the nature and extent of defendants' misrepresentations and omissions contained in the IPO Prospectus became known to investors, and to the market. The timing and magnitude of VM USA's stock price decline negates any inference that the losses suffered by plaintiff and the other members of the Class were caused by changed market conditions, macroeconomic or industry factors or even Company-specific facts unrelated to defendants' fraudulent conduct. During the same period in which VM USA's share price fell almost 30% as a result of defendants' misrepresentations and omissions being revealed, the Standard & Poor's 500 securities index was relatively unchanged.

59.     The economic loss, *i.e.* damages suffered by plaintiff and other members of the Class, was a direct result of defendants' misrepresentations and omissions being revealed to investors, and the subsequent significant decline in the value of the Company's shares was also the direct result of defendants' prior misstatements and omissions being revealed, as evidenced by the chart below:



## CLASS ACTION ALLEGATIONS

60.     This is a class action on behalf of all persons who purchased VM USA shares, or traceable stock, pursuant to the October 2007 Registration Statement and Prospectus (the "Class"), excluding defendants.  Class members are so numerous that joinder of them all is impracticable.

61.     Common questions of law and fact predominate and include whether defendants: (i) violated the Securities Act; (ii) whether the VM USA IPO Registration Statement and Prospectus misrepresented material facts; and (iii) the extent of and appropriate measure of damages.

62.     Plaintiff's claims are typical of those of the Class.  Prosecution of individual actions would create a risk of inconsistent adjudications.  Plaintiff will adequately protect the interests of the Class.  A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## CLAIM FOR RELIEF

### For Violations of §11 of the Securities Act Against All Defendants and §15 of the Securities Act Against Defendants Sprint and Covina

63.     Plaintiff incorporates each and every allegation above as if stated herein.

64.     The Individual Defendants each signed VM USA's IPO Registration Statement and/or filed that Prospectus with the SEC and distributed it to investors.  The Underwriter Defendants each permitted their names to be included on the cover of the Prospectus as the Underwriters.

65.     On or about October 11, 2007, the defendants named in this Claim for Relief completed an IPO of 27.5 million shares of VM USA common stock priced at $15 per share, for total proceeds of at least $412,500,000.00

66.     Each of the statements alleged herein relating to VM USA's prospects and financial results made in the October 2007 Prospectus and Registration Statement were materially false or misleading when issued.  The true but concealed facts were that VM USA was not operating according to plan and that the Company had already recorded disappointing results for 3Q:07, and

35

defendants knew or recklessly or negligently disregarded that they would also have to lower guidance for 4Q:07 and full year 2007. These adverse conditions had already severely and adversely affected results of the Company prior to the Offering and would continue to hinder the Company in the foreseeable near-term. These omissions were a violation of SEC Regulation S-K, Item 303(a), which requires that trends which will have a material effect on a registrant's results be disclosed.

67.    All defendants named in this Claim for Relief, with the exception of VM USA, the issuer (whose liability for the misstatements is absolute), owed to the purchasers of the stock, including plaintiff and the Class, the duty to make a reasonable and diligent investigation of the statements contained in the Registration Statement and Prospectus at the time it became effective, to assure that those statements were true and that there was no omission to state material facts required to be stated in order to make the statements contained therein not misleading.

68.    The officers and directors of VM USA who were signatories to the Registration Statement and the Underwriter Defendants were responsible for the preparation of the Prospectus and the Registration Statement. By virtue of the material misrepresentations contained in the Registration Statement and Prospectus, plaintiff and the Class have been damaged.

**69.**    By reason of the conduct herein alleged, each defendant named in this Claim for Relief violated §11 of the Securities Act. Sprint and Corvina by reason of their stock ownership and positions with VM USA, were controlling persons of VM USA and are liable under §15 of the Securities Act.

## PRAYER

WHEREFORE, plaintiff prays for judgment as follows: declaring this action to be a proper class action; awarding damages, including interest; and such other relief as the Court may deem proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: November 21, 2007

CARELLA, BYRNE, BAIN, GILFILLAN,
CECCHI, STEWART & OLSTEIN

By: _____
    JAMES E. CECCHI

**Local Counsel for Plaintiffs
& the Class**

Kim E. Miller
**KAHN GAUTHIER SWICK, LLC**
12 East 41st Street – 12 Floor
New York, NY  10017
Telephone: (212) 696-3730
Facsimile:  (504) 455-1498

Lewis Kahn
**KAHN GAUTHIER SWICK, LLC**
650 Poydras Street - Suite 2150
New Orleans, LA  70130
Telephone: (504) 455-1400
Facsimile:  (504) 455-1498

**Attorneys for Plaintiff & the Class**

## CERTIFICATION PURSUANT TO LOCAL CIVIL RULE 11.2

I hereby certify that the matter in controversy is not the subject matter of any other action

pending in any court, or of any pending arbitration or administrative proceeding.

Dated: November 21, 2007

CARELLA, BYRNE, BAIN, GILFILLAN,
CECCHI, STEWART & OLSTEIN

By: _____
      JAMES E. CECCHI

**Local Counsel for Plaintiffs
& the Class**

Kim E. Miller
**KAHN GAUTHIER SWICK, LLC**
12 East 41st Street – 12 Floor
New York, NY  10017
Telephone: (212) 696-3730
Facsimile:  (504) 455-1498

Lewis Kahn
**KAHN GAUTHIER SWICK, LLC**
650 Poydras Street - Suite 2150
New Orleans, LA  70130
Telephone: (504) 455-1400
Facsimile:  (504) 455-1498

**Attorneys for Plaintiff & the Class**

**EXHIBIT A**

## CERTIFICATION IN SUPPORT OF APPLICATION FOR LEAD PLAINTIFF

MICHAEL VARE _____ (name) ("plaintiff") declares, as to the claims asserted under the federal securities law, that:

1.     Plaintiff has fully reviewed the facts of the complaint(s) filed in this action alleging violations of the securities laws and plaintiff is willing to serve as a lead plaintiff in this case and all other related cases that may be consolidated with it.

2.     Plaintiff did not purchase securities of Virgin Mobile USA, Inc. at the direction of counsel or in order to participate in a private action under the federal securities laws.

3.     Plaintiff is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

4.     During the Class Period, plaintiff has executed transactions in the securities of Virgin Mobile USA, Inc. as follows.  See Attached Schedule.

5.     In the last three years, plaintiff has not sought to serve as a representative party on behalf of a class in an action filed under the federal securities laws, except as indicated herein.

6.     Plaintiff will not accept payment for serving as a lead plaintiff beyond its _pro rata_ share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

Dated:   _11-20_____ , 2007

_____
Plaintiff

Name of plaintiff : MICHAEL Vare

Schedule of plaintiff's Transaction(s) in
Virgin Mobile USA, Inc.

Purchase(s):

| Date | Units | Price |
|------|-------|-------|
| 10/16/07 | 5000 | 15 73 |
| 10/16/07 | 2000 | 15 55 |
| 11/14/07 | 111 | 1142 |

Sale(s):

| Date | Units | Price |
|------|-------|-------|