James E. Cecchi
CARELLA, BYRNE, BAIN, GILFILLAN,
 CECCHI, STEWART & OLSTEIN, P.C.
5 Becker Farm Road
Roseland, NJ 07068
(973) 994-1700

Kim E. Miller
Melissa R. Clark
KAHN GAUTHIER SWICK, LLC
12 East 41st Street, 12th Floor
New York, NY 10017
(212) 696-3730

Lewis Kahn
KAHN GAUTHIER SWICK, LLC
650 Poydras Street, Suite 2150
New Orleans, LA 70130
(504) 455-1400

Co-Lead Counsel for Lead Plaintiff & the Class

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| IN RE VIRGIN MOBILE USA IPO LITIGATION | Civil Action No. 07-5619 (SDW)<br><br>**CONSOLIDATED AMENDED CLASS ACTION COMPLAINT and DEMAND FOR JURY TRIAL** |

Lead Plaintiff the Volpe Group, Aaron Cheng, Zhao Li, John Mekari, Michael Volpe and Alan Whiting, by way of Complaint against Defendants, says:

1.      This is a federal securities class action lawsuit brought on behalf of the purchasers of Virgin Mobile USA, Inc. ("Virgin Mobile" or the "Company") common stock pursuant to its October 10, 2007 initial public offering ("IPO" or the "Offering") seeking to pursue remedies under the Securities Act of 1933 (the "Securities Act").  In connection with this Offering, defendants sold 27.5 million shares of common stock and raised gross proceeds of at least $412.5 million.  The Class Period begins on October 10, 2007, the date of the IPO, and ends on March 12, 2008 when the true facts were fully revealed to the public.

2.      Virgin Mobile, its entire Board of Directors, its Chief Financial Officer and the Underwriters involved in the Offering, in addition to certain other controlling shareholders, are each charged with violating the Securities Act by creating and/or distributing a materially untrue and misleading registration statement, which includes the prospectus – the document intended to provide the public with detailed information relevant to their decision to invest in the Company –  in connection with the IPO.

## INTRODUCTION

3.      On October 10, 2007, Virgin Mobile issued its final registration statement and prospectus in connection with its IPO.  As evidenced by the presence of materially untrue statements and omissions in the registration statement, defendants failed to conduct an adequate due diligence investigation into the Company prior to the IPO.

4.      In contrast to the glowing financial results and rising income published in the registration statement for prior reporting periods, defendants failed to reveal the true material fact that Virgin Mobile was not performing according to plan at the time of the IPO.  In fact, as a result of this poor performance, results for the third quarter of 2007 – *the period which ended a full __two weeks prior__ to the IPO* – showed growing losses as expenses rose and business slowed, indicating

that the Company would be forced to revise its near-term forward financial and operational guidance downward.

5.     The Issuer Defendant, Virgin Mobile, is strictly liable for the materially untrue and misleading statements in the Registration Statement and Prospectus. All other defendants negligently disregarded these readily-available third quarter results and painted an unrealistically rosy picture of the Company's financial success and business outlook in its registration statement and prospectus.

6.     When the Company revealed these poor third quarter results and lowered fourth quarter guidance just a month after the IPO on November 15, 2007, Virgin Mobile's stock value plummeted 30% from $11.09 to close at $8.07 per share.

7.     What investors still did not yet know, even after the November 15, 2007 disclosure, was that financial concerns within the Company prior to and during the IPO extended beyond the shockingly poor third quarter results. Former employees of the Company report that the finance department became shaky as the Company focused on showing strong financials for the upcoming IPO. The Company lacked cash and began delaying and refusing payment to vendors. Just months before the IPO, although not publicly disclosed, Defendant Schulman informed employees that personnel would need to be reduced by about 100 employees. Although Defendant Schulman told employees this reduction would be made through natural attrition, the Company instead conducted undisclosed layoffs. According to a former employee who worked in revenue forecasting during the relevant time period (Confidential Witness ("CW") #1), the Company tried to keep layoffs quiet by telling employees they were being let go due to "performance issues" and not offering severance or notice. The Company fired several high-level employees as well as several marketing staff members located in Company headquarters. Television advertising was also cut prior to the IPO, which

contributed to declining customer additions in the fourth quarter. Making matters worse, the Company also had significant internal control issues, including that it was unable to reconcile its internal inventory records with those of its warehouses at the time of the IPO.

8.      On January 16, 2008, after the close of the fourth quarter, news of the marketing and advertising issues began to come to light upon the announcement that the Company's Chief Marketing Officer, Howard Handler, was resigning from the Company. On this news, Virgin Mobile stock again plummeted – losing nearly 20% of its value falling from $8.71 to $7.06 per share.

9.      As Virgin Mobile continued to struggle financially, it was unable to compete in the market with other providers. The Company's prospectus had warned that "[t]o remain competitive with existing and future competitors, [the Company] may be compelled to offer greater subsidies … [or] reduce the prices for [] services." The prospectus did *not* warn, however, that the Company was already experiencing cash flow issues and declining new subscriber rates and was financially *unable* to lower prices to remain competitive.

10.     Instead, during the fourth quarter, in an industry the Company acknowledged in its prospectus was "disproportionately dependent on fourth quarter results," Virgin Mobile did not match competitors' increasingly subsidized handset pricing.

11.     On February 4, 2008, the Company announced low preliminary fourth quarter and year end results including that it did not even meet the Company's own guidance which was revised less than three months prior. Rather than the 350,000 to 400,000 new subscribers that the Company had indicated it expected for fourth quarter, it had net customer additions of only 210,000. On this news of poor financial results and the Company's inability to compete in the market in this crucial quarter, Virgin Mobile stock again fell – dropping from $8.04 to a new low of $6.12 before finally closing at $7.10, 11% lower than the prior day's close.

4

12.     On March 12, 2008 in a press release announcing final fourth quarter financial results, the full truth was finally revealed as the Company expanded on the disappointing fourth quarter news, adding that churn (customer turnover) had risen for the quarter, and issued shockingly low first quarter 2008 guidance for the number of new subscribers the Company expected to attain and projected earnings per share, predicting only 5,000 to 20,000 new customers, down from more than 300,000 the same quarter of the previous year.  The Company acknowledged its unwillingness to engage in aggressive pricing tactics of its competitors to attain new customers, stating that "**while competitors were aggressively lowering prices in the fourth quarter to impact gross adds, we chose not to pursue what historically have proven to be lower value, low-tenure customers**." (Emphasis added).

13.     On this news, Virgin Mobile stock fell more than 40% in a single trading day to close at $2.46.

14.     As the truth was revealed to the market through this series of four partial disclosures between November 15, 2007 and March 12, 2008, Virgin Mobile share prices fell from the IPO price of $15 to a closing price of $2.46 -- a decline of over 80%.  As a result, investors who purchased pursuant to the IPO suffered damages**.**

### JURISDICTION AND VENUE

15.     The claims asserted herein arise under §§11 and 15 of the Securities Act of 1933 (the "Securities Act") (15 U.S.C. §§ 77k and 77o).  Jurisdiction is conferred by §22 of the Securities Act, (15 U.S.C. § 77v).

16.     Venue is proper pursuant to §22 of the Securities Act , as defendant Virgin Mobile maintains its executive offices and principle place of business in this District, and/or the Individual

Defendants and Underwriter Defendants conduct business in this district, and the wrongful conduct took place in, this District.

## THE PARTIES

### Lead Plaintiff

17.     The members of Court-appointed Lead Plaintiff the Volpe Group, Aaron Cheng, Zhao Li, John Mekari, Michael Volpe and Alan Whiting, purchased shares of Virgin Mobile common stock pursuant and/or traceable to the Company's materially untrue and misleading Registration Statement and Prospectus issued by defendants in connection with the October 2007 IPO, including those shares detailed in the group members' certifications, submitted with the Volpe Group's lead plaintiff motion and incorporated here by reference, and were damaged thereby.

### Issuer Defendant

18.     Defendant Virgin Mobile USA, Inc. ("Virgin Mobile") is a Delaware corporation headquartered in Warren, New Jersey and was formed in April 2007 shortly before of the October 2007 IPO.  According to Virgin Mobile's profile on Yahoo! Finance, Virgin Mobile provides wireless communications services, offering prepaid services to the youth market (ages 14-34) in the United States.  The Company also develops content and has relationships with third parties to procure and offer customized content, music, and other services, including short message services. The Company sells its products through direct and third-party distribution channels and, as of March 31, 2007, reported approximately 4.9 million customers.  Defendant Virgin Mobile was the issuer of the materially untrue and misleading registration statement and prospectus issued in connection with the October 2007 IPO.

**Controlling Corporate Defendants**

19.     Defendant Sprint Nextel Corp**.** ("Sprint"), a Kansas corporation, is, and at the time of the IPO was, one of the largest shareholders of the Company.  Prior to the IPO, Sprint controlled 46.63% of the Company's voting power, or over 23 million shares.  In connection with the October 2007 IPO, Sprint sold over 14.8% of its interest back to the Company, in addition to selling over 1.33 million shares to public investors in the Offering.  Accordingly, in connection with the October 2007 IPO, ***Sprint received gross proceeds of approximately $155 million***, in addition to the repayment of debt owed to Sprint Ventures of $45 million.  In connection with the IPO, defendant Sprint sold almost $20 million of its privately-held Company stock.

20.     Defendant Corvina Holdings Limited ("Corvina") is, and at the time of the IPO was, the largest shareholder of the Company, owning and controlling 46.41% of the Company's combined voting power prior to the IPO.  Corvina is a holdings company organized under the laws of the British Virgin Islands.  Approximately 87% of Corvina is held by Virgin Group Holdings Limited ("VGHL"), and the remaining 13% of Corvina is owned jointly by Gamay Holdings Limited ("Gamay") and certain senior executives of the Virgin Group – including Richard Branson, founder of Virgin Group.[1]  The address of each of the above referenced persons and entities is c/o La Motte Chambers, La Motte Street, St. Helier, Jersey, JE1 1BJ , Channel Islands, Attention: Abacus Secretaries (Jersey) Limited.

---

1 Gamay is a wholly-owned subsidiary of VGHL. VGHL is jointly owned by (i) Richard Branson, (ii) Cougar Investments Limited, (iii) Plough Investments Limited, (iv) Deutsche Bank Trustee Services (Guernsey) Limited, solely in its capacity as trustee on behalf of the Virgo Trust, The Libra Trust, the Jupiter Trust, the Mars Trust, the Venus Trust, the Leo Trust and The Gemini Trust, and (v) RBC Trustees (C.I.) Limited, solely in its capacity as trustee on behalf of The Aquarius Trust, The Aries Trust, the Capricorn Trust, The Pisces Trust and The Saturn Trust. The principal beneficiaries of the DB Trusts and the RBC Trusts are Richard Branson and/or certain members of his family.

**<u>Individual Defendants</u>**

21.     The individuals identified below are referred to collectively herein as the "Individual Defendants."   The Individual Defendants each signed the registration statement containing the prospectus and they are therefore liable for the materially untrue and misleading statements and omissions contained therein.  The Individual Defendants include the following:

(a)     Daniel H. Schulman ("Schulman") has been the Chief Executive Officer of Virgin Mobile since October 2001 and was both the CEO and a member of the Board of Directors at the time the untrue and misleading registration statement and prospectus were issued.  Schulman signed the materially untrue and misleading registration statement.

(b)     John D. Feehan, Jr. ("Feehan") joined Virgin Mobile in January 2002 as the Vice President of Finance and was promoted to Chief Financial Officer in August 2006.  Feehan was CFO at the time of the IPO and he signed the materially untrue and misleading registration statement.

(c)     Frances Brandon-Farrow ("Brandon-Farrow") has been a member of the board of directors for Virgin Mobile since June 2007 and has served on the board of directors of Virgin Mobile USA, LLC ("VM LLC"), an indirect, wholly-owned subsidiary of the Company, since its inception in October 2001.  Brandon-Farrow was a Director of the Company when the materially untrue and misleading registration statement and prospectus were issued and he signed the registration statement.

(d)     Douglas Lynn ("Lynn") has served on the Virgin Mobile board of directors since August 2007 and on the VM LLC board of directors since July 2006 – serving as a board alternate since February 2007.  At the time the untrue and misleading registration statement and prospectus were issued, Lynn was a Director for Virgin Mobile and was also Vice President of Corporate

8

Development for Sprint Nextel.  Lynn signed the materially untrue and misleading registration statement.

(e)      Mark Poole ("Poole") joined the Virgin Mobile board as a Director in June 2007. Pool was appointed Virgin Group CFO beginning in 2000 and the Deputy Group CEO in September 2005.  Poole was a Director at Virgin Mobile at the time the untrue and misleading registration statement and prospectus were issued.  Poole signed the materially untrue and misleading registration statement.

(f)      Robert Samuelson ("Samuelson") has been a member of the board of directors of Virgin Mobile since June 2007.  At the time of the IPO, Samuelson was also a member of the Virgin Group's Investment Advisory Committee, the body that recommends all new investments and corporate transactions for the Virgin Group and also served on the boards of Virgin Mobile Canada, Virgin Mobile France, and Virgin Mobile South Africa. Samuelson signed the materially untrue and misleading registration statement.

**Underwriter Defendants**

22.      In connection with the IPO, Lehman Brothers Inc.; Merrill Lynch, Pierce, Fenner & Smith Inc.; Bear, Stearns & Co. Inc.; Raymond James & Associates, Inc.; and Thomas Weisel Partners LLC (collectively, the "Underwriter Defendants") acted as lead underwriters of the Offering – distributing 27.5 million shares of Virgin Mobile stock to investors and initiating the first public market for Virgin Mobile shares.

23.     The distribution of the Virgin Mobile shares awarded the Underwriter Defendants in the IPO occurred, as follows:

| Underwriters | Number of Shares |
|---|---|
| LEHMAN BROTHERS INC. | 8,525,000 |
| MERRILL LYNCH, PIERCE, FENNER & SMITH INC. | 8,112,500 |
| BEAR, STEARNS & CO. INC. | 8,112,500 |
| RAYMOND JAMES & ASSOCIATES, INC. | 1,375,000 |
| THOMAS WEISEL PARTNERS LLC | 1,375,000 |
| Total | 27,500,000 |

24.     In connection with the IPO, the Underwriter Defendants were paid at least $0.8625 per share in connection with the sale of the 27.5 million shares, totaling nearly $24 million in gross fees – paid indirectly by purchasers of the Company's shares

25.     These fees were to compensate the Underwriter Defendants for conducting a purported significant "due diligence" investigation into Virgin Mobile in connection with the IPO. The Underwriter Defendants' due diligence investigation was a critical component of the Virgin Mobile IPO and was supposed to provide investors with important safeguards and protections.

26.     The due diligence investigation that was required of the Underwriter Defendants included a detailed investigation into Virgin Mobile sales, accounting, controls, procedures and it also required defendants to test the assumptions and verify the projections adopted or ratified by defendants to the extent a reasonable investor with access to such confidential corporate information would.  A reasonable due diligence investigation would have extended well beyond a mere casual

10

view of Virgin Mobile books and records, and its accounting, financial report, and operational and

financial controls.  The failure of the Underwriter Defendants to conduct an adequate due diligence

investigation was a substantial contributing factor leading to the harm complained of herein.

27.     Moreover, based on the special circumstances surrounding the Virgin Mobile IPO,

defendants' due diligence investigation was of critical importance because material deficiencies in

the Company's operating controls and accounting procedures were detected at the end of the second

quarter of 2007, the period which ended June 30, 2007.   Evidence that the Virgin Mobile IPO

demanded the most heightened due diligence investigation appeared in the registration statement, in

part, as follows:

> During the preparation of our financial statements for the six months ended June 30,
> 2007, we identified errors in our financial statements in the amount of $0.5 million,
> $(0.3) million, $(0.3) million and $3.8 million to our net income/(loss) for the years
> ended December 31, 2006, 2005, 2004 and for the three months ended March 31,
> 2007, respectively. **These errors, which we have determined to be material
> weaknesses in our internal controls over financial reporting, were primarily the
> result of system interface failures for recovery fees for certain airtime taxes and
> regulatory charges and accrued revenues, which overstated our net service
> revenue and overstated our cost of service in each period, except for the three
> month period ended March 31, 2007, which understated our net service revenue
> and overstated our cost of service....**

(Emphasis added.)

28.     In addition to the millions of dollars in compensation they received as Underwriters,

defendants Merrill Lynch and Bear Stearns also had a large, direct financial interest in the Virgin

Mobile IPO because they received approximately 20% (9.4% and 11.7% respectively) of the net

proceeds of the Offering as repayment of prior debt.

**MATERIALLY UNTRUE AND MISLEADING STATEMENTS
IN THE REGISTRATION STATEMENT AND PROSPECTUS**

**Materially Untrue and Misleading Statements Regarding the Company's
Financial Results and Business Operations**

29.     At the time of the IPO, the registration statement and prospectus filed with the SEC

and made available to investors described Virgin Mobile as a company with a unique business plan

to sell no-contract wireless telecom services, and a company that was experiencing strong demand

and consistent growth in subscribers, revenues and earnings.  As evidence of this, the IPO Prospectus

stated, in part, the following:

> We were founded as a joint venture between Sprint Nextel and the Virgin Group and
> launched our service nationally in July 2002, reaching one million customers in
> November 2003, within eighteen months of our national launch. **We have continued
> to grow our customer base rapidly and, as of December 31, 2006, we served
> approximately 4.57 million customers, which we estimate represented
> approximately a 15% share of the pay-as-you-go market and a 19.0% increase
> over the 3.84 million customers we served as of December 31, 2005**. As of June
> 30, 2007, we served approximately 4.83 million customers**.** Our revenues and net loss
> for the year ended December 31, 2006 were approximately $1.1 billion and $(36.7)
> million, respectively. **Our revenues and net income for the six months ended June
> 30, 2007 were approximately $666.9 million and $26.5 million, respectively**. As
> of June 30, 2007 and December 31, 2006, our members' accumulated deficit was
> approximately $(614.4) million and $(643.9) million, respectively.

(Emphasis added.)

30.     The registration statement also reported the Company's financial results for the full

years 2004, 2005, and 2006 and for the first six months of 2007. The results reported that total

operating revenue and net income increased year over year and from the first six months of 2006 to

the first six months of 2007.  These results demonstrated the Company's purported financial strength

as well as the positive revenue and earnings growth trends in Virgin Mobile's business.

31.     The statements in ¶¶28-29 were materially untrue and/or misleading because,

although the Company's third quarter *ended more than two weeks before the IPO* and these

12

financial results were readily available to Defendants, the registration statement failed to reveal that the Company's third quarter results showed: (1) a widened financial loss which was higher than the Company's projections and far worse than its recent performance reported in the Prospectus; (2) significantly increased expenses; and (3) significantly declining subscriber growth trends.

32.     An adequate due diligence investigation conducted prior to the IPO would have revealed the Company's poor third quarter results.

33.     According to a former employee who worked in product development during the relevant time period (CW #2), forecasting and financial reporting were done on both a daily and a weekly basis at Virgin Mobile and the Company executives conducted monthly operational reviews with business directors from each department and other management.  A former employee who worked in project management with the Company during the relevant time period (CW #3) noted that Virgin Mobile employed a forecasting software package that provided the Company trending and forecasting capabilities and the ability to closely monitor its numbers, enabling it to have a clear and current financial snapshot at all relevant times.

34.     According to a former employee who worked as an analyst with the Company during the relevant time period (CW# 4), there was a company-wide meeting in mid-2007 during which management suggested that although subscriber growth was increasing year after year, the Company had extremely high capital expenditures that kept the Company from showing revenues that corresponded with its growth.  Defendants, however, negligently disregarded this material fact and failed to include it in the registration statement.

**Materially Untrue and Misleading Statements Regarding the Company's
Competitive Strengths**

35.    The registration statement identified its capital efficient business and variable cost

structure as "Competitive Strengths" which would purportedly allow Virgin Mobile to compete

effectively in the U.S. wireless telecom market:

> ***Capital Efficient Business.*** Our mobile virtual network operator, or MVNO,
> business model, easy-to-understand products and services, cost-efficient distribution
> channels and focused marketing strategy have made us **one of the lowest cost
> operators in the wireless industry**….. In addition, we pay Sprint Nextel for wireless
> services only to the extent of our customers' usage. As a result, **we have a highly
> variable cost structure, which we believe has allowed us to reach profitability
> faster than if we were to maintain our own network.**

(Emphasis added.)

36.    The registration statement also reported the significant growth opportunities that

would continue to allow defendants to expand the Company's business in the foreseeable near-term,

including the factors that purportedly distinguished Virgin Mobile from its competitors, in part, as

follows:

> We believe that **two key factors distinguish us from many of our competitors:
> our focus on the youth and pay-as-you-go segments of the U.S. wireless market
> and our mobile virtual network operator, or MVNO, business model**. Our focus
> on the youth and pay-as-you-go segments of the U.S. wireless market allows us to
> tailor our products and services, advertising, customer care, distribution network and
> overall operations to the needs and desires of our target market, which we believe is
> underserved by wireless providers. We control our customers' experience and all
> customer "touch points," including brand image, pricing, mobile content, marketing,
> distribution and customer care. As an MVNO, however, **we do not own or operate a
> physical network, which frees us from related capital expenditures and allows
> us to focus our resources and compete effectively against the major national
> wireless providers in our target market.**

(Emphasis added.)

37.    Virgin Mobile also touted its ability to adapt and flexibility regarding competition:

*Continue Product and Service Innovation*.   We have a proven ability to innovate and adapt to our customers' needs. For example, in 2006 we launched a suite of new service plans that were designed to be more attractive to higher-usage customers. These monthly bucket plans include anytime and night and weekend minutes without long-term contracts or commitments. At the same time, we launched mobile social networking and Sugar Mama, an innovative new program that enables our customers to earn minutes by viewing and rating advertisements online. **We intend to continue our efforts to address our market's evolving needs and to offer innovative and popular products and services ahead of our competitors.**

\*\*\*

*Leverage Our Scale and Infrastructure to Drive Profitable Growth.*   As of June 30, 2007, in five years since our national launch, we had grown our customer base to approximately 4.83 million. **We have built the infrastructure to support future growth in customers and usage while leveraging the advantages of our predominantly variable cost structure. As we continue to scale the business, we expect our growing customer base to translate into improved cost economies without the need for substantial capital investment.**

38.    The Company also noted in its Company Overview that its "business is highly seasonal with our first and **fourth quarters reflecting higher net customer additions**…" and in its Quarterly Results of Operations that the Company **"typically generate[s] [its] highest level of gross additions in the fourth quarter of the year…."** (Emphasis Added).

39.    The statements in ¶¶34-37 were materially untrue and misleading because they failed to disclose that at the time of the IPO, the Company was unwilling and unable, even in the fourth quarter, to lower its prices to remain competitive with other providers.  The prospectus disclosed that it experienced a cost to acquire new customers – usually exceeding $100 per customer – but unbeknownst to investors, with customer turnover remaining steady and/or increasing, a rapid decline in net customer additions, and this loss to the Company each time a new customer is added, the Company could not afford to lower prices to remain competitive.  As a result, instead of remaining competitive by cutting customer costs, a disclosed business risk (*see infra,* ¶¶63-64),

Virgin Mobile maintained its failing customer acquisition strategy, even into the fourth quarter when this "highly seasonal" business should be "reflecting higher net customer additions."

### Materially Untrue and Misleading Statements Regarding the Company's Brand Strength, Marketing, and Advertising

40.     In support of the Company's purported strengths and opportunities for growth, the Company emphasized its brand strength and marketing and advertising strategies, stating, for example:

> ***Strong Brand.***    **Virgin Mobile is the number one brand for prepaid wireless services in the United States in awareness and purchase consideration among 14-34 year-olds,** according to Gallagher Lee Brand Tracking (fourth quarter 2006), and was rated as one of the top ten "trendsetting" brands in any sector in the United States by the Cassandra Report in 2004. We believe that our customers identify with brands and products that reflect their values and our marketing efforts focus on leveraging the popular attributes of the Virgin brand: fun, style, good value and social responsibility. We have exclusive rights to use the Virgin Mobile brand through 2027 for mobile voice and data services in the United States, U.S. Virgin Islands and Puerto Rico through our trademark license agreement with the Virgin Group.
>
> ***
>
> ***Enhance our Brand Strength.***    We aim to maintain and strengthen a vibrant brand image that resonates with our customers and distinguishes us from other wireless service providers. Our goal is to attract and retain customers through our youth-oriented marketing message and service offerings that are straightforward, flexible and a good value. For example, our marketing events in 2007 included the Virgin Festival by Virgin Mobile, a two-day event that drew approximately 72,000 fans to see major performing artists. **We will continue to enhance our brand through targeted marketing, advertising, product packaging, point-of-sale materials and innovative services.**

41.     The statements in ¶39 were materially untrue and omitted to disclose facts necessary to make them not misleading for the reasons stated above in ¶38 and because, at the time of the IPO, the Company was facing financial difficulty and cutting marketing personnel and advertising costs, significantly weakening its brand strength.

42.     According to CW #2, by no later than August 2007, growth prospects were not in accord with Virgin Mobile's plan and the Company's churn (monthly customer turnover) was rising and its usage levels were falling.  In addition, according to CW #4, further damaging the Company's financial prospects, Virgin Mobile was unable show revenues that corresponded with its growth – limited as it was – because its handsets subsidies were causing Virgin Mobile to experience a loss from growing its customer base.

43.     According to a former customer care employee who worked at Virgin Mobile during the relevant time period (CW # 5), in the months immediately prior to the IPO, the Company was facing financial difficulty and was unable to pay its bills and vendors.  As a result, the Company's finance department began delaying payment of its vendors to keep cash on hand.  CW #5 reported that Virgin Mobile was "very effective in dragging its feet and not paying the bills" and would "do all that was possible not to pay."

44.     Another former employee, a project manager who worked at Virgin Mobile during the relevant time period (CW #6), noted that he/she had difficulty getting his/her vendors paid as early as July 2007.  Accounts payable personnel disclosed to CW #6 that *none* of the Company's bills was being paid.  CW #6 stated payments were being delayed because the Company needed to increase its cash flow in anticipation of the IPO.  CW #3 also noted that many projects were being put on hold – likely to cut spending until the IPO.

45.     According to CW #6, a Company-wide meeting was held prior to the IPO at which the CEO, CFO, CMO, and General Counsel addressed employees.  CEO Defendant Schulman stated at this meeting that the Company would have to reduce manpower by over 100 employees.  This information was not disclosed to shareholders.  Despite Defendant Schulman's indication that this reduction would happen through natural attrition, several employees, including vice presidents of the

17

Company, were seen escorted out of the building after being laid off.  Lay-offs occurred with increasing frequency as the IPO date approached.

46.     A former employee who worked in various positions with Virgin Mobile during the relevant period, including in the accounts receivable department (CW #7), stated that the Company initiated a large, undisclosed layoff of between 30 and 50 employees in July 2007 – just months prior to the IPO. CW #2 also reported that the Company continued layoffs in August 2007 by firing approximately 12 people from Virgin Mobile's New Jersey headquarters– about half of whom were marketing personnel.

47.     Beyond the significant cuts of marketing and other key employees, advertising – especially television ads – was noticeably decreased beginning early 2007.

48.     Subsequent to the marketing and advertising cuts, the call volume at least one of Virgin Mobile's customer service centers, ICT Group in Colorado, dropped dramatically and customer growth noticeably decreased, according to a former ICT Group employee who was employed by ICT during the relevant time period (CW #8).

### MATERIALLY UNTRUE AND MISLEADING STATEMENTS REGARDING THE COMPANY'S INTERNAL CONTROLS

49.     As stated herein, *supra*, the IPO required an extremely detailed due diligence investigation as a result of the aforementioned control deficiencies that were detected at the end of 2Q:07.  Thus, at the time of the IPO, it was again critical to investors that defendants stated that the control defects had been cured, and that the Company had sufficient controls and procedures in place such that Virgin Mobile complained with, at least, the minimum standards of good corporate governance required by practice and procedure.  As evidence of this, the Registration Statement stated, in part, the following:

18

…**We corrected these errors** through a restatement of our results for the three month period ended March 31, 2007 and an out-of-period net adjustment amounting to $(0.1) million (comprised of the cumulative effect of the prior year errors in the amount of $0.5 million, $(0.3) million and $(0.3) million for the years ended December 31, 2006, 2005 and 2004, respectively) reflected in our financial statements for the six months ended June 30, 2007 included in this prospectus. We have not restated our financial statements for any period ended on or prior to December 31, 2006, as **we do not believe these errors were material to any interim or annual prior periods. The impact of the out-of-period adjustments in 2007 are not material to our financial statements for the three month period ended March 31, 2007, the six month period ended June 30, 2007 and our projected financial results for the year ending December 31, 2007**. Additionally, we plan to restate our interim results previously reported for the three months ended March 31, 2007 when we file our quarterly report on Form 10-Q for the period ending March 31, 2008 to reflect those out-of-period charges.

**We are in the process of implementing procedures to remediate the material weaknesses that include an external assessment of our revenue flows and control points**, the implementation of additional monitoring controls in the periodic reconciliations of the affected accounts and corrections to the interfaces responsible for the errors….

(Emphasis added).

50.     The statements concerning the Company's controls and procedures, as well as the statements concerning the remedial actions taken by defendants to cure the defects that they negligently disregarded at the time of the IPO, were materially untrue and misleading and omitted to disclose material facts necessary to make defendants' statements true and correct, because Virgin Mobile's control deficiencies were much more severe than revealed, and the Company did not maintain the most minimum standards of good corporate governance or controls and procedures.

51.     This lack of internal controls was evidenced by the release of a registration statement that failed to disclose material information regarding the Company's poor third quarter results, recent mass layoffs and advertising cuts, low cash availability, nonpayment of vendors, declining customer subscriber rates, and inability to lower prices as needed to compete with competitors.

19

52.     In addition, CW #3 reported that there were significant mistakes in the architecture of Virgin Mobile's IT platform and the Company was facing "downstream problems." For instance, Virgin Mobile used an outsourced fulfillment house for inventory and had a very difficult time in reconciling inventory numbers between its internal systems and the numbers in the fulfillment house's systems. According to CW#3, it was virtually impossible for Virgin Mobile to accurately know its inventory numbers at any given time.

53.     Also signifying internal control problems in line with this inability to reconcile data, CW #5 reported that in or around March 2007, Company Chief Information Officer Mark Parks and two IT vice presidents were fired.

54.     Moreover, at the time of the Offering, defendants had *not* conducted an adequate due diligence investigation into Virgin Mobile which would have revealed many of these adverse undisclosed conditions, and that would most likely have prevented the sale of this Company to shareholders through the public equity markets at that time, or at the inflated price at which these shares were originally sold.

## MATERIALLY UNTRUE AND MISLEADING STATEMENTS REGARDING THE COMPANY'S COMPLIANCE WITH GAAP AND SEC RULES

55.     The registration statement also contained material misrepresentations and omissions related to Virgin Mobile's reporting in conformity with Generally Accepted Accounting Principles ("GAAP"), SEC accounting rules, and the Company's own stated reporting procedures. As evidence of this, the Virgin Mobile prospectus stated, in part, the following:

**Critical Accounting Policies and Estimates**

*Our consolidated financial statements are prepared in accordance with GAAP. …*
*We believe that the estimates and judgments upon which we rely are reasonable based upon information available to us at the time that these estimates and judgments are made*. We continually evaluate our judgments, estimates and

20

assumptions. To the extent there are material differences between these estimates and actual results, our consolidated financial statements will be affected.

**2. Summary of Significant Accounting Policies**

*Accounting Principles*

The financial statements and accompanying notes are prepared in accordance with accounting principles generally accepted in the United States.

\* \* \*

**VIRGIN MOBILE USA, LLC**
**Notes to Financial Statements (Unaudited)**

**Basis of Presentation**

The accompanying unaudited Financial Statements of Virgin Mobile USA, LLC (the "Company") have been prepared in accordance with accounting principles generally accepted in the United States of America and with Article 10 of Regulation S-X.

(Emphasis added.)

56.    Unbeknownst to investors, however, the registration statement contained untrue statements of material fact and omitted to disclose material facts necessary to make defendants' statements, as set forth herein, not materially untrue and misleading.  Specifically, the Company's statements regarding Virgin Mobile's GAAP and SEC rule compliance failed to disclose that, at the time of the IPO, defendants violated and caused or allowed the Company to violate GAAP and SEC rules by failing to disclose that, prior to the IPO, the Company had posted a larger than expected loss in 3Q:07, expenses were rising above plan, and that the remainder of the year would not meet the Company's growth expectations.

57.    GAAP consists of those principles recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practice at the particular time.  Regulation S-X, to which the Company is subject as a registrant under the Exchange Act, 17

C.F.R. 210.4-01(a)(1), provides that financial statements filed with the SEC which are not prepared in compliance with GAAP, are presumed to be misleading and inaccurate. SEC Rule 13a-13 requires issuers to file quarterly reports.

58.     However, pursuant to GAAP and pursuant to SEC Rule 12b-20, the Company's periodic reports must contain information that is necessary to make the required statements, in light of the circumstances under which they are made, not misleading. In addition, Item 303 of Regulation S-K requires that, for interim periods, the Management Division and Analysis Section ("MD&A") must include, among other things, a discussion of any material changes in the registrant's results of operations with respect to the most recent fiscal year-to-date period for which an income statement is provided.

59.     Instructions to Item 303 require that this discussion identify any significant elements of registrant's income or loss from continuing operations that are not necessarily representative of the registrant's ongoing business. Item 303(a)(2)(ii) to Regulation S-K requires the following discussion in the MD&A of a company's publicly filed reports with the SEC:

> **Describe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations. If the registrant knows of events that will cause a material change in the relationship between costs and revenues (such as known future increases in costs of labor or materials or price increases or inventory adjustments), the change in relationship shall be disclosed**.

Paragraph 3 of the Instructions to Item 303 states in relevant part:

> **The discussion and analysis shall focus specifically on material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results or of future financial condition**. This would include descriptions and amounts of (A) matters that would have an impact on future operations and have not had an impact in the past. .

(Emphasis added).

22

60.    The Company's financial statements contained in the IPO Registration Statement and Prospectus were presented in a manner that violated the principle of fair financial reporting and the following GAAP, among others:

(a)    The principle that financial reporting should provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit and similar decisions (FASB Statement of Concepts No. 1).

(b)    The principle that financial reporting should be reliable in that it represents what it purports to represent (FASB Statement of Concepts No. 2).

(c)    The principle of completeness, which means that nothing material is left out of the information that may be necessary to ensure that it validly represents underlying events and conditions (FASB Statement of Concepts No. 2).

61.    In addition, at the time of the IPO, defendants also violated SEC disclosure rules and the Company's own stated disclosure policies and procedures, as follows:

(a)    defendants failed to disclose the existence of known trends, events or uncertainties that they reasonably expected would have a material, unfavorable impact on net revenues or income or that were reasonably likely to result in the Company's liquidity decreasing in a material way, in violation of Item 303 of Regulation S-K under the federal securities laws (17 C.F.R. 229.303), and that failure to disclose the information rendered the statements that were made at the time of the October 2007 IPO, materially untrue and misleading; and

(b)    by failing to file financial statements with the SEC that conformed to the requirements of GAAP, such financial statements were presumptively misleading and inaccurate pursuant to Regulation S-X, 17 C.F.R. §210.4-01(a)(1).

62.     Defendants were required to disclose, in the IPO Registration Statement and Prospectus, the existence of the material facts described herein - - including the adverse results for 3Q:07, ended September 30, 2007 - - and to appropriately recognize and report assets, revenues, and expenses in conformity with GAAP.  The Company failed to make such disclosures and to account for, and to report, its financial statements in conformity with GAAP.  Defendants were negligent in not knowing, the facts which indicated that the IPO registration statement was materially untrue and misleading for the reasons set forth herein.

63.     Had the true financial position and negative results of operations for the Company's 3Q:07 been disclosed prior to the IPO, defendants would not likely have been able to sell 27.5 million shares Virgin Mobile common stock at $15.00 per share, if at all.

## MATERIALLY UNTRUE AND MISLEADING RISK DISCLOSURES

64.     The Company warned in its so-called "risk factors" that if competitors lowered their prices, Virgin Mobile may be compelled to reduce prices and offer greater subsidies, stating, in part:

> *We may face competitive pressure to reduce prices for our products and services, which may adversely affect our profitability and other financial results.*
>
> As competition in the U.S. wireless communications industry has increased, providers have lowered prices or increased the number of minutes available under monthly service plans to attract or retain customers. **To remain competitive with existing and future competitors, we may be compelled to offer greater subsidies for our handsets, reduce the prices for our services or increase the available minutes that we offer under our prepaid monthly, or hybrid, service plans. The prices we charge our customers for services do not affect the amounts we pay to Sprint Nextel under the PCS services agreement, which is based on Sprint Nextel's costs plus a margin on the services we purchase. As a result, any further subsidies or price reductions that we offer in order to remain competitive may reduce our margins and revenues, and may adversely affect our profitability and cash flows.** … A shift to lower value or less loyal customers could have an adverse impact on our results of operations and cash flows.

(Emphasis Added).

65.     The Company's risk factors also noted the importance of remaining competitive and achieving customer growth in the fourth quarter:

> *Our business is seasonal, and we depend on fourth quarter customer additions; our results of operations for future periods will be affected negatively if we fail to deliver strong customer growth in the fourth quarter of any year.*
>
> **The wireless business in the United States generally, and in the prepaid business in particular, is seasonal and is often disproportionately dependent on fourth quarter results. Our business has experienced a similar pattern and we expect this pattern to continue in the future.** If our fourth quarter customer additions fail to meet our expectations, it could adversely affect our results of operations and cash flows.

(Emphasis Added).

66.     These so-called "risk factors" in ¶¶63-64 were materially untrue and misleading when made in the prospectus and registration statement because they omitted to disclose the true, adverse fact that that the Company would be unable to experience strong fourth quarter customer additions or lower prices as necessary to remain competitive.  As discussed in ¶¶34-38, *supra*, the Company was struggling financially, cut television advertising, and laid off many employees, including core marketing personnel.  As such, Virgin Mobile was unable to attract new customers and further unable to compete with other service providers because of weak marketing and the Company's inability to offer the discounts and subsidies provided by other companies.

67.     In addition to these materially untrue and misleading statements regarding competition, the prospectus also contained almost 25 pages of other purported "Risk Factors," that did ***not*** alert investors to the true risk of investing in Virgin Mobile common stock – including the risk that the Company's operations were *already* behind plan, and that defendants were *already* unable to achieve the growth models that they forecasted or adopted.

25

68.     The only purported selected risk disclosure that even discussed the Company's financial performance said nothing of the actual sub-par performance of 3Q:07 and, instead, it alerted investors only to contingencies that could possibly have an adverse impact Virgin Mobile, at some point in the unknown future, as follows:

> ***Short operating history***. We have a limited operating and financial history and cannot be certain that our MVNO business model will be profitable or competitive. We have experienced, and ***may continue*** to experience, operating losses and significant fluctuations in our revenues and cash flows. ***If*** our revenues and earnings growth are not sustainable, we ***may not*** be able to generate the earnings necessary to fund our operations, continue to grow our business, satisfy our debt covenants or repay our debt obligations.

(Emphasis added.)

## THE TRUTH EMERGES CAUSING PLAINTIFF'S
## ECONOMIC LOSS

69.     In connection with the October 2007 Virgin Mobile IPO, defendants signed a materially untrue and misleading Registration Statement and filed with the SEC and made available to shareholders a materially untrue and misleading Prospectus.  These filings were essential in allowing defendants to complete the IPO of 27.5 million Virgin Mobile shares and raise over $412.5 million, and to create a public market for trading in Company stock immediately thereafter.

70.     By improperly characterizing the Company's financial results and misrepresenting its prospects, Defendants presented a misleading image of Virgin Mobile's business and future growth prospects.  The IPO Prospectus and Registration Statement emphasized the Company's operating controls and reporting procedures, and at the time of the IPO, defendants reported results that purported to show the Company's financial condition was improving both sequentially and year over year.  These claims caused and maintained the artificial inflation in Virgin Mobile's stock at the time

of the IPO and immediately thereafter, until the truth about the Company was ultimately revealed to investors.

**November 15, 2007: The Company Reveals Poor Third Quarter Results**

71.     It was not until November 15, 2007 earnings conference call and press release, one month after the IPO, that the truth about Virgin Mobile's financial and operational condition began to be revealed.  At that time, defendants disclosed that the Company had suffered a widening loss for the third quarter, the period ended September 30, 2007, as a result of rising expenses.  For the third quarter, the Company reported a *loss* that was more than $2 million greater than the same period the prior year.  These results also contrasted the $28.9 million in net *income* reported in the first six months of 2007 reported prior to the IPO.  The Company's release stated:

> Virgin Mobile USA reported a net loss for the third quarter 2007 of $7.3 million, compared to a net loss of $5.1 million for the third quarter 2006. … Interest payments also increased….

> Virgin Mobile USA is presenting its earnings per share on a pro forma basis to reflect its IPO, which took place after September 30, 2007. Virgin Mobile USA reported a pro forma diluted loss for the third quarter 2007 of ($0.15) per share, compared to a pro forma loss of ($0.10) per share in the third quarter 2006.

72.     The Company announced in its press release that it added only 45,830 customers in the third quarter, compared with nearly double that amount in the same quarter of the previous year:

> Third quarter 2007 average monthly customer turnover, or churn, remained stable at 4.9% when compared to the third quarter 2006. **During the third quarter 2007, Virgin Mobile USA added 45,830 net new customers to its base, compared to 88,386 in the third quarter 2006.** As of September 30, 2007, the company had approximately 4.9 million customers, an increase of 23% over the same period last year. **Churn for the nine months ended September 30, 2007 was 4.9%, up from 4.6% during the same period a year ago**, due to a one-time impact of changes made earlier in the year within the company's hybrid offers, as well as normalization of reported churn as the customer base grows. Virgin Mobile USA added 302,127 net new customers to its base during the first nine months of 2007, an increase of 161% compared to the same period in 2006.

27

(Emphasis Added).

73.     Defendants also revealed in the November 15 disclosures that fourth quarter 2007 outlook called for between 350,000 and 400,000 net customer additions, an anemic amount that Stanford Group Company analyst Michael Gary Nelson analysts described as "weak."  The release also revealed that 4Q:07 guidance would be "well below" expectations.

74.     Defendant Schulman stated in a November 15, 2007 earnings conference call that:

> Given the continued weakening of the macroeconomic environment in our country over the past couple of weeks, I think it's prudent to assume that similar macroeconomic conditions will linger throughout 2008.  While this does impact our expectations for net service revenues in the current quarter and for the year, the strength and flexibility of our model allows us to offset this trend through cost efficiencies.

75.     Regarding a question about whether performance had worsened or improved in the last two weeks in November, Defendant Schulman stated: "If anything, it's relatively stabilized from there or perhaps slightly improved from there but enough that we want to take the trends that we've seen and put them out.  But, no. We haven't seen a further decline."

76.     On this news, the Company's stock price declined precipitously.  On November 16, 2007 shares of Virgin Mobile fell almost 30% in intra-day trading -- declining from an opening trading price of $11.09 per share to a trading low of $8.07 per share, before closing the trading day at $9.10.  That trading day, Virgin Mobile shares also experienced exceptionally heavy trading volume with over 6.512 million shares traded -- more than five times recent average daily trading volume.

### January 16, 2007: The Resignation of the Company's Chief Marketing Officer Reveals Financial and Marketing Problems

77.     Further revealing the gravity of Virgin Mobile's problems with customer accrual and retention – as evidenced by their previously reported lagging customer growth and slowing sales – the Company announced on January 16, 2008, after the end of the fourth quarter but before the

astonishingly poor results were disclosed, that Howard Handler, the Chief Marketing Officer of the Company, was resigning from the Company.  According to the January 2008 release, this resignation would become effective on March 31, 2008 – after the Company disclosed its disappointing fourth quarter 2007 and year end results.

78.    Upon the January 16, 2008 announcement that Howard Handler, the Chief Marketing Officer of the Company, was resigning from the Company, Virgin Mobile stock declined from a close on January 16, 2008 of $8.71 to a close of $7.06 the following day – a nearly 20% decline, on unusually high trading volume.

### February 4, 2008: The Company Reports Poor Fourth Quarter Results and its Inability to Compete

79.    On February 4, 2008, the Company shocked investors when it announced initial results for the fourth quarter of 2007 which **missed the Company's own projections** issued just months prior in its Q3:07 earnings statement.   The Company's churn, the number of subscribers who leave the service each month, was reported at 4.9% for the year -- slightly worse than the 4.8% reported for 2006.  In addition, rather than the 350,000 to 400,000 new subscribers estimated (a report analysts had already described as "weak"), the Company announced in a press release and 8-K that the Company expected fourth quarter net customer additions of only 210,000.

80.    According to a report published in the *Silicon Alley Insider* that same day:

The holiday season was a stinker for Virgin Mobile USA (VM), the "virtual" wireless carrier that re-sells access to Sprint Nextel's (S) network. **The company announced initial Q4 results today, and they were bad enough to send shares down as much as 24%, reaching a new all-time low at $6.12.**

**The worst news:** *The company missed its own projections, which it raised just a few months ago.* In its Q3 earnings release last Nov. 15 the company bumped up its Q4 growth forecast, predicting it would add between 350,000 and 400,000 net new subscribers. But today Virgin said it only added about 210,000 net subscribers during the quarter -- a huge

miss. **Virgin blames it on financial prudence, choosing "not to participate in the practice of aggressive handset pricing at the $5.99 level. "**

(Emphasis Added.)

81.     On this news, Virgin Mobile shares collapsed from a closing price on February 1, 2008 of $8.04 to a new low the next trading day, February 4, 2008, of $6.12.  The stock finally closed at $7.10 – a decline of more than 11% from the previous trading day's close on unusually high trading volume.

### March 12, 2008: The Full Truth Is Finally Revealed in the Company's Final Fourth Quarter Results and First Quarter 2008 Guidance

82.     On March 12, 2008, Defendants expanded on this revelation of disappointing results when the Company reported its final fourth quarter and year-end financials.  Virgin Mobile announced that it added less than 210,000 customers for the fourth quarter and just over 510,000 for the entire year – down significantly from the subscriber growth experienced by the Company in 2006 when it added 613,752 customers in the fourth quarter and brought in 729,313 for the year.  The Company also reported, for the first time, that customer churn for the fourth quarter had risen to 5.1%.  The Company also issued guidance for first quarter 2008 net customer additions of only 5,000 to 20,000 new customers – an extreme decline of new subscribers from the greater than 300,000 net additions in the same quarter the previous year.

83.     Again, Defendants blamed poor performance on the fact that  "while competitors were aggressively lowering prices in the fourth quarter it impact gross adds, we chose not to pursue what historically have proven to be lower value, low-tenure customers."  The IPO registration statement contained no risk factor to warn that defendants would be unable to compete with other providers (especially in the crucial fourth quarter).

84.     On this news that Virgin Mobile had been struggling to find and retain customers, remain competitive, or adequately market itself at the time of the IPO, Virgin Mobile stock again collapsed from a close on March 11, 2008 of $4.20 to a close of $2.46 the following day – a greater than 40% decline in value on exceptionally high trading volume.

**Additional Causation Allegations**

85.     The declines in Virgin Mobile's stock price following the revelation of defendants' belated disclosures on November 15, 2007, January 16, 2008, February 4, 2008, and March 12, 2008 were a direct result of the nature and extent of defendants' misrepresentations and omissions contained in the IPO Prospectus becoming known to investors and to the market. The falls in Virgin Mobile's share price immediately following each of the four public disclosures discussed in detail in this section is evidence that the prior artificial inflation in the price of Company shares was eradicated.

86.     The timing and magnitude of Virgin Mobile's stock price decline negates any inference that the losses suffered by Plaintiff and the other members of the Class were caused by changed market conditions, macroeconomic or industry factors or even Company-specific facts unrelated to defendants' misstatements and omissions.  During the same period in which Virgin Mobile's share price fell over 80% as a result of defendants' misrepresentations and omissions being revealed, the Standard & Poor's 500 securities index was relatively unchanged.

87.     As a direct result of their purchases of Virgin Mobile stock in connection with the IPO, including those who purchased shares traceable to the Offering in the public markets immediately thereafter, Plaintiff and other members of the Class suffered economic losses, *i.e.* damages under the federal securities laws.

## POST CLASS PERIOD DEVELOPMENTS

88.     An April 17, 2008 article on VentureBeat.com addressed Virgin Mobile's continuing

failure, potential layoffs, and inability to retain high-level technology employees, stating, in part:

> Virgin Mobile, the first company to prove you could offer wireless service to people
> for a profit using other carriers' infrastructure, may soon announce up to 300 layoffs.
>
> Virgin Mobile USA's management is mulling the plan, given the deterioration of its
> business outlook. If implemented, the cuts would impact jobs in the company's
> Northern California operations the most, VentureBeat has learned. A few marketing
> and sales jobs may be cut at the company's New Jersey headquarters. The company
> last month gave employees a heads-up about the possible cuts, spokeswoman Jayne
> Wallace confirmed in an interview, though she did not say how many cuts were being
> considered.
>
> She said the Virgin Mobile USA has a total headcount of 450. That makes a cut of
> 300 from the group's US operations alone extremely high, and we're scratching our
> head where they would come from, if they don't include the wider group.
>
> Virgin Mobile USA hasn't done very well since its initial public offering in Oct.,
> having lost 85 percent of its worth in a steady fall (see chart). Virgin offered a "pay-
> as-you-go" model, which provides customers more flexibility, but U.S. carriers have
> responded with similar plans and Virgin has seen serious defections. It is losing
> money, and last month it provided a grim outlook, citing both competition and the
> downturn in the economy for its woes....
>
> Virgin has given its four top executives pay raises of up to 30 percent percent, even
> as the stock has declined (and in part, *because* the stock has declined; their options
> are now worth nothing). The chief information technology officer position has been
> unfilled for months, after two CTOs quit within a year. [The company tells me Jim
> Gamm is now the CTO.]

### ADDITIONAL ALLEGATIONS REGARDING
### THE INDIVIDUAL DEFENDANTS

89.     Each of the Individual Defendants, by virtue of their high-level positions with the

Company (as well as those high-level positions with the Company's subsidiaries and affiliates),

directly participated in the management of the Company, was directly involved in the day-to-day

operations of the Company at the highest levels, and was privy to confidential proprietary

information concerning the Company and its business, operations, products, growth, financial statements, and financial condition, as alleged herein. Accordingly, the Individual Defendants were also involved in drafting, producing, reviewing and/or disseminating the untrue and misleading statements and information alleged herein, and approved or ratified these statements, in violation of the federal securities laws.

90.     As officers and controlling persons of a publicly-held company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, and was traded on the New York Stock Exchange (the "NYSE"), and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to disseminate accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings and present and future business prospects, and to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly-traded common stock would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions made in connection with the issuance of common stock in October 2007 violated these specific requirements and obligations.

91.     The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company at the time of the Offering. Each Individual Defendant was provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected. Accordingly, each of the Individual Defendants

is responsible for the accuracy of the public reports and releases detailed herein and are therefore primarily liable for the representations contained therein.

## ADDITIONAL ALLEGATIONS REGARDING
## THE UNDERWRITER DEFENDANTS

92.    Like the Individual Defendants, it is also appropriate to treat the Underwriter Defendants as a group for pleading purposes and to presume that the untrue, misleading, and incomplete information conveyed in the Company's public filings, press releases, and other publications as alleged herein are the collective actions of the narrowly defined group of defendants identified above.  Moreover, because of the Underwriter Defendants' positions, they each had access to the adverse undisclosed information about Virgin Mobile's business, operations, products, operational trends, financial statements, markets and present and future business prospects *via* access to internal corporate documents (including the Company's operating plans, budgets and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof and via reports and other information provided to them in connection therewith.

## NO SAFE HARBOR

93.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the untrue statements of material fact or material omissions pleaded in this complaint. The vast majority of the specific statements pleaded herein were not identified as "forward-looking statements" in the Prospectus and/or Registration Statement.

94.    To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

34

95.     Alternatively, to the extent that the statutory safe harbor does apply to any forward looking statements pleaded herein, Defendants are liable for those untrue forward-looking statements because at the time each of those statements was made, the forward-looking statement was authorized and/or approved by an executive officer of the Company.

## CLASS ACTION ALLEGATIONS

96.     This is a class action on behalf of all persons who purchased Virgin Mobile shares, or traceable stock, pursuant to the October 10, 2007 IPO.  Excluded from the Class are all defendants. The Class Period ends on March 12, 2008 when the facts were fully revealed.  Class members are so numerous that joinder of them all is impracticable.

97.     Common questions of law and fact predominate and include whether defendants: (i) violated the Securities laws; (ii) whether the Virgin Mobile IPO Registration Statement and Prospectus misrepresented material facts and/or omitted to state facts necessary in order to make other misstatements not untrue of misleading; and (iii) the extent of and appropriate measure of damages.

98.     Plaintiff's claims are typical of those of the Class.  Prosecution of individual actions would create a risk of inconsistent adjudications.  Plaintiff will adequately protect the interests of the Class.  A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## COUNT I
### (For Violations of §11 of the Securities Act Against Virgin Mobile)

99.     Plaintiff incorporates each and every allegation above as if stated herein.

100.    On or about October 11, 2007, Issuer Virgin Mobile completed an IPO of 27.5 million shares of Virgin Mobile common stock priced at $15 per share, for total proceeds of at least $412,500,000.00

101.    Each of the statements alleged herein relating to Virgin Mobile's prospects and financial results made in the October 2007 Prospectus and Registration Statement were materially untrue and/or misleading when issued.  The true but concealed facts were that Virgin Mobile was not operating according to plan and that the Company had already recorded disappointing results for 3Q:07, and defendants negligently disregarded that they would also have to lower guidance for 4Q:07 and full year 2007.  These adverse conditions had already severely and adversely affected results of the Company prior to the Offering and would continue to hinder the Company in the foreseeable near-term.  These omissions were a violation of SEC Regulation S-K, Item 303(a), which requires that trends which will have a material effect on a registrant's results be disclosed.

102.    Virgin Mobile is absolutely liable for the material misstatements and omissions in the registration statement and prospectus issued by it.

103.    Less than three years elapsed from the time that the securities upon which this Count is brought were sold to the public to the time of the filing of this action. Less than one year elapsed from the time when Plaintiff discovered or reasonably could have discovered the facts upon which this Count is based to the time of the filing of this action.

104.    By reason of the conduct herein alleged, the Issuer Defendant violated §11 of the Securities Act.

**COUNT II**
**(For Violations of §11 of the Securities Act Against the Individual Defendants)**

105.    Plaintiff incorporates each and every allegation above as if stated herein.

106.    The Individual Defendants each signed Virgin Mobile's IPO Registration Statement with the SEC and distributed the Registration Statement/Prospectus to investors.

107.    The Individual Defendants owed to the purchasers of the stock, including plaintiff and the Class, the duty to make a reasonable and diligent investigation of the statements contained in the Registration Statement and Prospectus at the time it became effective, to assure that those statements were true and that there was no omission to state material facts required to be stated in order to make the statements contained therein not misleading.

108.    The officers and directors of Virgin Mobile were signatories to the Registration Statement.  By virtue of the material misrepresentations contained in the Registration Statement and Prospectus, Plaintiff and the Class have been damaged.

109.    Less than three years elapsed from the time that the securities upon which this Count is brought were sold to the public to the time of the filing of this action. Less than one year elapsed from the time when Plaintiff discovered or reasonably could have discovered the facts upon which this Count is based to the time of the filing of this action.

110.    By reason of the conduct herein alleged, each of the Individual Defendants violated §11 of the Securities Act.

## COUNT III
**(For Violations of §11 of the Securities Act Against the Underwriter Defendants)**

111.    Plaintiff incorporates each and every allegation above as if stated herein.

112.    The Underwriter Defendants each permitted their names to be included on the cover of the Prospectus as the Underwriters.

113.    The Underwriter Defendants owed to the purchasers of the stock, including Plaintiff and the Class, the duty to make a reasonable and diligent investigation of the statements contained in

the Registration Statement and Prospectus at the time it became effective, to assure that those statements were true and that there was no omission to state material facts required to be stated in order to make the statements contained therein not misleading.

114.    The Underwriter Defendants were responsible for the preparation of the Prospectus and the Registration Statement.  By virtue of the material misrepresentations contained in the Registration Statement and Prospectus, Plaintiff and the Class have been damaged.

115.    Less than three years elapsed from the time that the securities upon which this Count is brought were sold to the public to the time of the filing of this action. Less than one year elapsed from the time when Plaintiff discovered or reasonably could have discovered the facts upon which this Count is based to the time of the filing of this action.

116.    By reason of the conduct herein alleged, each of the Underwriter Defendants violated §11 of the Securities Act.

## COUNT IV
## (For Violations of §15 of the Securities Act Against the Controlling Corporate Defendants)

117.    Plaintiff repeats and re-alleges each and every allegation contained above.

118.    This Count is brought pursuant to §15 of the 1933 Act against the Controlling Corporate Defendants: Defendants Sprint and Corvina.

119.    Each of these Controlling Defendants was a control person of Virgin Mobile by virtue of his or her position as a director and/or senior officer of Virgin Mobile or as a result of its large equity interest.  The defendants each had a series of direct and/or indirect business and/or personal relationships with other directors, officers, and/or major shareholders of Virgin Mobile.

120.    Each of the Controlling Defendants is liable for violating §15 of the 1933 Act based on their ability to control Virgin Mobile, which violated §11 of the 1933 Act as alleged in Count I

above. This ability stems from their management positions and/or ability to control those persons in management positions, access to information regarding Virgin Mobile's operations and/or financial condition, ability to cause and direct the dissemination of that information, and/or the ability to prevent the issuance of, correct, or cause to be corrected, the misleading statements in the Registration Statement and Prospectus.

121.    The Controlling Defendants, by reason of their stock ownership and/or positions with Virgin Mobile, were controlling persons of the Company and are liable under §15 of the Securities Act.

WHEREFORE, Plaintiff prays for judgment as follows: declaring this action to be a proper class action; awarding damages, including interest; and such other relief as the Court may deem proper.

CARELLA, BYRNE, BAIN, GILFILLAN,
CECCHI, STEWART & OLSTEIN
Co-Lead Counsel for Plaintiff & the Class

By:_____/s/ James E. Cecchi_____
        JAMES E. CECCHI

Dated: May 16, 2008

Kim E. Miller
Melissa R. Clark
KAHN GAUTHIER SWICK, LLC
12 East 41th Street, 12th Floor
New York, NY  10017
(212) 696-3730

Lewis Kahn
KAHN GAUTHIER SWICK, LLC
650 Poydras Street, Suite 2150
New Orleans, LA 70130
(504) 455-1400

Co-Lead Counsel for Plaintiff & the Class

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury as to all issues so triable.

CARELLA, BYRNE, BAIN, GILFILLAN,
CECCHI, STEWART & OLSTEIN
Co-Lead Counsel for Plaintiff & the Class

By:     /s/ James E. Cecchi
        JAMES E. CECCHI

Dated: May 16, 2008

Kim E. Miller
Melissa R. Clark
KAHN GAUTHIER SWICK, LLC
12 East 41st Street, 12th Floor
New York, NY  10017
(212) 696-3730

Lewis Kahn
KAHN GAUTHIER SWICK, LLC
650 Poydras Street, Suite 2150
New Orleans, LA 70130
(504) 455-1400

Co-Lead Counsel for Plaintiff & the Class