```
 1                    IN THE UNITED STATES DISTRICT COURT
                       FOR THE DISTRICT OF NEW JERSEY
 2                     CIVIL ACTION  2:07-cv-5619-SDW


 3
        MICHAEL VOLPE,             : TRANSCRIPT OF PROCEEDINGS
 4                                 :
                    Plaintiff      :      M O T I O N
 5                                 :
                    -vs-           :      Pages 1 - 92
 6                                 :
        DANIEL H. SCHULMAN, et als, :
 7                                 :
                    Defendants.    :
 8      - - - - - - - - - - - - - - -

 9                                     Newark, New Jersey
                                       March 9, 2009
10
        B E F O R E:   HONORABLE SUSAN D. WIGENTION,
11                       UNITED STATES DISTRICT JUDGE

12
        A P P E A R A N C E S:
13
             CARELLA BYRNE BAIN GILFILLAN CECCHI STEWART & OLSTEIN, PC
14           BY:   JAMES E. CECCHI, ESQ.
             Attorney for the Plaintiff
15
             KAHN, GAUTHIER, SWICK, LLC
16           BY:   KIM E. MILLER, ESQ.
             MELLISSA A. CLARK, ESQ.
17           Attorneys for the Plaintiff

18


19
        _____
20      Pursuant to Section 753 Title 28 United States Code, the
        following transcript is certified to be an accurate record as
21      taken stenographically in the above entitled proceedings.

22
                                  S/Carmen Liloia
23                                CARMEN LILOIA
                                  Official Court Reporter
24


25
```

```
 1
        APPEARANCES - continued
 2

 3      SILLS CUMMIS & GROSS, PC
        BY:  JEFFREY J. GREENBAUM, ESQ.
 4      Attorney for the Underwriter Defendants

 5
        SKADDEN ARPS, LLP
 6      BY:  SUSAN SULTZSTEIN, ESQ.
        Attorney for the Underwriter Defendants
 7

 8      DRINKER BIDDLE & REATH, LLP
        BY:  JEFFREY MATTHEW BEYER, ESQ.
 9      Attorney for the Defendants Virgin Mobile, Schulman, Feehan,
        Brandon-Farrow, Poole, Samuelson and Corvina Holdings
10

11      SIMPSON THACHER & BARTLETT, LLP
        BY:  JAMES GAMBLE, ESQ.
12      CHRISTOPHER LUCHT, ESQ.
        Attorney for the Defendants Virgin Mobile, Schulman, Feehan,
13      Brandon-Farrow, Poole, Samuelson and Corvina Holdings

14
        JONES DAY
15      BY:  ROBERT MICHELETTO, ESQ.
        BRONSON BIGELOW, ESQ.
16      Attorneys for Defendants Spirnt & Douglas Lynn

17
        LOWENSTEIN SANDLER, PC
18      BY:  SALLY MULLIGAN, ESQ.
        Attorney for Defendants Sprint Nextel and Douglas Lynn
19

20

21

22

23

24

25
```

```
 1              THE COURT:  All right, counsel.  This is the matter of
 2    In re Virgin Mobile, and it's civil action number -- it's part
 3    of multi-district litigation, but the civil action number for
 4    New Jersey's purposes is 07-5619.
 5              I do are your sign-in sheet.  Let's proceed and have
 6    everyone enter your appearances and we'll get started.
 7              MR. CECCHI:  Good morning, your Honor.  James Checchi,
 8    Carella Byrne, on behalf of the Plaintiff.  This morning with
 9    me is Kim Miller and Melissa Clarke from Kahn Gauthier Swick.
10              THE COURT:  Good morning to all of you.
11              MR BEYER:  Good morning, your Honor.  Jeffrey Beyer
12    from the law firm of Drinker Biddle & Reath, local counsel for
13    defendants Virgin Mobile, Corvina and the individual
14    defendants, other than Douglas Lynn.  With me here today is
15    co-counsel from Simpson, James Gamble and Christopher Lucht.
16              THE COURT:  Let me maybe sure.  Mr. Gamble, you're
17    number one.
18              MR. GAMBLE:  Well, I'm going to argue, at least.
19              THE COURT:  All right.  You're number one.  Go with
20    it.  You know what I mean?  If you get it, go
21              MR. GAMBLE:  Thank you, your Honor.
22              THE COURT:  James Gamble.  And, counsel, the second
23    seat, I'm sorry?
24              MR. LUCHT:  Christopher Lucht, your Honor.
25              THE COURT:  You're L-U-C-H-T?
```

```
 1              MR. LUCHT:  That's correct, your Honor.

 2              THE COURT:  L-U-C-H-T.  All right.

 3              And who's next?

 4              MS. MULLIGAN:  Good morning, your Honor.  Sally

 5    Mulligan from Lowenstein Sandler PC on behalf of the defendants

 6    SprinT Nextel and Douglas Lynn.  And I'm here with my

 7    co-counsel, Robert Micheletto of Jones Day, and his colleague

 8    Bronson Bigelow from Jones Day.

 9              THE COURT:  Good morning to both of you, Mr.

10    Micheletto.  Am I correct "letto"?  That is an O at the end of

11    that?

12              MS. MULLIGAN:  It is.

13              THE COURT:  All right.  And let me just get counsel,

14    also from Jones Day.  You guys signed up.  Counsel, what's your

15    name, I'm sorry?

16              MS. MULLIGAN.:  Sally Mulligan.

17              THE COURT:  You're other colleague.

18              MR. BIGELOW:  Bronson Bigelow.

19              THE COURT:  You're way back there.  I thought you were

20    introducing the woman that's there.  All right.  Bronson

21    Bigelow.

22              And, of course, I know you.  All right, Mr. Greenbaum.

23              MR. GREENBAUM:  Good morning.  Jeffrey T. Greenbaum,

24    Sills Cummis & Gross for the underwriter defendants.  With me

25    here today is Susan Sultzstein and her colleague William
```

 1      O'Brien from the Skadden Arps firm.

 2              THE COURT:  Excellent.  Good morning to you guys as

 3      well.  You have enough room back there, counsel?  You all

 4      right?  Want you to be comfortable.  I have a feeling we'll be

 5      hear for a while and I want everyone to be comfortable.

 6              We do have three applications pending essentially for

 7      the same thing.  It's a motion to dismiss before the Court.  I

 8      have read the written submissions that have been provided to

 9      the Court.  I wanted to give counsel an opportunity to be heard

10      orally, which is why we have scheduled today's hearing.

11              So with that being said, I'm going to -- I don't know

12      who filed first, quite honestly.  It doesn't really matter for

13      our purposes, but I'm going to start with you, Mr. Gamble, I'm

14      assuming you're arguing.

15              MR. GAMBLE:  I think that's right.

16              THE COURT:  See, number one

17              MR. GAMBLE:  Your Honor, I'm going to speak a fair

18      amount from this presentation, and I notice that we have two

19      folks who are sitting on this side of the room, who won't see

20      it very well.  Is it all right if I hand them copies?

21              THE COURT:  They're interns.  You're more than welcome

22      to.  They're very special.

23              MR. GAMBLE:  I can hand copies to anyone else.  Would

24      you like one?

25              THE CLERK:  Yes, please.

```
 1              THE COURT:  Do I have one, counsel?
 2              MR. GAMBLE:  No, but I can hand you one.
 3              MR. CECCHI:  You don't need it.
 4              THE COURT:  I don't need it, right, Mr. Cecchi.
 5              MR. GAMBLE:  The first time I gave a presentation they
 6         told me you shouldn't pass it out at the beginning because
 7         people will flip through.
 8              THE COURT:  We had that discussion in chambers, but I
 9         like it.
10              MR. GAMBLE:  You're going to decide.  I just assume
11         you flip to the end, the conclusion is good for us.
12              THE COURT:  Okay
13              MR. GAMBLE:  Your Honor, I'm going to go to the first
14         slide here which starts in an optimistic place, which is what
15         we agree on.  I'm going to note I have 31 slides, and this is
16         the only one that talks about things we agree about.  So I
17         don't want -- I want to have full disclosure that it's not
18         going to go necessarily quite as easily all the way through.  I
19         think these are important points.
20              The first think we have is the Rule 8 applies to many,
21         not all, but many of the plaintiffs' claims.  Plaintiffs have
22         argued that we're looking for a 9B standard on all of their
23         complaint.  We are not.  I'm going to get to the specific
24         claim.  I think 9B applies to later on, even there I will say
25         that they haven't met the Rule 8 standard, so I won't talk a
```

```
 1        lot about it, but I want to be clear about that.

 2              THE COURT:  Okay

 3              MR. GAMBLE:  The second thing we agree is Section 11

 4        does not impose a scienter requirement.  We're not arguing

 5        anything different than that.  The law is quite clear on that.

 6        However, however, I do want to be clear that plaintiffs' claims

 7        of a failure to disclose a material trend do require plausible

 8        allegations of knowledge because of item 303 of SK, and I will

 9        get to that specifically as well when we get there.

10              The third piece, the Court has to consider the

11        entirety of the documents on which plaintiffs rely, which means

12        you don't just look at the four corners of the complaint in the

13        case like this, you also have to look at the prospectus, you

14        have to look at SKs to which they cite because here context

15        matters.

16              And in the last point is that loss causation is an

17        affirmative defense under Section 11.  And we are not moving to

18        dismiss for failure to plead loss causation, that is also one

19        of the plaintiffs arguments, and we are not going there.  So,

20        again, loss causation is not part of our affirmative case here.

21        Okay.

22              So now let's talk about what's required to satisfy

23        Rule 8.  The plaintiffs' first argument is that they can

24        survive the motion to dismiss so long as, and this is a quote,

25        "under some set of facts consistent with the allegations" they
```

1    can recover.  But the law is the Supreme Court rejected that

2    standard in the Twombly case, and the new standard is that it

3    has to be more than merely conceivable, which I think is what

4    sort of is any set of facts standard really applies, or some

5    courts use it for it has to be more than really conceivable.

6    The Court has to nudge it past the conceivable to a place where

7    it's plausible on its face.  I think that the Third Circuit has

8    ruled on this in a way that's very helpful.

9          The Phillips case and the Burlington case picks up on

10   this, really defines this in a way that courts very commonly do

11   make decisions on motion practice decisions in a matter of law,

12   and that simply is it has to be a reasonable reading.

13         Now, I believe the other thing that the Phillips case

14   makes very clear that's important is the context matters, in

15   Phillips what that meant is the court actually looked at the

16   fact that it was a Sherman Act case and read the pleadings in

17   light of what the Sherman Acts' intentions were, as well as

18   read the pleadings in light of all the surrounding facts.

19         Here, what I think that the teaching of Phillips, that

20   context matters means is that you need to look at this in the

21   context of the overall Securities Laws, and the way the

22   Securities Law have developed and are developing.  And the key

23   point there is that the Securities Law in general, much more so

24   than virtually any other body of law we have, are designed to

25   permit courts to weed out meritless complaints at the motion to

1    dismiss phase.  There's a lot of case law that describes this.

2    There's a lot of scholarship around the Section 10B claims in

3    particular on the private Securities Law format that talk about

4    the fact that the laws really are designed to allow those

5    claims to be weeded out, and that's because discovery in these

6    cases is extremely in intrusive and completely expensive, so

7    courts don't want to have the interim effect of discovery to

8    create settlements that aren't ultimately fair.

9         I think, your Honor, what does Section 11 means

10   essentially and the simple statement, just what's quoted here,

11   and this is an omissions case, so I'm going to skip to the

12   omissions part of it which says:  If you're going to plead an

13   omission, you have to plead that there was a material fact

14   omitted or -- sorry, an omitted state of material fact required

15   to be stated therein.  That means they're under a duty because

16   it's specifically required or necessary to make statements

17   therein not misleading.  Simply put, if plaintiffs haven't

18   alleged a material omission, they haven't alleged a claim.  To

19   adequately allege an omission, the plaintiffs have to plead

20   that there was a duty to disclose the omitted fact.  Okay?

21        Well, whether a duty exists is determined by, and I've

22   cited here a Panther Partners case.  There are other cases

23   cited in our brief, but essentially -- the essential rule is

24   whether a duty exists to disclose is determined by the itemized

25   disclosures that are required by the Securities Laws and

1      regulations had are promulgated thereunder.

2            Well, here's where we get to I think sort of what is

3      at some level the crux of the case.  Where the allegation is a

4      failure to disclose a material trend, there's a line of cases,

5      Shaw starts it, Turkcell picks it up.  There's a number of

6      other cases that follow it -- again, they're cited in our

7      brief -- that say where you're alleging a failure to disclose a

8      material trend, what you have to allege is the trend was known,

9      which I'll talk about the fact that they haven't done that well

10     here, but that's really not going to be the crux of my argument

11     today.  That's in the papers.  Now, the crux of my argument is

12     going to be extreme departure part of the standard, and that

13     is, unless this trend that you're claiming was -- the company

14     failed to disclose was an extreme departure from the range of

15     results which could be anticipated based on currently available

16     information, it's not a material omission.

17           Now, the plaintiffs' actually acknowledge that item

18     303 limits disclosure obligations to known trends that are

19     extreme departures.  But I believe their argument, as I

20     understand it, is that they don't have to plead a violation of

21     303.  Because the defendants were, and here is a quote from

22     their opposition brief, were "also obligated under other duties

23     of due diligence and disclosure to disclose material omitted

24     facts."

25           I think what they're essentially saying is when

1    there's a general obligation not to omit material facts, and I

2    think they're missing the point I believe what the Shaw and

3    Turkcell line of cases says, if you want to understand what

4    constitutes a material omission when you're talking about a

5    trend, when you're comparing things period to period, okay,

6    when you're talking about a trend, how you know that something

7    is material and needs to be disclosed is that it meets the 303

8    standard, or meets the standard that's set out in Shaw and

9    Turkcell.

10           The key point, your Honor, is that it's not a separate

11   standard.  There's not the general material omission standard

12   and the 303 standard.  The explanation of 303 and the

13   regulation itself defines what's material in this context.

14           Okay, context.  The plaintiffs' case in large measure

15   comes down to one thing, and that is, that the company on

16   November 15th, announced what they call shockingly poor third

17   quarter results, which I will later tell you are certainly not

18   shockingly poor, but the plaintiffs state that there was a

19   disclosure on November 15th of what they call shockingly poor

20   third quarter results.

21           I also want to, and this is a quote from their papers,

22   and it says, "and fourth quarter guidance."  So we announce

23   both third quarter results and fourth quarter guidance on

24   November 15th.  And then the company stocks dropped 30 percent

25   the next day.  That's essentially the argument.  The argument

1    is, I think, what the plaintiffs -- what we're alleging that

2    the defendants failed to disclose must have been material to

3    the market because stock prices dropped by 30 percent.  Well,

4    this is context.  Okay?

5         Now, the Court's entitled to take account of closing

6    prices on the stock market in a motion to dismiss like this.

7    That's a matter of public record that you guys -- you're

8    absolutely entitled to look at.  What I put up here is just a

9    chart, and this chart does it, actually tracks the stock price

10   from essentially the day of the IPO, that little yellow line is

11   intended to be November 15, and then it goes on further than

12   that.

13        What -- this is really here to show your Honor the

14   decline began well before any allegedly quote unquote

15   corrective disclosure, so it couldn't have been based on what

16   they claim was a material omission because, according to them,

17   the market wouldn't have known about those material omissions

18   quote unquote until November 15th.  The stock price decline was

19   well under way by then.

20        I also have to note, and this is a technical term,

21   that it's going down in a way that's spiky.  By that all I mean

22   is it's highly volatile.  And so the mere fact of a volatile or

23   spiky drop and/or around November 15th doesn't tell you very

24   much and it particularly doesn't tell you very much because of

25   the fact that the plaintiffs also allege that on November 15th,

1      in addition to talking about our third quarter results, we talk

2      about our fourth quarter guidance.  And there is, I don't

3      believe, any allegation that the prospectus itself contained

4      any prior guidance, that there was any duty to give guidance.

5      And the law is very clear, there is no duty to give guidance or

6      publish interior projections, so that has to be a separated

7      piece, and that's a piece of context that matters.

8              I want to again just really reinforce for the Court

9      that looking at the context, looking at information like this,

10     is entirely appropriate on a motion to dismiss in the

11     securities class action.  You can look at securities cases that

12     are detailed in our brief, and you can look at Chubb.  You can

13     look at the N2K cases, Garber v. Legg Mason, Shaw, Turkcell --

14     again, all in our brief.  If you read those cases, your Honor,

15     what you will see is in each case the court goes through a

16     detailed analysis of the prospectus of the claims, and goes

17     sometimes line by line and does an analysis and asks itself,

18     okay, what have we -- you know, is this in fact alleging a

19     material omission.  All done on motions to dismiss, entirely

20     appropriate in this context.

21             THE COURT:  Let me just understand your chart, Mr.

22     Gamble.

23             MR. GAMBLE:  Sure.

24             THE COURT:  The chart has down there -- so the

25     November 30th, 2007 date at the top, what is that referring to?

1           MR. GAMBLE:  I'm sorry?

2           THE COURT:  It's right under -- where the chart square

3       begins.  It says Virgin Mobile U.S.A., Inc and the New York

4       Stock Exchange, that section.

5           MR. GAMBLE:  I think the November 30th date, and I'm

6       going to turn around and look at my colleague here, that would

7       be the date that we printed this off.  So that's not actually

8       relevant to the dates on the chart, I believe.

9           THE COURT:  Okay

10          MR. GAMBLE:  If you look, there's a center line that

11      says November 5.  So you go back at the bottom, it starts

12      around October 10, October 15, October 22, October 29,

13      beginning in November, 5, 12, 19, 26.

14          THE COURT:  Right.  So the stock is rising up until

15      the point of the IPO.  Right?

16          MR. GAMBLE:  Well, there really is no stock up until

17      the point of the IPO.  On the date of the IPO, it sort of jumps

18      up and pretty much starts down in the next day or two I believe

19      it starts down.

20          THE COURT:  Okay.

21          MR. GAMBLE:  One of the plaintiffs' argument is the

22      chart I just put up is only important in considering loss

23      causation.  I already said we're not arguing loss causation,

24      but I don't think the plaintiffs are correct.  I believe what

25      the law is, the context is important because the plaintiffs

1     have to show there were material omissions.  And the

2     plaintiffs' only allegation to support that the alleged

3     omissions were material is the stock drop.  The context shows

4     that plaintiffs' allegations can't be credited, even on a

5     motion to dismiss, because the stock drop isn't in any way

6     coincidence with what they claim to be the omissions.  And I

7     also want to again stress the fact there is that fourth quarter

8     information that's in the same place.

9          THE COURT:  But I think part of what they argue is

10    that two weeks prior to the IPO, there was information relating

11    to this third quarter, and the fact that profits were down, et

12    cetera.  And that wasn't disclosed.  So --

13         MR. GAMBLE:  Your Honor, you know what, this is, since

14    you've asked the question, let me get to it now.

15         THE COURT:  I'm probably on slide 40

16         MR. GAMBLE:  Well, no, I only have 31, so not 40.  But

17    you're about the middle of the thing, and I'll get to it in a

18    little bit more detail.  Since you asked it, let me get to it.

19         THE COURT:  Okay

20         MR. GAMBLE:  I think you're right in the sense the

21    hardest question for me to have to answer is, okay, I get the

22    fact that maybe there's no duty to disclose future projections,

23    but what the plaintiffs are really arguing is:  Hey, these

24    aren't future projections.  You are making comments about the

25    positive state of the company, and at that very time you had in

```
 1     your possession information about the third quarter that was
 2     essentially inconsistent with what those statements were.  And
 3     even -- at some level I suppose the plaintiffs could be saying:
 4     Even if it's inconsistent, even if we told them, as we did, we
 5     expect our expenses to continue to increase, or we expect our
 6     rate of net subscriber to decrease over past periods, even if I
 7     told you I had that prospective, but in fact it wasn't an
 8     expectation, I knew it to be true, am I not misleading you.  I
 9     think the answer to that, your Honor, is, to my mind, really,
10     really clear.  And I actually thought about this as I was
11     preparing this morning because I thought:  Maybe I'm making
12     this a lot more complicated than I have to.  My point is simple
13     and I'm going to use the example of the net subscriber
14     additions, which I'll get to later, and show you there are a
15     disclosures saying net subscribers went down from 2004 to 2006,
16     year on year.  We expect them to continue to go down,
17     explaining why we expect them to continue to go down.  And in
18     fact they do go down.  And the point I think is pretty simple.
19     If you show investors in your prospectus that net additions
20     have been decreasing for several years, and you tell them you
21     expect that to continue, you cannot possibly be guilty of
22     misleading those investors when in fact what you told them you
23     expected to happen, actually does.
24              Now, even if you assume, you already knew that the
25     disclosed trends of declining adds had continued in the third
```

```
 1    quarter, when they said in the prospectus they expected them to
 2    do so, that continuation of an already disclosed trend doesn't
 3    trigger an interim reporting obligation.  And the reason I
 4    thought it was really worthwhile addressing this in detail here
 5    instead of asking you to wait until I got to it later is that's
 6    a key point here, the Securities Laws have a disclosure program
 7    set up.  You're suppose to disclose every quarter, and then
 8    annually in your 10K.  And, yes, you can go to the market in
 9    between.  There is no generalized rule in Securities Law that
10    says:  When I put out a prospectus, I have to bring down my
11    audited financial statements to the day of my prospectus.  That
12    doesn't exist, and in fact as a practical matter, it just
13    couldn't.  Companies don't work that way.  Auditing doesn't
14    work that way.  It's not possible.
15         So what you have to do then is define when does an
16    interim obligation arise?  What is it that's sufficient to
17    trigger the need to stop in the middle one of those quarters
18    and say:  You know what, I think we better stop and tell people
19    something because we can't wait until the actual 10Q to be
20    filed.  That I think is what Shaw and Turkcell is about, were
21    it an extreme departure standard.  And I'll talk a little more
22    about the extreme departure standard.  The fact is, I really
23    looked at the stuff this morning when I thought about it.  I
24    don't think I have to get to extreme departure.  What I'm
25    saying to you flatly is that if I tell you that in the past my
```

1    net customer additions has gone down, and I tell you I expect

2    it to continue to -- in fact before my 10Q is out, I know in

3    fact, heck, look at that, it did, doesn't mean that on the day

4    that I say, gee, look at that, it did, I have to tell you.  It

5    means, everything I've told you before is still right.  It just

6    means that when the time comes to actually do my disclosures

7    where this particular piece of information is necessary and

8    appropriate to disclose because I'm hitting that period's

9    results, that I have to do it then.  That's really what I think

10   the key answer here is, your Honor.  Yes, the extreme departure

11   standard is, I think, the legal framework in which this fits

12   and I think what I'm saying is in a case like this where the

13   disclosures are so clear, and in fact all the company is doing

14   is following an existing trend rather than departing from it, I

15   think what you really have to look at is, say, whatever it is

16   that triggers that interim obligation, this clearly isn't it.

17           Let's go to the next slide.  To go back a little bit

18   to the standard and why context matters so much, your Honor.  I

19   think the Chubb case is a 9B case, and I want to be clear about

20   that.  It also talk about Rule 10B, but then it describes Rule

21   11 as well.  And I think it's -- what they say in Chubb is

22   important.  We've been clear that fraud cannot be inferred

23   merely because at one time the firm bathed itself in a

24   favorable light, but later the firm discloses that things are

25   less than rosy.  We have long rejected attempts to plead fraud

1    by hindsight.

2              So the mere fact that I said something was good at one

3    time and it turns out later that it's not, that in itself does

4    not give rise to a claim.  Granted that it's a 9B case.

5              I want to look at Castlerock, which is a District of

6    New Jersey case from this court, where the court actually

7    adopts the Shaw standard and Turkcell, and it's a case that

8    actually has a lot on point with this cases, the Castlerock

9    case does.  And that court says "that liability cannot be

10   imposed on the basis of subsequent events is no less the case

11   when a plaintiff proceeds under a negligence theory."  In other

12   words, fraud by hindsight isn't defined because of 9B.  Fraud

13   by hindsight is something you just can't plead because by

14   hindsight, it's not a material omission.

15             THE COURT:  They say they're not pursuing fraud.

16             MR. GAMBLE:  They saw they're not pursuing fraud.

17             THE COURT:  Right.

18             MR. GAMBLE:  Well, I think what Castlerock is saying,

19   you can't plead in a sense negligence by hindsight either, that

20   what you have to show essentially is that the statement, and

21   you can look at the text of the law, was untrue at the time it

22   was made.  That you can't simply say:  Well, things didn't work

23   out as well as we thought that they should.  That you actually

24   have to prove that something was untrue or was materially

25   omitted at the time the original set of statements were made.

1    Here, at the time of the prospectus.  I think that's really

2    what this stands for.  It's not necessary that you get to

3    fraud.  I think that's what I'm saying Castlerock really stands

4    for.

5         Now, I've talked about this a little bit already, but

6    the plaintiff do argue that we're raising factual disputes that

7    aren't properly determined on a motion to dismiss.  The law is

8    that issues like this are routinely decided as a matter of law.

9    I've noted two cases, the Trump case and the Burlington Coat

10   Factory case.  Again Burlington Coat is a 10B case.  Again, it

11   doesn't really matter in this context, they are courts deciding

12   issues of what's material, what's not, what's an omission,

13   what's not, after a thoroughly detailed analysis of both the

14   proceedings and the prospectus, itself, and other companies'

15   ancillary disclosures.

16        Now I get to the specifics.  For all of these, your

17   Honor, I think the short answer is on the specific three

18   buckets of what I think really are the crux of their claims,

19   which is there was a widened financial loss, that expenses were

20   increasing, and that our net subscriber additions were

21   decreasing.  The rate of net subscriber additions were

22   decreasing.  All three of those, the answer at this point is

23   pretty short, which is:  All disclosed.  It's all in the

24   prospectus.  The fact that that was happening and likely to

25   continue is all in the prospectus.

```
 1              Let me get to it with a little bit of more
 2    specificity.  The widened financial loss is probably the one
 3    that's a little bit different than that, but basically the
 4    same.  Because what the plaintiffs essentially claim is that
 5    the prospectus was untrue or misleading because we didn't tell
 6    people that the third quarter showed a widened financial loss.
 7    Again, I'm not dealing a lot with knowledge here.  I don't
 8    think the plaintiffs have met the knowledge standard.  We've
 9    talked about that in our brief.  But I'm going to skip over
10    that and say I don't concede it, and I'll rest on the papers
11    for that because I want to talk about the departure standard.

12              Here, I don't even need to get to knowledge in the
13    first instance because if you look at the actual document that
14    reports this allegedly widening financial loss, here's what it
15    says.  Then the third quarter of '06, and what the plaintiffs
16    do is compare the third quarter of the '06 loss to the third
17    quarter of '07 loss, and they do that because we have a Virgin
18    cyclical business, you know, the fourth quarter people buy
19    telephones for Christmas.  There's a lot of costs associated
20    with that.  But then, because the substantial base increases,
21    that revenue ramps up later in the year.  So there's a lot of
22    seasonality here.  They compare quarter on quarter.

23              When we disclose our third quarter '07 results, we
24    make the point, and this is also disclosed in the prospectus
25    because they're doing it on an annual basis, it's a little more
```

```
 1    complicated.  It's primarily the basis of a one-time 11.4
 2    million dollar favorable impact on the third quarter '06
 3    associated with the reversal of an accrual for settlement.
 4          So absent that, okay, absent that favorable impact,
 5    essentially we had a litigation reserve up, and we released it
 6    because we had a better settlement then we thought we were
 7    going to get.  Absent that, the actual clause in Q3 is 16.5
 8    million dollars in Q3 of '06.  VMU lost 7.3 million dollars in
 9    Q3 of '07.  Apples to apples.  The lass declined, it didn't
10    widened.  You can say:  Gee, the technical gap number of 5.1 is
11    also reported there, couldn't an investor think that was the
12    important number as opposed to it on what I've called an apples
13    to apples basis?  I think the short answer to that is no.  That
14    you have to take this in contention.  You have to look at the
15    full disclosure, and while 5.1 is maybe the line item that GAAP
16    had them put up there.  GAAP is a package of rules, and it does
17    require additional disclosure to round specific numbers.  And
18    the fact that we also disclose the content, the quality of the
19    earnings number, is something that an investor would take into
20    account.  And, again, when I say that, I can almost hear the
21    wheels grinding behind me saying:  Ah, an investor would take
22    into account.  I point the Court to Garber v. Legg Mason.
23    The Garber vs. Legg Mason.  Legg Mason is an asset manager.
24    And they acquired Citibank's asset management business.  It was
25    a very large merger.  Citibank -- after the merger, but before
```

```
 1        Citibank did a secondary offering, so there was a Section 11

 2        component to this, before Citibank did the secondary offering,

 3        one of Legg Mason's sort of superstar asset managers came to

 4        them and said:  You know what, guys, I'm going to leave.  I

 5        don't like the combined entity, I'm going to take off, and I'm

 6        going the take 8.5 billion dollars of asset management with me.

 7        And that was acknowledged by all parties that Legg Mason knew

 8        that before the prospectus went out for the secondary offering.

 9        And the Court in Legg Mason found that's not material as a

10        matter of law.  That's not material.  Why?  Because in a

11        context of a merger, any reasonable investor would understand

12        that the departure of some employees is not only possible, but

13        likely.

14               And I think what you have to say is the same thing

15        here.  You don't have to reach far, but you do have to

16        acknowledge that a reasonable investor, somebody operating at

17        all in the market, is not just going to look at a bare number.

18        They're going to look the entirety of the statements around it

19        and they're going see that 5.1 billion, that that contains 11.4

20        million dollar release of litigation reserve just as a going

21        forward basis.  You would look at that and you would have to

22        take that into account and make an investment decision.  I

23        think you have to understand an investor would take that into

24        account here.

25               Again, all I'm saying here, your Honor, is that under
```

```
 1          the law, that the Court can't credit allegations that are
 2          actually inconsistent with the very documents that they rely --
 3          the plaintiffs rely on.  And here, since the plaintiffs haven't
 4          pled a widened loss, there can't possibly be a material
 5          omission.  And that takes us to their next allegation, which is
 6          the registration statement is misleading because it omits to
 7          disclose that the company -- the third quarter results showing
 8          significantly increased expenses.
 9                   Now, this is what the prospectus says.  Cost of
10          services has gone up by 28.6 percent for the six months
11          going -- for six months of the year '07.  Cost of the equipment
12          has gone up for the same six months by 22.4 percent.  Selling,
13          general and administrative expenses, up 17.1 percent up.
14          That's all in the prospectus.  What is that saying?  Our
15          expenses are increasing.
16                   If you look at this chart, it's actually in our brief.
17          I'm not going to spend a lot of time on it, but what you look
18          at when you look at it, it shows you that in fact the six
19          months that are disclosed.  Then if you look at it over the
20          nine-month period, that includes our third quarter earnings
21          that are announced on November 15th.  The numbers are extremely
22          consistent.  A little bit of an uptake in cost of service.
23          Actually the cost of the equipment.  And the SG&A expenses go
24          down.
25                   Now, what plaintiffs have said about this in their
```

1    opposition brief, which is an argument not in the pleadings at

2    all, but it's in their opposition brief as well.  Yeah, but you

3    know, before your increased expenses were all because you were

4    adding subscribers so fast.  And that meant you spent money on

5    hand sets and other things.  And here you had declining net

6    subscriber additions, and so that, that means it's a different

7    reason, and the fact that it was trending downward -- that your

8    expenses were continuing to increase, even though you weren't

9    adding subscribers, well, that's different, and that it's a

10   substantially different fact, and that you had to disclose.

11        I think here they just got the analysis wrong.  And

12   this, again, if you look at the cases, you'll see this is

13   exactly the kind of analysis courts do.  The primary expense, I

14   think, that is associated with adding customers is the new

15   phone.  I'm sure that there are also network charges and other

16   things that have to be built up, although because Virgin is

17   virtually a network, it's not going to operate as somebody who

18   has to build sell towers.  I need to get away from that

19   because, I don't know, you have to talk intelligently.

20        One thing I do know, particularly in the cell phone

21   business at this time, one of the things you did when you put

22   new subscribers on board you have to subsidize the purchase of

23   a phone, a hand set.  Well, if you're going to look at

24   increasing expenses based on the number of subscribers you add,

25   you don't look at the net number, because the fact that

1        somebody decides to drop your service, you don't get the money

2        back that you subsidized them for the phone.  Right?  It's

3        gross additions that matter.

4              And one of the things you'll see when they talk about

5        the net additions number, that gross additions in the third

6        quarter of 2007 actually went up fairly considerably.  So their

7        argument is just inconsistent with the fact, because what you

8        have to look to is, well, did our expenses continue to increase

9        because we are continuing to add subscribers on a gross basis,

10       not a net basis?  I think that it's the correct explanation.

11       I'm not sure you even have to get there because I think their

12       argument in their brief, which is clever, is not supported by

13       any of the allegations in the complaint.  So I believe it's

14       unsupported and would be dismissible on that basis anyway.  But

15       I think if you actually read the prospectus documents, it's

16       also inconsistent with the prospectus documents and so would

17       be -- would not satisfy Rule 8 because of that.

18             Okay.  Decline in substantial growth rate.  We have

19       spilled more ink on that then I think on any other argument in

20       the papers.  I've already spoken with you about it to some

21       extent because I did that in the context of the difference

22       between -- what does it mean that this was in the plaintiff's

23       view at least a present fact that we failed to disclose as

24       opposed to the future.  But just to go through it a bit, the

25       plaintiffs claim that the registration statement was materially

```
 1    misleading because we didn't disclose that the third quarter
 2    had a significant decline in substantial growth trends, that's
 3    the way they phrase it.  I want to be clear, what they're
 4    pointing to is what they call net subscriber additions.  These
 5    subscribers is the total number of people you sign.  Net is
 6    people you sign, the less the people who leave.  What you have
 7    to see first is that on the prospectus, at page 79, we'll go to
 8    a chart that we've got in here, and this is actually -- it's
 9    excerpted from the prospectus.  There's more information in the
10    prospectus charter than this.  This is a line item and it's
11    shown.  So if you look in the offering documents, it actually
12    says in '04 our net additions were 1.4 million; in '05 they
13    have 900 something some thousand.  And '06, unaudited
14    statements, for '06 there 730,000.  You see a fairly
15    significant decline here in the range of 500,000 -- 30 percent
16    from '04 to '05, another close -- another about 30 percent from
17    '05 to '06.  Significant decline.
18            Not only that.  But the prospectus also says -- it
19    explains the trend.  It says, 'we believe that a decrease in
20    the rate of net customer additions, as seen in our 2004 to 2006
21    annual performance," so they're actually pointing people to
22    that fact, "is typical of the effect of customers switching
23    providers," which is what the company called churn, "on an
24    increasing customer base."  That is, as more people get to be
25    more savvy, they change telephone operators.  Our net numbers
```

1    are likely to go down.  They also say:  "We expect growth in

2    customers and penetration to continue at lower rates than

3    previously experienced in the industry."

4         It would be pretty hard for it to be more on point

5    than that.  They're basically saying:  We expect our net

6    customer additions to go down, and that explains why.  One of

7    the reasons it explains why, again, I hesitate to do this,

8    given the length of prospectus, but I really do commend the

9    Court to the discussion, and the management discussion, and

10   analysis, and the risk factor section of the prospectus.  They

11   are really very full and frankly excellent examples of how a

12   company is suppose to go through and disclose the risks

13   associated with investing in a first-time public company.  But

14   the prospectus actually describes a number of issues.

15        But here's I think a very representative one.  It

16   says:  "Most of our competitors have substantially greater

17   resources than we have."  We're obviously competing with

18   Verizon, AT&T, and others.  A lot of resources there.  And as

19   consolidation, the industry creates even larger competitors.

20   Our competitors purchasing advantages may increase further,

21   hampering our ability to attract and retain customers.  So then

22   what they're saying is:  Look, you've seen it.  You've seen the

23   net subscriber additions go down.  We're telling you to expect

24   them to continue to go down.  And a part of the reason at

25   least, or a part of the reason that may happen is we have

```
 1        competitors with an awful lot of wherewithal, and what goes
 2        with this is all that money muscle, we may not be able to match
 3        it.
 4             And this, your Honor, means I won't repeat what I said
 5        before.  This is the item 303, essentially, that the trend has
 6        to be an extreme departure.  Given the disclosure I just talk
 7        about, it would be impossible to see this as any kind of
 8        departure because it's the same trend, let alone an extreme
 9        departure, given the disclosures.  And take us back to the last
10        line I think for a second.  I think that's it, your Honor.  I
11        believe I sort of covered that to some extent.  If we go onto
12        the next page, it's a little bit more detailed description of
13        Shaw, which essentially says, you know, "a company is not
14        required to disclose interim financial results whenever it
15        preserves a possibility that the quarter's results may
16        disappoint the market.'  I believe that's a powerful and
17        important phrase.  And it adopts the standards that interim
18        results are disclosable only if they're a known trend or
19        extreme departure.  Turkcell adopts the same.  And there's just
20        no way for the plaintiffs to plead around this or argue their
21        way around the pleading requirements, is probably a better way
22        of saying it.
23             Take a look at the next page, your Honor.  What I
24        tried to do is anticipate the question.  Okay?  Extreme
25        departure is a standard.  How do I define it?  What does it
```

 1    mean?  And I've always wanted to use this example for
 2    something, and it finally fits something really well.

 3              THE COURT:  I'm glad.

 4              MR. GAMBLE:  In high school chemistry class I had a
 5    teacher who explained to us the Rutherford's foil scattering
 6    experiment.  It's an experiment where this physicist fired
 7    elementary particles through gold foil.  And based on the way
 8    they came, it inferred from that the actual shape of the atom,
 9    which is kind of cool.  Our chemistry teacher in high school
10    explained it by the following.  Took a shoe box, painted it
11    black, and on the back wall of the shoe box he pasted a hard
12    object that looked like a star.  And then he sealed the box up
13    so you couldn't see in it and he showed it to us and said:
14    What's in here?  We all said:  I've no idea.  It's a black shoe
15    box.  And he put it on a stand and he fired BBs at it, a whole
16    bunch of BBs.  You probably wouldn't do that today because of
17    the liability.

18              THE COURT:  Was just thinking that, that wouldn't work
19    today.  You're a classroom where he fired a BB?

20              MR. GAMBLE:  He did it outside.  What he did -- then
21    he showed us the front box and we said:  What is it?  We have
22    no idea.  It's a bunch of shots in the front of the box.  And
23    he turned it around.  We said:  Oh, it's a star shape on it
24    that a BB won't get through.  You can see so many things that
25    popped out around the star, but nothing could get through.

1    It's a long way to explain how the Common Law works, like

2    generally you sort of have to look at the cases and see where

3    they go through and make a decision about where you fall.

4         The reason I'm using that example, I think, your

5    Honor, is I think what we're talking about here is Virgin

6    Mobile is right dead center, that star shaped object.  If you

7    take a look at this chart, what I've tried to do is first I

8    have a wonderful quote I think from Shaw which is:  "There is

9    always some risk that the quarter in progress at the time of

10   the an investment will turn out for the issuer to be worse than

11   anticipated.  The market takes this risk of variability into

12   account."  Very much like the comment I made about the Garber

13   case earlier, where the Court said:  Look, people understand in

14   merger some of the employees, maybe even important ones, are

15   going to leave.  You can't call that misleading.  This is

16   essentially what the Court is saying.

17        Now, in Shaw the Court actually found an extreme

18   departure.  It did a detailed walk-through of the prior

19   disclosure, prior period disclosures, and it said:  Look, there

20   were a 183.1 million dollar net loss in this quarter.  It was

21   far greater than analysts expected.  The Court assumed

22   knowledge here.  I don't know if there was a debate in the

23   decision.  The Court says it assumes knowledge, and it was at

24   largest loss since the first quarter of 1983.  And I'd have to

25   go back and look at the dates on this, but that's within --

1   it's a couple of years.  The Court says:  That's enough.  In

2   the full context, that's not enough to really describe the

3   analysis the Court did, but that's the flavor of it.

4       Then we go to Turkcell, and the Turkcell court said:

5   That's not enough to plead an extreme departure.  And in

6   Turkcell is a 9 percent decline from Q1 to Q2 in a phase of a

7   prospectus that actually showed a history of rising profits.

8   The prospectus here is issued after the second quarter is over,

9   very much like our facts after the second quarter is over, it

10  shows a 9 percent decline in net income when the prospectus

11  showed a history of rising profits.  But the Court said:

12  There's no decline in other indicators.  There's other

13  disclosures around this.  This isn't enough to show an extreme

14  departure.  It's not enough to show.  You got to drop off the

15  Securities Law reporting scheme and report earlier.

16      So Virgin Mobile, if you look at Virgin Mobile, now

17  we've talked about the widening loss point.  I'm not going to

18  go back to that.  But what they're really focussed on here,

19  from a net addition point of view, yeah, there's a 52 percent

20  decline of net adds in one quarter of the year.  But there's a

21  13.9 percent increase in gross adds.  This is the point I made

22  before about expenses in gross adds in the same quarter.  For

23  the full nine-month period, it's 161 percent increase in the

24  net adds, and the prospectus actually says that the growth in

25  customers is expected to continue at lower rates than

```
 1        previously experienced.

 2              So where does this take us?  Here's the conclusion

 3        that I reach out of this, and I think the Court should reach.

 4        First, the focus in the prospectus, if you look at this in

 5        light of the focus in their prospectus on the year-to-year

 6        changes in net adds, rather than the quarter's prospectus.  If

 7        you look at this, it disclosed a downward trend in subscriber

 8        adds from '04 to '06.  If you look at the increase in

 9        subscriber addition rates for the first nine months overall of

10        '07, and the prospectus disclosure, that subscriber addition

11        rates are expected over time to decline.  They're just is no

12        material omission.  Because a one-quarter decline in

13        substantial growth numbers can't be seen as a trend that was in

14        any way an extreme departure from what could have been

15        anticipated.  As I said before, it's not even a departure, let

16        alone extreme.

17              I will also note that the plaintiffs have not

18        adequately pled that the defendants knew the substantial growth

19        numbers for Q3 at the time of the IPO.  I believe, just going

20        to flip through here, your Honor, and make sure I can skip what

21        I'm looking at.  Okay.

22              This maybe the other thing we spilled a lot of ink

23        over, an issue of confidential witnesses.  I think the only way

24        plaintiffs have of complaining -- the only thing they try in

25        their complaint is to claim, well, they must -- they knew.  In
```

```
 1      part, they say:  Well, they must have known because the quarter
 2      had ended already, and I believe the law is pretty clear that
 3      all by itself isn't enough.  I think what they do say is, well,
 4      we have these confidential witnesses who make statements about
 5      the state of the company at the time.  And I'm going to say
 6      flatly the confidential witnesses here are simply not
 7      identified well enough, and their statements are not
 8      sufficiently specific to be meaningful at all in this context.
 9      And I'm going to point the Court to the Chubb case.  The Chubb
10      case in the context of its 10B analysis goes through in great
11      detail what it takes to make a confidential witness meaningful.
12      But I want to be clear that Chubb also rejects the Section 11
13      claims that are based on the same set of allegations.  And it
14      does so essentially on the strength of the exact same argument
15      that it relies on for 10B.  So effectively it applies the same
16      analysis, the same standards to the confidential witnesses
17      under Section 11 because essentially when it rejects the
18      Section 11 arguments, it essentially says in a little bit
19      longer form, for all the reasons that we discussed in the
20      context of our 10B argument, the plaintiffs' claim under
21      Section 11 fails as well.  And so the confidential witness
22      standard I think the Chubb court is saying is the same.
23              So the first thing the plaintiffs have to do is they
24      have to plead the confidential witness had a job that would
25      give him or more firsthand knowledge of the facts the witness
```

1    is allegedly disclosing.  Firsthand knowledge.  It's not enough

2    the plaintiff was around to hear a rumor or was in a room to

3    hear a speech.  They have to have firsthand knowledge of

4    important facts.  Okay, in Chubb, the key witness was described

5    as a Customer Services team leader.  We should go to the next

6    page. Go back.  Sorry about that.  Next one.  There we go.

7         In Chubb, the guy described as a Customer Services

8    team leader who had quote unquote worked for Chubb for six

9    years and was thus very familiar with how it operated.  Now,

10   this witness allegedly disclosed facts about Chubb's nationwide

11   reserve setting policies.  The Court said that:  "It cannot be

12   disputed that this description is wholly insufficient."  In

13   other words, the fact that somebody was a customer services

14   team leader with six years of experience at Chubb didn't give

15   that person a right to make disclosures about whether or not

16   the company had a particular national reserve setting policy.

17        Here, the plaintiffs describe, and there's a fair

18   number of confidential witnesses, so I'm summarizing a bit

19   here, but the plaintiff described the witnesses with even less

20   detail.  You've got an employee who quote unquote worked in

21   product development, and one who quote unquote worked in

22   project management cited for statements regarding financial

23   reporting software, financial for the cost of software, and the

24   frequency of their financial reporting.  Two things completely

25   divorced of each other.  There's nothing in the alleged

1        description of witnesses that they would have any firsthand

2        knowledge of what they're allegedly disclosing.

3                The plaintiffs also cite statements of VMU's use of

4        financial standards and reporting and analysts, but they don't

5        describe what the person analyzed.  A customer care employee,

6        another project manager, and someone who worked in quote

7        unquote various positions for VMU.  None of this is nearly

8        enough information to indicate they possess personal knowledge

9        of what was allegedly disclosed.

10               Secondly, the facts that the confidential witnesses

11       allege are not sufficient, even if you credited them, even if

12       you assume they could know firsthand what they were saying.

13       Those facts taken by themselves are not sufficient to support

14       the plaintiffs' allegations.

15               So plaintiffs' alleged VMU had forecasting software

16       and that quote unquote forecasting and financial reporting were

17       done on a weekly basis.  But that's less than what was alleged

18       in Chubb.  In Chubb, it was alleged that management had

19       meetings every two weeks to review the specific types of

20       financial results at issue in the complaint.  And the Third

21       Circuit found that that was insufficient.  In other words, a

22       specific allegation that management reviewed financial results

23       every two weeks wasn't enough, it wasn't detailed enough.

24       That's much more than was alleged here.

25               The Chubb court says that to be meaningful, plaintiffs

1       would have to allege the specific meetings at which the data

2       was discussed, what the data was, who was present, who prepared

3       the reports, when they were prepared, how official the numbers

4       were.  And that's important because, yes, the quarter was over,

5       but, you know, we're just recently over.  The plaintiffs'

6       allegations are just woefully short of this, and I'm not going

7       to go through line by line on these.  We talked about them in

8       our papers, and I'll rest on those.  But I just want to stress

9       again I think the confidential witness's statements are simply

10      not sufficient to be meaningful in this context.

11              Okay.  This takes us to the very last point that I'm

12      going to address today, and that is, in the opposition brief,

13      really for the first time, I didn't read this from the

14      complaint  originally.  Plaintiffs may argue its there, but I

15      didn't read this from the complaint.  Originally in their

16      opposition brief for the first time the plaintiffs argue that

17      the prospectus is misleading because it contained positive

18      statements, which I believe they would concede are true on

19      their face.  In other words, the specific facts are true.  But

20      a positive statement about VMU's past performance or plans that

21      were rendered misleading because of the failure to disclose the

22      three buckets of information we've just been discussing.

23      Plaintiffs also lumped in a bunch of other general stuff, which

24      I can talk a little bit about but I'm not going to get into in

25      detail because I think the first three points don't get them

1      past the line of being plausible, and the rest of the stuff is

2      not going to.

3              Here's what the prospectus actually says.  The

4      prospectus says.  VMU's total operating revenue and net income

5      increased year over year and from the first six months of 2006

6      to the first six months of 2007.  Those are objective facts.  I

7      don't think anybody challenges they're true.

8              Next is VMU has continued to grow our customer base

9      rapidly.  And that's shown by the substantial addition numbers

10     I showed you earlier that the gross subscribers are going up.

11     VMU is one of the lowest cost operators in the wireless

12     industry with a highly variable cost structure allowing the

13     company to reach profitability faster.  I don't think any of

14     those things reach profitability faster, one they're

15     challenging.  Generally I don't think those specific statements

16     are generally challenged as untrue.  Prospectus also says, and

17     the plaintiffs claim this is misleading, that VMU aims to

18     maintain and strengthen a vibrate brand image.  That VMU will

19     continue to enhance its brand through a variety of steps.  And

20     that VMU is the number one brand for prepaid wireless services

21     in the United States in awareness among people 14 to 34.  Okay.

22             What the law says is that none of these complained of

23     disclosures is misleading, actionable or otherwise requires

24     additional disclosures.  Because why?  One, they're true.

25     Accurate reports of past successes do not give rise to a duty

1    to inform the market whenever present circumstances suggest
2    that future may bring a turn for the worse.  I'm quoting Shaw.
3    There's a legend of cases out there that say accurate reports
4    of past success do not require you to disclose early outside of
5    the normal reporting structure the fact that things aren't
6    going so well now.  And the second is simply that cautionary
7    language is out there that rendering the alleged omissions
8    immaterial.  This, your Honor, by the way, is the piece of the
9    plaintiffs' argument that I believe 9B applies to.

10            Now, what I've just said, and let's actually do this
11    first and let me get to the 9B point.  I'm not going to read
12    all these, there's about three pages that look like this.  I've
13    already sort of commended to the Court the risk factors and the
14    management discussion analysis which is where all this comes
15    from.  But if you look at this, look at what the prospectus
16    also says.  It says:  We have a limited operating and financial
17    history, can't be certain our business model will be profitable
18    or competitive.  We experienced and may continue to experience
19    continued fluctuations in revenues and cash flows.  If our
20    growth is unsustainable, we won't be able to generate the
21    earnings to fund operations.  Talks about competition in the
22    wireless industry, which I already talked about to some extent.
23    It's a very difficult market place, and they compete with
24    people with a lot more money and a lot more scale then they
25    have.

```
 1              Competitive pressure to reduce prices.  This goes
 2     along hand in hand with competing with people who have a lot
 3     more scale and a lot more money than you do.  They can reduce
 4     prices, continue to lose money for a long time before they run
 5     out of it.  It's difficult for a small company.  Can't be
 6     certain if the Sprint network they rely on is necessarily going
 7     to allow them to do the same new service offerings that others
 8     might do.
 9              Customer turnover.  Talks about the fact that network
10     coverage, hand set quality, a variety of factors can cause
11     customers to turn over.  And it says specifically:  We don't
12     require long-term service contracts.  It's a part of their
13     business model.  They don't try to get young people who don't
14     have long-time commitments.  Their customers can terminate
15     service.  Their churn would be expected to be a little higher,
16     and they talk about what that means.  I already talked about
17     the declining substantial growth.
18              Again, there's a lot more disclosure than this in
19     here, and I really think that this is an excellent almost model
20     prospectus, and I would ask the Court to take a look at it, as
21     I think that's what the cases really require here, but I
22     believe that's really the key point.
23              Let me just step back because I believe the conclusion
24     here is that in light of all that, those disclosures are
25     sufficient under Trump and the other cases that say:  Look,
```

1    effective warnings are enough to render alleged omissions

2    immaterial as a matter of law.  And I think here if you look at

3    them, and you tie them back together, you're going to say

4    that's what happened here.

5            Let me talk briefly about the 9B point before I quit,

6    which I will do shortly, and that is, that here's the reason I

7    think 9B applies here.  Again, I don't think they satisfied

8    Rule 8, so I don't think I have to get here.  But if the Court

9    thinks maybe they have gotten close to nudging it across the

10   plausible line to what a reasonable person might think is

11   meaningful somehow, again, I don't think you should, but if you

12   did, I think you would really need to look at this and say:

13   Really, 9B, for this particular set of claims, this sort of --

14   those statements in the claims in the prospectus that are

15   positive are rendered misleading because of sort of this --

16   I'll call them the three specific admissions in the haze of

17   other things.  You have to say 9B is what really applies,

18   particularly because of the haze of the other things here.

19   What they're saying in that haze is that, well, the company,

20   according to our confidential witnesses, who you shouldn't

21   credit, but if you did, according to them, the company was

22   decreasing its advertising spending, it was laying people off.

23   It was extending its payables to try to conserve cash, doing a

24   variety of things that, you know, a healthy company is not

25   suppose to do.

```
 1              First off, these are management decisions, and the law
 2    is really clear, management decisions aren't disclosable.
 3    They're just not.  The effect of them can be when you get
 4    there.  But you can't make a company disclose every time they
 5    decide, well, you know, we're going to lay some people off,
 6    we're going to hire these people, unless you actually hit a
 7    firing that's of a required reporting person.  Those sorts of
 8    things are not disclosable under this law, and separately and
 9    of themselves they just don't get there.  But what they're
10    really saying is the company made affirmative statements, all
11    those affirmative positive statements I put up there before,
12    while at the same time they were taking affirmative actions,
13    they were firing people, they were delaying payables, they were
14    decreasing advertising.  Those are things you don't do by
15    negligence or accident, you do on purpose.  They're saying:
16    You made purposeful statements at the same time you were taking
17    purposeful actions that are directly contradictory to those
18    statements.  That's fraud.  And even though the Chubb case has
19    a nice quote, and there are other cases that say the same, a
20    one sentence disavowment of fraud in the complaint does not
21    divorce the claims from the fraudulent underpinnings you don't
22    like.  We're not pleading fraud.  You have to look at what the
23    complaint actually says.  And in Chubb, for example, the Court
24    applied 9B to a Section 11 claim because the plaintiffs allege
25    the company -- here's a quote, concealed key factors from its
```

```
 1        disclosures, exactly what the plaintiffs are claiming here.
 2        And consequently that the earnings for cost, and this is what
 3        the plaintiffs' claim were quote unquote false when made.
 4        That's exactly what the plaintiffs alleges here.  Alleging
 5        concealment, which is active.  Alleging concealment is alleging
 6        fraud.  And even though Section 11 doesn't require you to
 7        allege fraud, when you do, you have to satisfy 9B.  And for all
 8        the reasons I just described, you couldn't even possibly argue
 9        these guys are getting close to meeting the 9B standard.
10             And so, your Honor, for all of those reasons, we
11        respectfully submit the complaint should be dismissed in its
12        entirety, and should be dismissed within its entirety because
13        if you look at the disclosures and prospectus, this is a
14        fixable complaint.
15             THE COURT:  Very well.  Thank you, Mr. Gamble.
16             All right, anyone else arguing on different side?  All
17        right, Miss Sultzstein.
18             MS. SULTZSTEIN:  Good morning, your Honor.
19             THE COURT:  Good morning.
20             MS. SULTZSTEIN:  Susan Sultzstein on behalf of the
21        underwriters, and good morning, your Honor.
22             Your Honor, I'll be quick, and I certainly don't want
23        to repeat what's already been said on points we agree within
24        our brief and have been made already.  Just a few things I want
25        to add to the argument today.
```

```
 1              Your Honor, the opening line of plaintiffs' brief with
 2     respect to its legal standards starts with a very stark
 3     declaration.  They say that it's axiomatic that motions to
 4     dismiss are viewed with disfavor and are rarely granted.
 5              Your Honor, I don't believe that's the case.  And when
 6     you go back and you look at the cases that they cite in support
 7     of that declaration, they're out of circuit cases that are
 8     housing discrimination cases, disability discrimination cases.
 9     None of those cases are securities cases, and none of them --
10     and all of the cases they cite predate the Supreme Court's
11     decision in Twombly.
12              Far from anomalous, the list of decisions that grant
13     motions to dismiss in the context of a Section 11 case is long.
14     And the long list includes not just cases decided under Rule
15     9B, but cases also decided under Rule 8.  And I've compiled,
16     I've already given it to counsel here, but I have compiled an
17     illustrative list of some of those cases, if I can hand it up
18     to the Court.
19              What's interesting about the list as well is besides
20     its 9B and Rule 8 cases, is there are cases that really speak
21     to the issue that the Court is confronted with here, which is
22     the claim that a company has gone out, it's introduced itself
23     to the public with an IPO.  That sometime after the IPO was
24     announced and went effective, the stock price fell and the
25     shareholders suffered a loss and they say and there are cases
```

1      in that pile that say:  And what do you do when?  And the

2      plaintiffs argue in those cases that because you didn't

3      prematurely disclose your interim results, that you're somehow

4      engaged in violations of the Securities Act.  And those cases

5      say, as I believe we've gone over through the list, if you look

6      at the In re Arbinet and Panther Partners and N2K Securities

7      litigation, all of those cases speak to that very issue, and

8      come to the conclusion, after reading over the prospectus, that

9      the extreme departure test was not met.

10             I do want to talk a little bit about context, your

11     Honor.  Last year alone, according a study that was done by

12     the National Economic Research Associates, and it's a group

13     that -- it's a group economic, and they put out studies on --

14     they follow trends in filings.  That they were 255

15     securities -- shareholder class actions that were filed in

16     2008.  And filing those cases, the security class action cases

17     have become something of a cottage industry.  Every time a

18     company announces bad news and the stock price drops, there is

19     typically a complaint filed along with it.

20             The Supreme Court in the Twombly decision goes as far

21     as to recognize the practical significance of Rule 8 in these

22     kind of circumstances.  And it was talking in the opinion, and

23     this is at 1966, not just about the -- not just in the

24     anti-trust context, which is what Twombly was dealing with, but

25     it speaks specifically to cases that arise under the Securities

```
 1    Law and the court said in those cases that where -- that when
 2    you're dealing with Rule 8's pleading requirement, there's a
 3    risk that a plaintiff might be permitted to proceed with a
 4    largely groundless claim, and be allowed to take up the time of
 5    a number of other people with the right to do so representing
 6    an interim increment of the settlement value.  And so according
 7    to the Supreme Court, when the allegations in the complaint,
 8    however true, could not raise a claim of entitlement to relief,
 9    this basic deficiency should be exposed to the point of minimum
10    expenditure of time and money by the parties and the Court.
11         I think the overarching theme, your Honor, is context
12    matters in pleading.  And recognizing the potential for abuse,
13    and the proliferation really of strike suits like this one,
14    claims arising under the Securities Law is an area of law where
15    courts aren't particularly vigilant in looking at the
16    pleadings.
17         Now, plaintiffs also seem to be arguing that the Court
18    isn't entitled to look at the complaint and compare it against
19    the registration statement, which really forms the basis of
20    what they're suing on.  I mean, that's what they're pointing to
21    and they make that argument on no fewer then eleven occasions.
22    They say plaintiffs claims that the Court must defer to what
23    they call fact intensive questions of materiality.  But I
24    believe here again the plaintiffs are misconstruing the burden
25    of their pleadings and the Court's role.
```

```
 1              A similar argument of fact was made in the Castlerock
 2     Management case.  And there the plaintiffs, like here, tried to
 3     plead around the pleading requirements of 9B and said:  No, no,
 4     no, we're just making a negligent misrepresentation claim.  The
 5     Court in that case said:  Plaintiffs -- and I think it's in
 6     words equally applicable here -- plaintiffs appear to be
 7     confusing Federal Rule of Civil Procedures 9B particularity
 8     requirements implicated in fraud actions with the requirements
 9     of Section 11 itself, which by the plain statutory language
10     require that the registration statement contain a material
11     misstatement or omission, when such part became effective.
12     They say plaintiffs' allegations, while presented under a
13     theory of negligent misrepresentation, still requires the
14     presence of an affirmative statement that is made misleading by
15     the material omission.  So that's -- and then the Court goes on
16     and looks at the registration statement against the standards.
17              Scrutinizing the offering documents against the claims
18     asserted in the complaint to determine if plaintiffs stated a
19     claim and had met the requirements of Twombly, not a lesser
20     standard, Twombly is the standard here, is exactly what is
21     required.  And, you know, that's the best way and I think the
22     only way to determine whether or not a complaint has alleged
23     specific, non-speculative, contemporaneous facts with
24     sufficient detail to make its theory not just conceivable, not
25     just possible, but according to Twombly, it has to be
```

1    plausible.  And when you make that comparison here, and you

2    look at the registration statement against the complaint,

3    there's nothing that they've pointed to, nothing in the

4    registration statement that was rendered false and misleading

5    by any later statement made by the defendants.

6         I just want to spend -- say a few words about the

7    policy considerations here as well.  I'm representing the

8    underwriters, your Honor, and the underwriters are part of the

9    capital markets, and the capital markets need certainty.  Part

10   of the entire scheme of the securities regulation process is

11   that you have quarterly filings.  Company files first quarter,

12   second quarter, third quarter, they have their annual report.

13   And the rule that's been developed in the cases like Shaw and

14   Turkcell and have been followed by other courts is that to step

15   away from that filing process requires an extreme departure,

16   right, and the reason is for entities like underwriters, like

17   accountants, it puts -- it would put -- if it was required in

18   any case that you had to disclose early what your results are,

19   where they may not have been collected, right, the results may

20   not have been known, where that doesn't have the benefit of the

21   reliability of people looking over them and seeing what the

22   numbers actually mean, you're putting the third parties in a

23   very difficult position.  And it runs contrary to the SEC's

24   disclosure requirements which require's quarters, not daily,

25   not weekly, not biweekly reports.  And really the essence of

 1     the rule is to give companies time to get it right.  Otherwise,

 2     you'll have the case where disclosures are made and the

 3     reliability of which can't really be tested.

 4          I want to make just one final remark, your Honor, in

 5     terms of pleading fraud by hindsight, or pleading claims by

 6     hindsight in this case.  That's extended not just to the 9B

 7     standard.  You can't just say, as plaintiffs have done here,

 8     looking, we're going to look to the November statement that the

 9     company made, we're looking to the March statement that the

10     company made, we're going to look to the February statement

11     that the company made, and from that say:  Aha, something that

12     you said earlier must have been known.  That's not a permitted

13     pleading standard.  That doesn't meet the pleading standard.

14     The "must have knowns."

15          THE COURT:  So your position then, Miss Sultzstein is

16     they have to put that in their complaint what they knew, when

17     they knew it, how they knew it, et cetera, as opposed to, if

18     you look at these documents that exist after the filing of the

19     IPO?

20          MS. SULTZSTEIN:  That's exactly what I'm saying.  If

21     you look at the case they cite, which is In re Adams Golf, that

22     looking backwards one perceives a trend, does not necessarily

23     mean that conditions were such that at earlier times the

24     situation was sufficiently obvious or noteworthy.  And if you

25     look at Arbinet-thexchange at page 8, Panther Partners at page

```
 1    673, your Honor, Castlerock Management, I think that's at page

 2    323, note 5 in the Castlerock case the Court said, and this is

 3    also a Rule 8 case, that liability cannot be imposed on the

 4    basis solely of subsequent events.  Is no less the case when a

 5    plaintiff proceeds under a negligence theory.

 6              And with that, your Honor, I will take my seat.

 7              THE COURT:  Very well, Mr. Sultzstein.

 8              Anyone else.

 9              MR. MICHELETTO:  It's now afternoon, your Honor.

10    Robert Micheletto of Jones Day on behalf of defendant Sprint

11    Nextel Corp. and Douglas Lynn.

12              I am last here today, but hopefully not least.  I am

13    going to proceed briefly on the Section 15 claims that have

14    been asserted against my client Sprint Nextel Corp. as well as

15    against Mr. Gamble's client Corvina Holdings Limited.  Neither

16    of those two entities have been sued under Section 11 for a

17    primary violation.  They have been sued only under Section 15.

18    They are the only Section 15 defendants.  And what the

19    plaintiffs are trying to do through the mechanism of Section 15

20    is essentially to hold these two entities, Sprint and Corvina,

21    secondarily liable for the alleged primary violations of

22    Section 11 by the other defendants.

23              Let's take a look at Section 15 standards.  There's no

24    dispute about this aspect that to state a claim under Section

25    15, plaintiffs must plead at least two things.  One, a primary
```

1      violation of the Federal Securities Law by a controlled person;

2      and two, control of the primary violator by the defendant.

3              In Tellium, Judge Wolfson found there was an

4      additional or third element that is necessary to plead or state

5      a claim for violation of Section 11, and that is culpable

6      participation in the primary violation of the defendant.

7      Plaintiffs have cited several cases admittedly that disagree

8      with this standard.  There are other courts within the Third

9      Circuit, Ravisend, that agree with Judge Wolfson and found

10     there is in fact a third element of culpable participation.

11     Mr. Gamble, I thought, very persuasively demonstrated this

12     morning in oral argument why plaintiffs' primary claims for

13     violation of Section 11 should fail.  If in fact those claims

14     do fail, then it is the law there can be no secondary liability

15     under Section 15.  So if the Section 11 claims are dismissed,

16     so too must the Section 15 claims be dismissed.

17             I believe the real point of contention, your Honor,

18     with regards to -- in addition to whether or not there's been

19     effective Section 11 claims stated with regards to the Section

20     15 claim is with regards to the second requirement, and that

21     is, control over the primarily violator by the alleged

22     secondary violator, namely Sprint and Corvina.  And the law in

23     the Third Circuit and others with regards to what needs to be

24     pleaded to establish control is fairly well settled, I think.

25             Let's just start with what the courts have found

1    pretty much across the board for what control is not.  Control

2    is not the mere ability to persuade or to affect the primary

3    violator's actions.  There has to be more.  Control is not the

4    mere fact of stock ownership, nor is the mere fact that a

5    person was a director sufficient in and of itself to establish

6    control.

7           Now, the SEC has defined control as "the possession,

8    direct or indirect, of the power to direct or cause the

9    direction of the management and policies of a person, whether

10   through the ownership of voting securities by contract or

11   otherwise."

12          And the courts are basically in accord with this

13   definition, and many of them have in fact expressly adopted it,

14   and the courts pretty uniformly have found that actual control,

15   not hypothetical or speculative control, but actual control

16   over the primary violator is necessary.  And the courts have

17   said that that means that the secondary actor has a practical

18   ability to direct the actions of the primary violator.  And

19   it's also pretty clear that all these cases, if your Honor

20   looks at them, and many of them are cited in our brief, that

21   conclusory allegations without adequate factual support are

22   simply insufficient to establish control.  It's not enough to

23   merely repeat, as I think plaintiffs have done in the very few

24   allegations in their complaint that actually relate to Corvina

25   and Sprint, to merely repeat the legal standard for Section 15

         1      liability.  You've got to plead facts.  And those facts need to
         2      establish actual control.
         3              I'm not going to spend a lot of time going through the
         4      cases, but I think it's important to look at least a few of
         5      them because the courts have set a fairly high standard for
         6      pleading control.  And one of the primary cases upon which we
         7      rely in the briefs is the Flagg case out of Southern District
         8      of New York.  And in that case the court dismissed a Section 15
         9      claim against Verizon for failure to allege facts showing that
        10      Verizon had actual control over Flagg, who was the alleged
        11      primary violator, even though plaintiff alleged these following
        12      facts:  One, Verizon's predecessor company founded Flagg; two,
        13      Verizon owned almost 30 percent of Flagg's voting stock and was
        14      the company's largest shareholder; three, Verizon designated
        15      three of the nine members of Flagg's Board of Directors; four,
        16      an analyst concluded that "the bond between the two companies
        17      is extremely strong where key strategic decisions are approved
        18      by both Verizon and Flagg"; and five, Flagg was "instructed,"
        19      and that's in quotes, and strong armed by Verizon and its
        20      designees on the Flagg Board to act "for the benefit of Verizon
        21      and to Flagg's detriment."  Notwithstanding all of these
        22      allegations, which are very factual in nature, the Court found
        23      that the plaintiff had not adequately pleaded actual control by
        24      the secondary actor over the alleged primary violator and
        25      dismissed the Section 15 claims.

```
 1                Sloan, which is another Southern District of New York
 2    case decided in 1996, which is a case that plaintiffs rely on
 3    fairly heavily, similarly dismissed a Section 15 claim for
 4    failure to plead control under similar facts.  In that case the
 5    plaintiff alleged that the defendant was a founder, creditor,
 6    shareholder and underwriter of the alleged primary violator and
 7    had a representative on the primary violator's Board of
 8    Directors and those allegations, according to the Court in
 9    Sloan, were insufficient to establish actual control.
10                Let's look at what plaintiffs have alleged with
11    regards to Sprint and Corvina to try to establish actual
12    control.  It's important to note of the 121 paragraphs in the
13    complaint, by my count only five, five, are specifically
14    directed towards Corvina and Sprint.  And if your Honor looks
15    at those allegations, and they can be found in paragraphs 19
16    through 20 and 119 through 121, your Honor will see, I think,
17    that even those few allegations in the complaint that are
18    directed towards Sprint and Corvina are conclusory in nature.
19    Most of what the plaintiffs do is simply repeat the legal
20    standard for Section 15 liability without any factual support.
21                With regards to Sprint, in the way of facts,
22    plaintiffs allege two things.  One, that Sprint owned less than
23    a majority of the interest in Virgin Mobile U.S.A.,
24    specifically a 46, roughly a 46 percent interest in the
25    company; and two, Sprint -- one of the eight Virgin Mobile
```

1    directors was a Sprint designee.  Interesting, plaintiffs

2    concede that Sprint designee, who is a defendant in this case,

3    Douglas Lynn, was on the board only as of August of 2007, a

4    mere -- roughly two months before the IPO in question in this

5    case.

6         As to Corvina, plaintiff alleges, as it did with

7    regards to Sprint, that Corvina owns less than a majority

8    interest in Virgin Mobile of approximately 46 percent.  And

9    Corvina is not alleged to have designated any of the Virgin

10   Mobile directors.  What is alleged is that three of the eight

11   Virgin Mobile directors were designated by the Virgin Group,

12   which is alleged to own Corvina, but that does not support any

13   inference that Corvina, itself, had any control over the VMU

14   board or VMU, itself.  Similarly, with regards to the fact that

15   Sprint had only one of the eight directors, there was no way

16   from that fact alone that the Court can infer that that one

17   director, through that one director, Sprint could have possibly

18   controlled the VMU board.  And there are again no other facts,

19   if your Honor looks at paragraphs 19 through 20 and 119 through

20   21 alleged with regards to supposed control over VMU by Sprint

21   and Corvina.

22        In their opposition papers, plaintiffs, although this

23   is not in the complaint, point to certain representations in

24   the registration statement that Sprint and Corvina collectively

25   had the ability to control VMU. While that maybe true, your

1       Honor, those allegations do nothing to show that in their

2       individual capacities, which is the appropriate focus, do

3       nothing to show that either Sprint or Corvina had actual

4       control over VMU and its Board of Directors.

5            And lastly, your Honor, the -- if your Honor agrees

6       with Judge Wolfson that culpable participation in the primary

7       violation should be an element of a Section 15 claims, and we

8       believe it should be, your Honor, and that Judge Wolfson's

9       reasoning in that regard is sound, there is no dispute that

10      plaintiffs have not pleaded any facts whatsoever demonstrating

11      that either Sprint or Corvina culpably participated in the

12      primary violation here; namely, the Section 11 violation.

13           For all these reasons, your Honor, as well as for the

14      reasons set forth in the briefs, we request that the Section 15

15      claims against Sprint and Corvina be dismissed with prejudice.

16      Thank you.

17           THE COURT:  Thank you, Mr. Micheletto.

18           All right, plaintiff's counsel.

19           MS. MILLER:  Good afternoon, your Honor.

20           THE COURT:  Good afternoon.

21           MS. MILLER:  Counsel.

22           THE COURT:  Counsel, you're Miss Miller?

23           MS. MILLER:  Yes.  I don't have a power point

24      presentation today, but I do have my sticky tabs, so hopefully

25      those will help.

```
 1              THE COURT:  You can't pass those up.

 2              MS. MILLER:  No, if I can only read them.

 3              I'd like to start off by, lowering the microphone,

 4     with a policy point, your Honor.  The underwriters counsel

 5     spoke to the importance of policy here, and I really couldn't

 6     agree more.  In light of what's going on in the financial

 7     markets today, the recent sensational news about Bernie Madoff

 8     and companies like Stanford, the regulatory system in this

 9     country has failed.  It is more important now then ever that

10     the government, that the SEC has the assistance of private

11     civil actions, has the assistance of attorneys on behalf of

12     sophisticated individual investors such as the lead plaintiffs

13     here, to go in and to make claims under the Securities Laws and

14     to have those cases looked at very carefully.  It can't all be

15     left up to the SEC, especially now.

16              With respect to the standards applicable to this case,

17     I would like to speak to the Twombly standard, which has been

18     referred to by the defendants as a lowered standard, just to

19     say clearly in the Phillips case, the Third Circuit in 2008 has

20     just noted that the Supreme Court in Twombly expressly

21     reaffirmed that Rule 8 requires only a short and plain

22     statement of the claims and their grounds.  Put another way, in

23     light of Twombly, Rule 882 requires a showing, rather than a

24     blanket assertion of an entitlement to relief.  Thus, under our

25     reading, the notice pleading standard of Rule 882 remains
```

1       intact and courts may generally state and apply the Rule

2       12(b)(6) standard attentive to context and showing that the

3       pleader is entitled to relief.  It remains an acceptable

4       standard, your Honor, and Twombly specifically says this.  To

5       accept all factual allegations as true, construe the complaint

6       in the light most favorable to the plaintiff, and determine

7       whether under any reasonable reading the plaintiff may be

8       entitled to relief.

9               Now, your Honor, with respect to standards, although

10      none of the defendants raised it in their opening motions, none

11      of the defendants raised the 9B issue.  None of them.

12              On reply, there was a small note in the main

13      defendant's brief suggesting that Rule 9B should apply to this

14      case.  Rule 9B does not apply to this case, your Honor.  And

15      there is no colorable argument that it could or should.  The

16      only case cited to support the idea that 9B should be applied

17      here was a citation to the Chubb case.

18              Your Honor, the Chubb case was a 10B case.  It also

19      included Section 11 claims.  The Court in Chubb said:  "The

20      core theory of fraud permeates the entire complaint.  The

21      linchpin is knowing and intentional conduct for the purposes of

22      effectuating a merger and for good measure the plaintiffs

23      incorporated by reference all of the 10B allegations, including

24      scienter, into the complaint.  Clearly not the case here.  If

25      there were a case that can be pleaded within the construct of

1    Section 11 for negligence, if the statute in fact exists and

2    provides a remedy, this is that case, your Honor.  We have

3    pleaded a straight claim under Section 11 for negligence, for

4    strict liability of the company.  There's no doubt there are no

5    allegations of fraud here, and it is very plain that Rule 8

6    applies, Rule 9B does not.  Excuse me.  And just to follow up

7    on what follows from the fact that Rule 9B does not apply, I'm

8    going to take my argument slightly out of order, but just since

9    we are talking about Chubb, and since that is the case that

10    addresses sources, I'd like to address the source issue.

11    Under Rule 8 of course no sources are required to be

12    identified.  In fact, the defendants repeatedly characterize

13    this case as one of fraud by hindsight, which is a mystery to

14    me since we have no fraud claims here.  There are no

15    allegations, whatsoever.  And of course your Honor has already

16    raised that question.

17    Nevertheless, even the Rule 8 applies.  We have no

18    less than eight confidential witnesses, all of whom are

19    described in terms of their position, the time they work at the

20    company, including a project manager, an accounts receivable

21    employee, an employee who was employed by the ICT group, which

22    was a Virgin Mobile customer service center representative, a

23    person who worked in revenue forecasting.  All of these eight

24    confidential witnesses, and frankly many complaints are upheld

25    under 9B when you have one or two witnesses, here we have

 1      eight, certainly support our claim under Section 11 and make

 2      clear that this is not a case where the stock dropped and then

 3      the plaintiffs pleaded a negligence case.  We did an

 4      investigation.  We found contemporaneous facts from credible

 5      sources which we have pleaded which demonstrate the facts

 6      available at the time the statements in the registration

 7      statement were being made.

 8              And along those lines, your Honor, then the

 9      Castlerock -- the Castlerock case is not inconsistent with

10      this.  All the Castlerock case stands for is the proposition

11      that you must allege a material misstatement.  Well, of course,

12      in order to state a claim under Section 11, it's required that

13      the plaintiff plead a material misstatement or omission in the

14      registration statement, which we have done here.

15              And with respect to the fact that in their briefs and

16      in argument today the defendants have relied -- the defendants

17      have relied on many 9B cases and have said:  Well, it's okay to

18      look at in the context of this or that.  As noted by the Third

19      Circuit in In re Adams Golf in 2004, "the requirements under

20      Section 11 stand in stark contrast to those of the Securities

21      Exchange Act of 1934 which include a showing of reasonable

22      reliance and scienter."

23              Your Honor, I'd like to specifically go to this issue

24      of knowing and whether -- there appears to be some confusion in

25      order to state a claim under Section 11 there is no scienter

```
 1    component.  There is no knowledge component.  Defendants claim
 2    that part of this case hinges on Section 303, which requires
 3    the disclosure of known trends and uncertainties.  That does
 4    not trigger a scienter requirement.  In fact, this case can
 5    stand or fall without regard to Section 303 at all and I will
 6    speak to that.  But just to be clear, from the context of
 7    actually stating a claim under Section 11, knowledge is not
 8    required.  What is required is a showing, some showing
 9    sufficient to meet Rule 8 notice standards that at the time the
10    statements were made, that the conditions at the coexisting --
11    that conditions and what was happening at the company showed
12    that, without proper context from -- information that was
13    omitted, that the statements made were materially misleading.
14    And that's why we have all of these statements from our
15    confidential sources showing contemporaneous information that
16    was happening at the company, regardless of who knows it.
17             In addition, with respect to the 303 issue, we have
18    alleged in paragraph 33 of our complaint that the defendants
19    had daily forecasting, regular meetings that at all times they
20    had a current financial snapshot of the state of the company at
21    any given time.  Of crucial importance here, the third quarter
22    ended weeks, your Honor, almost two weeks before the October
23    10th initial public offering.  Those results were in hand.  The
24    quarter was completed.
25             I'd like to talk about the Shaw standard in which the
```

1      Court held that where there was an extreme departure, it was

2      required that results for a quarter in progress that was 11

3      days from completion prior to the IPO, that because of the

4      extreme departure, that it was mandated that the facts that

5      were -- the trend that was in the hands of the company be

6      disclosed and the statements were held to be actionable

7      misrepresentations and omissions because that trend was not

8      disclosed.  Of course what we have here, your Honor, is much

9      more than a trend and much stronger than Shaw, because we have

10     results in hand.

11         THE COURT:  What about the argument that Mr. Gamble

12     makes that throughout the prospectus, there's talk about

13     obviously the net subscribers decreasing and the number of

14     subscribers decreasing, that's something that would have

15     alerted a potential purchaser of the stock of this trend, so to

16     speak?

17         MS. MILLER:  Well, with respect to the idea of a

18     trend, and in fact whether or not it's a trend, defendant

19     Schulman in fact described as a trend what was going on with

20     the company.  So he gave that label to what was going on.

21     However, it's very clear that in accordance with what the

22     complaint alleges, that the registration statement discloses

23     and does not disclose the statements that we expect expenses or

24     conditions or growth to continue to go down.  What we have

25     alleged is that the defendants already had in hand a dramatic

```
 1    departure from prior results.  Expenses were going up even
 2    though the defendants tied expenses to substantial growth and
 3    that growth had gone down already.  And of course this is not
 4    an interim -- the quarter has been completed already and so
 5    this is not an issue that the results are not in hand.
 6              In the Shaw case, though, there is terrific language,
 7    and even though our facts are much stronger here, and arguably
 8    we don't need 303, the Court in Shaw said:  To focus here on a
 9    duty to disclose in the abstract, however, would be to miss the
10    obvious in favor of the obscure.  This action arises out of an
11    allegedly defective registration statement and prospectus filed
12    in connection with a public stock offering.  The obligations
13    that attend the preparation of those filings embody nothing if
14    not an affirmative duty to disclose a broad range of material
15    information.  The Court goes on to conclude that it cannot say
16    that the defendants were not required to disclose material
17    information concerning its performance in the quarter in
18    progress at the time of the public offering, nor could they
19    conclude as a matter of law that the company was not in
20    possession of such material non-public information at the time
21    of the offering.  Of course on that latter point, again
22    paragraph 33 plainly alleges that they had that information in
23    their possession.  So, your Honor, I would argue that the -- I
24    would argue that the Shaw standard, the extreme departure is
25    not triggered here.  We don't need it here, and that in fact
```

1       the defendants were required to disclose this information under

2       the tenants of Section 11 itself.  And the basic regulation

3       that talks general disclosures in 17 CFR Section 230.408, which

4       provides:  In addition to the information expressly required to

5       be included in a statement or report, there shall be added such

6       further material information, if any, as maybe necessary to

7       make the required statements in light of circumstances under

8       which they are made not misleading.

9               Your Honor, the defendants don't point to a single

10      case that a factual scenario directly analogous to this one on

11      the crucial point that the quarter had ended.  There are cases

12      that hold that interim results for a quarter in progress need

13      to be disclosed because they constitute an extreme departure.

14      There are cases that say the extreme departure standard is not

15      met.  There are no cases with these facts that support the idea

16      that when the quarter has been completed, and when the results

17      when ultimately revealed cause a material drop of 30 percent in

18      the price of the stock, when it's revealed that customer

19      additions have dropped by 50 percent, when it's revealed --

20              THE COURT:  But they've been dropping, right?

21              MS. MILLER:  Well, they've been dropping by 30

22      percent, but they disclosed that they've been dropping by 30

23      percent.  But they already had information in hand that the

24      drop was 50 percent.  So there's a pretty significant

25      difference between 30 and 50, and it's not just on the customer

```
 1    adds, but also the losses.

 2              And with respect to the specific issue of the widening

 3    losses, Mr. Gamble said the loss declined, it didn't widen.

 4    However, the defendants in their main brief cite to a November

 5    16, 2007 analyst report.  It's actually in -- it's attached to

 6    one of their declarations as Exhibit 9.  The headline is:

 7    Despite upgrade, Virgin Mobile falls after reporting wider

 8    third quarter loss.  And to quote just one line.  "Virgin

 9    Mobile said late Thursday that its third quarter loss widened

10    to 7.3 million compared to the loss of 5.1 million in the year

11    ago quarter."

12              I point this out not because it matters one way or

13    another whether exactly the loss was characterized as widening

14    or not, but the defendants are attempting to say that there are

15    no factual issues here, and the idea that Mr. Gamble can say

16    that the loss declined, it didn't widen, and yet Virgin

17    Mobile's own brief says and quotes an analyst which goes back

18    to quote the company to say that there was a third quarter loss

19    that widened.

20              And also with respect to facts that the defendants

21    attempt to put in to create some issue where none exists with

22    regard to whether or not disclosure was required of the results

23    that caused ultimately a material drop of 30 percent.  The

24    company, in the main brief -- in their main opening brief, they

25    actually goes to great lengths citing no less than five or six
```

```
 1    articles saying that there was already an industry trend at the
 2    time of the IPO.  That in the industry, comparable companies,
 3    there was a fall.  In fact, those five or six articles
 4    specifically cited and attached to their motion papers, again,
 5    not that this is a central issue, but they directly, the
 6    language in each of those articles directly contradicts what
 7    they claim the articles support.  Each of those articles show
 8    that there was no general industry down turn until the first
 9    quarter of '08.  They claim that these articles support a down
10    turn in the third quarter of '07, and that's demonstratively
11    false, and supports the idea that our claims are adequately
12    pleaded, and they're looking for things to make an issue out of
13    because they don't have a real issue under Section 11.
14              I'd like to speak briefly about materiality, because
15    after all, materiality is really the central issue that we
16    should be focusing on here, were they're materially false --
17    materially untrue and misleading statements.
18              In the Merck case, the Third Circuit in 2005 said that
19    in the context of an efficient market, Section 11 and 10B share
20    the materiality element and share the stock price test for
21    materiality.  If a company's stock trades on an efficient
22    market, we measure materiality under the Burlington standard.
23    Thus, materiality of disclosed information maybe measured post
24    hoc by looking at the movement in the period immediately
25    following disclosure of the price of the firm's stock.
```

1          Now, your Honor, there are two materiality standards.
2     There's the TSC, Supreme Court industry standard, which is
3     addressed in the briefs.  Only if the alleged misrepresentation
4     or omission is so obviously unimportant to an investor that
5     reasonable minds cannot differ is it appropriate to rule the
6     allegations are unactionable as a matter of law.  That's also
7     cited in the Adams Third Circuit case, which is very recent.
8     That's at page 275.

9          However, here, in addition one can look to the Merck
10    materiality standard to show that the disclosures of the fact
11    that the statements in the registration statement and the
12    omitted information was in fact material, the stock drop is an
13    indicia.  That applies here.  Virgin Mobile is alleged to have
14    traded on the New York Stock Exchange.  There can be no serious
15    dispute that that is an efficient market and that the
16    Burlington -- that the Merck standard is applicable here.

17         Now, the defendants make an interesting argument with
18    respect to the four partial disclosures that occur through
19    which we allege the true fact is that the registration
20    statement contained materially untrue and misleading facts and
21    omissions were revealed.  They seem to think that we are
22    alleging that those four statements are additional actionable
23    statements.  Of course only statements and omissions in the
24    registration statement are actionable under Section 11.  The
25    reason that we have included the details regarding the

 1    disclosures, the four partial disclosures culminating in the

 2    March 12 final disclosure is to show the information that was

 3    revealed and the impact on the stock price.  The impact was

 4    tremendous.  Volume increased.  In some cases volume doubled or

 5    tripled.  The stock dropped when the third quarter results were

 6    revealed.

 7              THE COURT:  Give me the dates again.

 8              MS. MILLER:  Thirty percent -- sorry.

 9              THE COURT:  The dates?  The IPO occurs in October?

10              MS. MILLER:  Yes.

11              THE COURT:  And just break down for me when the third

12    quarter ends, two weeks obviously before the IPO occurs.

13              MS. MILLER:  The third quarter ends September 30,

14    2007.  Those results are in hand then.  The IPO occurs October

15    10, 2007.  The results for the third quarter are not released

16    until November 15 -- here it is.  There's a section, your

17    Honor, in the complaint starting at paragraph 69, discussing

18    the truth emerges causes plaintiffs' economic loss.  It is in

19    paragraph 71 through 76 that there's a discussion of the first,

20    the November 15, 2007 revelation of the poor third quarter

21    results where defendants disclose that the company had suffered

22    a widening loss for the third quarter.  The period ended

23    September 30, 2007, as a result of rising expenses.  The

24    company specifically reported a net loss for the third quarter

25    of 7.3 million compared to a net loss of 5.1 million for the

```
 1        third quarter, 2006, and the company reported that it added
 2        only 45,830 customers in that third quarter, which was
 3        approximately half the amount in the same quarter the previous
 4        year.  It was also reported that churn, which is the customers
 5        who drop off monthly, churn for the nine months ending
 6        September 30, was 4.9 percent up from 4.6 percent.  We then
 7        allege that the stock fell almost 30 percent.
 8             The next of the four partial disclosures occurred on
 9        January 16, 2007, where the resignation of the company's chief
10        marketing officer was announced revealing financial --
11             THE COURT:  Two thousand eight, right?
12             MS. MILLER:  You are right.  And my complaint has a
13        wrong date at the end -- at a heading just above paragraph 77
14        there's a typo.  January 16, 2008, the resignation of the
15        company's chief marketing officer revealed the financial and
16        marketing problems.
17             Now, I'd just like to, before I get to the final
18        disclosures, show why this is important.  Because the
19        information regarding the chief marketing officer's
20        resignation, which led to a 20 percent decline, relates
21        specifically to statements in the registration statement that
22        Virgin Mobile had touted that it, for example, I'm just going
23        to, rather than summarizing it, I'm just going to point you
24        specifically to the complaint in paragraph 40.  The company
25        states in the registration statement:  We aim to maintain and
```

```
 1        strengthen a vibrant brand image that resonates with our
 2        customers and distinguishes us from other wireless service
 3        providers.  And then goes on to say:  We will continue to
 4        enhance our brand through targeted marketing advertising,
 5        product packaging, point of sale materials and innovative
 6        services.  But of course the complaint alleges that at this
 7        time the company was facing financial difficulty, cutting
 8        marketing personnel and advertising costs, and significantly
 9        weakening its brand strength.
10             The next disclosure occurred on February 4, 2008,
11        when the company reported poor fourth quarter results on
12        inability to complete, and also surprisingly that it missed its
13        own projections that it issued just months prior in its Q 307
14        earning statement.
15             I'd like to point the Court to the In re Children's
16        Place decision which is a decision in which the Court held that
17        statements relating to seasonal fluctuations and the
18        possibility that later quarters may have problems, those types
19        of statements were deemed actionable in the Children's Place
20        case and have -- and those statements have language very
21        similar to the seasonal fluctuation and the possibilities that
22        the dependence of the company on the fourth quarter, very
23        similar to Children's Place, where those types of statements
24        were upheld.  And, in fact, Children's Place was another
25        situation where there were -- there was a quarter in progress
```

1    at the time.

2            And then finally on March 12, the final disclosure

3    occurred.  The complaint alleges that the full truth was

4    finally revealed in the company's final fourth quarter results

5    and first quarter guidance.  And the complaint notes that while

6    the defendants blamed poor performance on the fact that while

7    competitors were aggressively lowering prices in the fourth

8    quarter to impact gross adds, we chose not to pursue what

9    historically have proven to be lower value, loan tenure

10   customers.  Importantly, the complaint goes on to say the IPO

11   registration statement contained no risk factor to warn that

12   defendants would be unable to compete with other providers,

13   especially in the crucial fourth quarter.

14           Your Honor, a lot is made about the risk disclosures

15   in this case.  But if you look carefully at the actual

16   disclosures, many of them say like:  We may be impacted if we

17   choose to do something where in fact at the time they'd already

18   made a choice not to do it.  We maybe impacted if we choose to

19   bring down the price of our hand sets and increase hand sets

20   subsidies.  They weren't going to do that, your Honor.  They

21   couldn't afford to do that.  They already possessed the

22   financial information at the time, as our eight confidential

23   witnesses show, to demonstrate that the company was losing

24   money quickly, unable to increase its customers, had dramatic

25   increasing expenses, despite the fact that it wasn't gaining

1    the number of net customer ads that it was anticipating.
2    Nevertheless, these types of warnings don't fit here and don't
3    help the defendants here because they don't fit.
4         I'd just like to briefly mention a couple of the other
5    types of the statements which have not been touched on because
6    really it does come down to an analysis of what do we allege
7    the statements are, what do we allege the omissions are, are
8    they material?
9         Here's one that wasn't touched on.  Just above
10   paragraph 49:  Materially untrue and misleading statements
11   regarding the company's internal controls.  Just to take a look
12   at one piece of this, at the end of allegation, paragraph 49,
13   the company says:  We are in the process of implementing
14   procedures to remediate the material weaknesses that include an
15   external assessment of our revenue flows and control points.
16   The implementation of additional monitoring controls and the
17   periodic reconciliations of the affected accounts and
18   corrections to the interphase responsible for the errors.  What
19   it didn't say about internal controls, as we note in the
20   following paragraphs 42 and 53, is the company used an
21   out-sourced fulfillment house for inventory, and had a very
22   difficult time in reconciling inventory numbers between its
23   internal systems and the numbers in the fulfillment house's
24   systems.  And according to one of our confidential witnesses,
25   confidential witness number 3, it was virtually impossible for

1    Virgin Mobile to accurately know its inventory numbers at any
2    given time.  And additionally, the chief information officer
3    and two IT vice presidents had been fired.

4         Your Honor, this statement is incomplete, materially
5    so.  It omits to state that internal controls were not in the
6    process of being remedied.  The weaknesses were not in the
7    process of being fixed and handled.  They were outstanding
8    material inventory control problems that go to the heart of
9    internal controls.

10        Materially untrue statements about brand strength
11   marketing in advertising, I think I touched on this already in
12   paragraph 40.  We will continue to enhance our brand through
13   targeted marketing, advertising, product packaging, point of
14   sales materials, and innovative services.  But the company had
15   already made drastic cuts in their marketing department.  The
16   company was facing severe financial difficulties, cutting
17   advertising costs, marketing personnel, resulting in a
18   significantly weakened brand strength.

19        We show in the complaint, we allege the statement, we
20   say it was misleading, we say it omitted information.  We
21   provide the information that was omitted that we allege to be
22   necessary to make that statement in accordance with Section 11
23   materially complete and proper.  As we've alleged here, the
24   statement is incomplete because it omits the material fact that
25   the cuts in marketing personal, advertising cuts and cost in

1    financial difficulties, show that they were not enhancing their

2    brand.  They were not continuing to enhance their brand at all.

3            THE COURT:  So you're saying there are a number of

4    things that they failed to set forth in the registration

5    statement essentially more than just there was a poor showing

6    in this third quarter, which obviously is one of the main

7    things?

8            MS. MILLER:  Your Honor, the defendants are trying to

9    make this case entirely about that issue in the third quarter,

10   so don't even touch these other statements.  There are several

11   different category of statements.  There are GAAP statements,

12   there are internal control statements, there are marketing

13   statements, and then there are statements that relate to the

14   widening financial loss, which they say didn't exist, even

15   though they cite in their own papers a statement by the company

16   using the words:  Widened financial loss in the third quarter.

17           They attempt to make this case dependent on 303 and

18   trends.  They say there was no trend, even though defendant

19   Schulman called it a trend.  And even though we don't even need

20   to go to the Shaw standard of an extreme departure, which

21   nevertheless we meet because of course when you go to a -- to

22   net customer ads that are a 50 percent drop from the prior

23   year, when you disclose in the prospectus that there's been a

24   30 percent drop, but now you're at a 50 percent drop, and plus

25   there's also additional undisclosed losses, when they come out

1    under in the third quarter, under Merck, when the information

2    was revealed, it was material because there was a drop of 30

3    percent.  And when each of the four partial disclosures came

4    out, there was a double digit drop, at minimum.

5            THE COURT:  Talk to me a little bit about Mr.

6    Micheletto's claims with respect to Sprint and Corvina and

7    their actual control or, you know, constructive control.

8            MS. MILLER:  Sure, your Honor.

9            Counsel for Sprint and Corvina says that there's no

10   Section 15 control person claim adequately stated first because

11   there's no underlying Section 11 claim.  I think we've

12   addressed that.  But also because we have failed to allege

13   control.

14           Now, every case cited by defendants on this Section 15

15   case, every case they cite is a section 20 case, which is a

16   control person claim for 10B and falls under the 9B rule.

17   We're under 8B.  None of those apply and culpable participation

18   is not a requirement in a Section 15 claim.  Even when culpable

19   participation is deemed to be a requirement under Section 10,

20   most cases say it doesn't even need to be pleaded.  But none of

21   those cases apply to the Section 15 claim here.  And we allege

22   that the registration statement specifically contains, and this

23   is set forth in page 40 of our opposition brief.  I'm just

24   going to point to a couple, but there are numerous statements

25   that discuss control.  Here's one.  So long as Sprint Nextel

```
 1    and the Virgin Mobile Group continue to own a significant

 2    amount of our equity, even if such amount represents less than

 3    50 percent of our voting power, or the rights under the

 4    stockholder's agreement continue, they will continue to be able

 5    to influence significantly or effectively control our

 6    decisions.

 7             And just one more.  Sprint Nextel and the Virgin Group

 8    are principal stockholders, will hold the other two classes of

 9    our common stock and immediately following the consummation of

10    this offering, will be able to exercise control over our

11    management and affairs in all matters requiring stockholder

12    approval.

13             Your Honor, there are many cases that say Section 15

14    should not be -- it's a factual issue and should not be decided

15    at the motion to dismiss phase.  Of course surely here where 9B

16    doesn't apply, the only case support the defendants can point

17    to is in the 9B context of Section 10B cases.  It is certainly

18    a factual issue when the registration statement specifically

19    says that Sprint Nextel is a controlling -- will be able to

20    exercise control.  That Virgin Group will be able to exercise

21    control and that Sprint Nextel will continue to be able to

22    influence significantly or effectively control our decisions.

23    Same with Virgin Group.

24             And counsel mentioned that there's something that

25    says -- that it's collectively only.  But these statements
```

```
 1          don't say that you have to take the two groups together and
 2          that independently they don't exhibit control.  The statements
 3          say that Sprint is a controlling person, and Virgin Group is a
 4          controlling person, and certainly plaintiffs should have the
 5          right to explore that in the course of discovery.
 6                    In light of defendant's concession that loss causation
 7          is not an issue here, which we plainly agree with, and for
 8          which there's controlling Third Circuit law, I believe if the
 9          Court does not have any further questions, that I'm done.
10                    THE COURT:  Very well.  Thank you, Miss Miller.
11                    MS. MILLER:  Thank you.
12                    THE COURT:  Oh, Mr. Cecchi is trying to get your
13          attention.
14                    MR. CECCHI:  I just thought of it.  On the Sprint
15          Nextel issue, this network operates on Sprint Nextel's network.
16          Virgin Mobile, as it was pointed out, is not building towers,
17          doesn't have the its own network.  I think that goes to the
18          factual issue.  Sprint Nextel is the entity that gives Virgin
19          Mobile the ability to make phone calls for people with a Virgin
20          Mobile phone, to make phone calls.  I think that raises another
21          factual issues vis-a-vis control without Sprint Nextel, there
22          is no Virgin Mobile.  Thank you, Judge.
23                    THE COURT:  Very well.  Thank you, Mr. Cecchi.
24                    Mr. Gamble, you want to be heard further?
25                    MR. GAMBLE:  Just briefly, your Honor, if I could.
```

```
 1            I wanted to first address some of the case law issues.
 2    The plaintiffs' counsel said that we have cited no cases that
 3    involved a closed quarter.  The Turkcell case, which is the
 4    Southern District of New York, 202 F. Supp. 2d 8, the N2K case,
 5    which is Southern District of New York, 82 F. Supp. 2d 204.
 6    The DeMaria case, which is 318 F. 3d 170.  Are all cases where
 7    the quarter was closed.
 8            Shaw, I think as plaintiffs even pointed out, while
 9    the quarter wasn't closed, the Court assumed that the
10    defendants actually had knowledge of the facts that were at
11    issue.  And so I don't think it's appropriate to distinguish
12    Shaw on the basis of the fact that the quarter wasn't closed
13    because knowledge was assumed.  And I think this actually is a
14    good way to distinguish the Children's Place case, which is a
15    case the plaintiffs cite and rely pretty heavily on.
16            First off, I would note that Children's Place is a
17    pre-Twombly case, so is has the any set of facts standard.
18    Children's Place confirms that you can't plead fraud by
19    hindsight.  It confirms, and is a Section 11 case, it confirms
20    that you do need to do a detailed analysis of the claims.  And
21    it contains only one real claim that I would analogize to this
22    case.  It contains one claim essentially that the prospectus
23    reported prior year earnings, and that those reports were
24    rendered misleading because the company already knew that its
25    next set of earnings would be materially different or be a
```

```
 1    significant departure.  I don't think they use the words
 2    extreme departure, materially different let's say from their
 3    prior period earnings.  The thing is the Children's Place court
 4    actually dismisses that claim.  It dismisses that claim and
 5    says:  Well, the quarter is not closed yet, and at this point,
 6    assuming that the quarter was, you'd be actually forcing them
 7    to disclose based on their projections how the quarter will
 8    close out because you don't know how it's going to close out
 9    yet, so I would call this not really analogous for this reason.
10    It's an analogous claim, but the underlying fact that a quarter
11    timing is different.  And in this case the Court found it made
12    a difference, unlike in Shaw.
13              I would say that the Castlerock case is actually much
14    closer.  In the Castlerock case, essentially the analysis the
15    Court went through was the prospectus disclosed that the
16    company had a certain amount of capacity in one of that -- I
17    think it was a battery maker had a prospectus -- a sudden
18    prospectus, it had sufficient capacity in one of its plant to
19    increase its production.  And the plaintiffs claimed:  Well,
20    yeah, but you had the ability to ramp up that production from
21    where it was to its actual capacity, it was going to create a
22    lot of difficulty and dislocation of the company, you didn't
23    disclose that.
24              Now, the Court discusses a little bit whether that's
25    really an implied statement, but in fact assumes that there's
```

1     an implication in the prospectus that in fact the ramp up
2     ability is implied in the saying:  We have the ability to do
3     the production.  And the Court dismisses that claim in
4     Castlerock and the court dismisses the claim because it says:
5     Well, they disclose in their prospectus that increasing their
6     production may put strains and personnel resources and may put
7     strains on a number of their resources.  That's enough
8     disclosure to let someone know there could conceivably be a
9     problem.  I think Children's Place is a different case, and I
10    think it brings into stark contrast where it's meaningful that
11    the quarter isn't closed.

12             I want to address the Adams Golf case a little bit.
13    First off, not a 303 case.  So from that prospective, knowledge
14    isn't required.  And the key point about Adams Golf, which I
15    think is really cited by the plaintiffs for the idea that the
16    Court shouldn't be deciding these types of issues of
17    materiality on a motion to dismiss is the Adams Golf court
18    actually dismisses one of the two sets of claims that are in
19    front of it on the ground that it's immaterial as a matter of
20    law.  The other one it simply reviews the facts and says:  I
21    don't think it gets me there.

22             Only other thing I wanted to really do, your Honor,
23    is -- I guess a couple of things.  One, is that I think the
24    plaintiffs actually repeated twice during the course of their
25    arguments that their argument for why this stuff is material is

1    because the stock price dropped.  And I think that really

2    requires the Court to go look at the context that I put up on

3    the board in that graph earlier.  They talked about the post Q

4    3 announcements, the January 16th announcement and the February

5    announcement.  As far as I can tell, the January 16th

6    announcement is just about the resignation of a chief marketing

7    officer.  There's absolutely nothing other than the bold face

8    assertion saying the resignation of that officer had anything

9    to do with anything that was going on at the time of the

10   prospectus.  And there's certainly no allegation that the

11   company knew that the guy was going to resign when they put the

12   prospectus out.  So that would be essentially saying the

13   prospectus had to predict the future, and that's simply wrong.

14          The fourth quarter projections.  It's entirely opaque

15   to me how fourth quarter projections that didn't come out until

16   after the prospectus could render the prospectus misleading,

17   even that the fourth quarter projections aren't met.  Again, I

18   just don't think there's any connection made between what they

19   claim are corrective disclosures and what they claim was

20   omitted.

21          The last piece, your Honor, is I did in a sense not

22   directly address today what they call their other allegations

23   of things that were missing from the complaint.  They are in

24   our papers.  We're certainly not conceding, and the papers

25   address them.  But the examples that were brought I just want

1    to address really quickly.

2            She talked about internal controls.  Well, she read

3    the fact that we disclosed in the prospectus that we had a

4    material weakness in our internal controls, that's material

5    weaknesses, an accounting term of art.  There are literally

6    thousands, I have to believe, thousands of reporting companies

7    in the United States who have reported material weaknesses.

8    It's because the rules that require the reporting of them are

9    relatively new and it's complicated for people.  But I'm not

10   really sure what they're arguing we didn't disclose, other than

11   to say, well, really when you said you had a material weakness,

12   it was worse than that.  But the only thing that says it was

13   worse than that, it's a very antiquated argument that leaps

14   from a statement that we out-sourced inventory and had

15   difficulty reconciling our inventory controls.  And say, well,

16   that really means that your problems were much worse than the

17   material weakness you disclosed.

18           Again, I don't believe, and it's done more directly in

19   the papers, I don't believe there's any connection there

20   between what they claim the witness -- the confidential witness

21   says.  Certainly what I said before is through, that there's no

22   connection between what any of the confidential witnesses and

23   the source of information that they're talking about, there's

24   no reason to think those confidential witnesses would actually

25   have known this.  But there's also no connection what the

```
1    confidential witness allegedly said and the failure to disclose
2    something about the company's internal controls.
3              On the issue of, I think I did address this briefly,
4    but on the issue of whether or not the company was continuing
5    to spend the same amount of money on markets or was letting go
6    marketing staff, it's, again, impossible for me to understand
7    how you tie that to the idea that the company is somehow not --
8    doesn't mean it when it says it's going to continue to maintain
9    its brand strength.  There's no disclosure subsequent to their
10   prospectus, as far as I'm aware, that the company finds its
11   brand strength is falling apart, and it's not going to continue
12   to try to build brand strength.  It may have chosen different
13   ways to do that which are consistent with the resources it has,
14   and it may have chosen different ways to do that based on why
15   they think they have to do that in the competitive environment
16   they face.  The competitive environment they face is duly
17   disclosed.  How they make a choice to construe their brand
18   strength can't possibly mean an argument that if they continue
19   to do so is not something subject to disclosure.  That's the
20   strategy of the company and you certainly don't put your
21   strategy out every time you file a public document.  That's all
22   I have, unless the Court has questions of me.
23             THE COURT:  I do not.  Thank you, Mr. Gamble.
24             MR. GAMBLE:  Thank you, your Honor.
25             THE COURT:  Ms. Sultzstein, anything you want to add?
```

```
 1              MS. SULTZSTEIN:  Thank you, your Honor.

 2              Really, just a quick point.  The fact is that the

 3      standard here is whether or not there was an extreme departure

 4      from known trends.  That's it under Rule 8.  Doesn't make a

 5      difference if we're talking about Rule 8 or Rule 9, that's the

 6      standard.  There was no widening loss.  And substantial growth

 7      rate was disclosed.  So at the end of the day, there's no

 8      claim.  And those facts emerge from the registration statement.

 9      So, you know, the ambition of private plaintiffs to go out and

10      raise claims under the Securities Law is notwithstanding.  In

11      this case, there's just no claim.  That's the point.

12              THE COURT:  All right.

13              MS. SULTZSTEIN:  Thank you, your Honor.

14              THE COURT:  Mr. Micheletto.

15              MR. MICHELETTO:  Thank you, your Honor.  When I was up

16      last time, I forget to hand you a power point copy of my

17      presentation.

18              THE COURT:  I didn't want to stop the momentum.

19              MR. MICHELETTO:  Often as it was.

20              THE COURT:  You can bring it up.

21              MR. MICHELETTO:  Thank you.

22              Your Honor, just a couple points.  One, plaintiffs'

23      counsel says that the cases on which we rely for purposes of

24      Section 15 argument dealt with Section 20 of the Securities

25      Exchange Act as opposed to Section 15.  That's simply not true.
```

```
 1        I direct your Honor specifically to the Flagg decision issued
 2   by the Southern District of New York in 2005, which is the
 3   primary case upon which we rely.  Copland is another case on
 4   which we rely, which deals specifically with Section 15, as
 5   does the Sloan case, as well as Judge Wolfson's case In
 6   Tellium, also deals specifically with the Section 15 claim.
 7        Plaintiffs' counsel also pointed to an argument
 8   contained in their opposition papers, which I pointed out in my
 9   initial argument, doesn't make its way anywhere into the
10   complaint as support for the proposition that they have
11   adequately alleged control by Sprint and Corvina over Virgin
12   Mobile U.S.A.
13        I invite your Honor to take a look at their brief
14   where they make this argument.  It's at page 40, and it carries
15   over a little bit onto page 41.  And each of the quotations
16   that they set forth on those pages from the Virgin Mobile
17   registration statement talks about Sprint Nextel and the Virgin
18   Group.  Sprint Nextel and the Virgin Group together will
19   continue to hold interests.  Sprint Nextel and the Virgin Group
20   together, Sprint Nextel and the Virgin Group.  In other
21   words -- your Honor, what they're asking you to do is to lump
22   two distinct legal entities together for purposes of your
23   analysis and consider them to be one person, and to say those
24   two separate and distinct legal entities have, as one person,
25   have control over Virgin Mobile.  But that's not the
```

1    appropriate analysis.  The analysis talks about sole person,

2    not control groups of people randomly lumped together by

3    plaintiffs in an effort to state a claim for Section 15.

4           I submit to your Honor that you got to look at each of

5    Sprint Nextel and Corvina separately to determine whether each

6    of them in their individual capacity had the requisite actual

7    control over Virgin Mobile for purposes of Section 15.  And as

8    I indicated before, neither of them in their individual

9    capacities had such actual control.  Again, they're both

10   alleged to have only been minority shareholders.  Granted it

11   was a 46 percent ownership interest, but it still is a

12   non-majority, non-controlling interest in Virgin Mobile.

13          As for Sprint, it is alleged to have had only one

14   director that it designated, the 8-person Virgin Mobile Board

15   of Directors.  A minority share holding interest, plus one of

16   eight directors does not, under any stretch of the imagination,

17   equal actual control over Virgin Mobile.  It's just not there.

18          And as for Corvina, it's even worse because with

19   respect to Corvina, they allege again only that Corvina had a

20   minority interest, again roughly 46 percent, again a

21   non-majority, non-controlling shareholding interest in Virgin

22   Mobile U.S.A., and they don't allege that Corvina designated a

23   single one of the directors on the Virgin Mobile board.

24   Instead, they argued that the Virgin Group, which is alleged to

25   own Corvina, designated three directors.  But simply because

```
 1    the parent corporation of Corvina designated three directors
 2    doesn't mean that Corvina, the subsidiary, had control over
 3    Virgin Mobile U.S.A..  Again, it's just not there, there's not
 4    enough facts.
 5          Again, if your Honor would look at the very limited
 6    five paragraphs of the complaint that deal at all with Sprint
 7    and Corvina specifically, they're filled mostly again with the
 8    legal standard for what's necessary to state a claim under
 9    Section 15.  They're devoid of any facts, only the minority
10    share holding interest, and the limited participation on the
11    board.  And again those facts just aren't enough to state a
12    Section 15 claim, and they can't and shouldn't be allowed to
13    lump these two, again, distinct legal entities under the law
14    together and have the court treat them as one for purposes of
15    assessing whether or not there's control here.  They should be
16    treated separately.  And when you do that, there's no control.
17    And for this reason, as well as the other reasons I talked
18    about this morning, and the reasons that are set forth in the
19    brief, the Section 15 claim should be dismissed.  Thank you.
20          THE COURT:  Very well.  Thank you, Mr. Micheletto.
21          MR. CECCHI:  Judge, can I have one minute?
22          THE COURT:  I'm counting, one.
23          MR. CECCHI:  Thank you, Judge.
24          We agree with the concept that this Court must play an
25    important gate keeper role in securities cases.  And what we
```

 1    say on the plaintiffs' side is the role of the Court today is
 2    more important than it ever has been.  We agree with the
 3    concept that this Court should weed out non-meritorious,
 4    suspect, weak or speculative claims one hundred percent.  But
 5    your role, Judge, is even more important because of the world
 6    we live in.  We know the regulatory failures that have affected
 7    our economy.  This case is absolutely not the type of case
 8    where it can be lumped in with those cases that the courts
 9    speak about weeding speculative claims.  This is a case where
10    the allegations are the defendant had in hand the information
11    that we say is material and would have been material to the
12    investing public.  They had in hand all the negative
13    information.  We've outlined it in our pleading.  And they just
14    didn't tell the investing public the information they had in
15    hand.  And that's not the type of case where the law says
16    should be weeded out.  We say that case where they had the
17    information and chose not to disclose it, is exactly the type
18    of case where there is a role for these cases to protect the
19    investing public because we all know what happened in this case
20    after the IPO.

21         As to the argument about the control.  I already
22    mentioned Sprint Nextel.  Sprint Nextel had the switch here.
23    Its network, we submit, at the very least, that raises an issue
24    as to when Sprint Nextell had control.
25         As to Mr. Micheletto's point on the other side, Virgin

```
 1        Mobile, it's Richard Branson, we believe Richard Branson had a
 2        principle role in everything that went on here, or at least
 3        it's a fact issue.  We dare say that Mr. Branson is not going
 4        to allow his Virgin Mobile brand to be put out to a public
 5        offering without some level of control, without control.  So we
 6        would submit that that also raises a fact issue.  And, Judge,
 7        we submit respectfully the motion to be dismissed in its
 8        entirety.  Thank you.
 9                   THE COURT:  Thank you, Mr. Cecchi.
10                   As I indicated, counsel, at the outset, I did read the
11        written submissions provided to the Court.  I wanted to give
12        counsel an opportunity to be heard orally here today as to the
13        defendants' 12(b)(6) applications to dismiss plaintiffs'
14        amended complaint in this case.
15                   So at this juncture the Court has to look at this
16        complaint in the -- from the standard that all allegations are
17        considered to be true, essentially for leading purposes.  And
18        while there have been a number of arguments raised by defense
19        counsel that this is really a fraud case, and therefore it
20        should be pled with more particularity and more specificity.
21        What has been clearly indicated by the plaintiffs, and the
22        Court has to accept it as true, that this is not a fraud case.
23        And there have been a number of arguments set forth here today
24        that goes toward factual arguments which go towards what's
25        going to bear itself out during the course of the discovery,
```

```
 1    which we don't know what's going to happen at this point
 2    because there has been no discovery.  And so when the Court
 3    looks at this from the Twombly prospective of whether the
 4    pleadings set forth plausible allegations, and whether the
 5    defendants are on notice of what's being alleged against them,
 6    the complaints in its amended state clearly does that.  And so
 7    I don't have any basis upon which to grant the motions to
 8    dismiss.  I'm not suggesting to you that there are not some
 9    claims that are suspect in terms of the strength and ultimately
10    in a summary judgment scenario may in fact go by the wayside,
11    but that's not what we're here for today.  And as it relates to
12    specifically the claims for a dismissal by the Sprint and
13    Corvina defendants, under the Section 15 aspect of the act,
14    there is at this particular point -- these are issues of fact.
15    I mean, it's an issue of fact as to what the control was, how
16    much they control, what did they do.  And the Court can't reach
17    that conclusion as to the Section 11 claims as it relates to
18    the other defendants and whether the omissions were material
19    omissions.  At this stage I'm not suggesting any ruling that
20    these were material omissions, I don't know.  If they do bear
21    themselves out to be accurate based on plaintiffs allegations,
22    it's reasonably understandable that it could in fact have been
23    material and therefore affected the stock.  But it's not only
24    the -- the third quarter of 2007 that's at issue, it's a number
25    of other things that are set forth in the complaint.  I think
```

```
 1        it's certainly set forth with enough information to give
 2        defendants notice of what the claims are, notice of where these
 3        confidential witnesses come from and what their positions were,
 4        and discovery itself will bear itself out as to whether these
 5        are claims that stand from a summary judgment prospective.  But
 6        the motions to dismiss pursuant to 12(b)(6) are going to be
 7        denied at this point.
 8             I do think the complaint is sufficient and
 9        satisfactory in its allegations, and I don't have a basis at
10        this point, in this Court's opinion, to dismiss the complaint
11        at this juncture.  I will just ask, I believe counsel
12        submitted -- I don't have them out here with me.  If we need an
13        order, we'll reach out to counsel as necessary.  Thank you for
14        the briefing, and for the enlightenment for the Court just in
15        terms of -- just the history of this whole thing.  So the case
16        will proceed, it will go through discovery, and we will monitor
17        it closely to see at what point summary judgment will be
18        appropriate because I'm sure we'll be back.  Okay?
19             MR. CECCHI:  Thank you, Judge.  Have a great afternoon
20             MR. GAMBLE:  Your Honor, could I ask that we, in
21        trying to coordinate the case into a going forward basis, that
22        the Court allow us to sit with all the defense counsel and
23        plaintiffs counsel and work out a schedule for discovery and
24        various aspects of the case that makes sense, and we'll submit
25        that to the Court.  And if you can give us maybe ten days to do
```

1    that?

2              THE COURT:  I think that's fine.  We will do it, Mr.

3    Gamble.  Judge Arleo will actually be the magistrate judge

4    assigned, and she will coordinate all discovery.  I'm sure she

5    will not have an objection if you agree.  She knows how I work,

6    I like to move things.  Don't give me 2012, okay, anywhere in

7    that document.  But I think it's absolutely appropriate that

8    you meet and confer and try to set forth some type of schedule.

9              MR. GAMBLE:  Thank you.

10             THE COURT:  But she'll get in touch with you in terms

11   of scheduling and when that conference will be conducted.

12   Okay?  And I'll sort of give her a heads up we're done here and

13   she will proceed and schedule that.

14             MR. GAMBLE:  Thank you, Judge.

15             THE COURT:  Thank you, all.

16             MR. GREENBAUM:  Thank you.

17             (Matter concluded)

18

19

20

21

22

23

24

25