## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

IN RE: VIRGIN MOBILE USA IPO
LITIGATION

This Document Relates To:

               ALL ACTIONS

Lead Case No. 07-05619 (SDW)
(Securities Class Action)

**LEAD PLAINTIFFS' DISCOVERY PLAN**

1. **Set forth a factual description of the case.   Include the causes of action and affirmative defenses asserted.**

      This case involves violations of Sections 11 and 15 of the Securities Act of 1933 ("Securities Act") in connection with Virgin Mobile USA, Inc.'s ("Virgin Mobile") October 10, 2007 initial public offering ("IPO") of 27.5 million shares of common stock to raise gross proceeds of at least *$412.5 million*.   Lead Plaintiffs (the Volpe Group, comprised of Aaron Cheng, Zhao Li, John Mekari, Michael Volpe, and Alan Whiting) aver that the Registration Statement and Prospectus contained a series of materially untrue and misleading statements and omissions related to financial results and business operations; brand strength, marketing, and advertising; competitive strength; internal controls; and, compliance with GAAP and SEC rules.   Defendants named in this action are Virgin Mobile USA, Inc. ("Virgin Mobile" or "Company"), the Individual Defendants who signed the Registration Statement, [1] the Underwriters, [2] and Controlling Corporate Defendants Corvina Holdings Limited[3] and Sprint Nextel Corp. (collectively, "Defendants").

      As alleged in the Consolidated Amended Class Action Complaint ("Complaint")[4], which Judge Wigenton sustained, despite having in hand the poor results for the third

---

[1]     The Individual Defendants are: CEO Daniel H. Schulman, CFO John D. Feehan, Jr., and Board members Frances Brandon-Farrow, Mark Poole, Robert Samuelson, and Douglas B. Lynn.

[2]     The Underwriter Defendants are Merrill Lynch Pierce Fenner & Smith, Inc. ("Merrill Lynch"); Bear, Stearns & Co., Inc. ("Bear Stearns"); Raymond James & Assoc., Inc.; Thomas Weisel Partners, LLC; and Lehman Brothers, Inc. ("Lehman").   On September 19, 2008, the Securities Investor Protection Corporation instituted liquidation proceedings against Lehman, at which time Judge Lynch of the Southern District of New York entered an order staying all proceedings against Lehman.

[3]     Approximately 87% of Corvina Holdings Limited ("Corvina") is held by Virgin Group Holdings Limited ("Virgin Group"), and the remaining 13% of Corvina Holdings Limited is owned jointly by Gamay Holdings Limited and certain senior executives of the Virgin Group -- including Sir Richard Branson, the Virgin Group's founder.

[4]     "¶" refers to the Complaint.

quarter of 2007 -- *the period ended a full 2 weeks prior to the IPO* -- Defendants failed to disclose that Virgin Mobile was not performing according to plan. These results showed: (a) widened financial losses that were higher than projections and far worse than any recent performance reported in the Prospectus; (b) significantly increased expenses; and (c) significantly declining subscriber growth rate. ¶31. Yet, Defendants did not disclose these highly material facts in the Registration Statement and Prospectus filed in connection with the IPO. ¶31. As evidence of the Company's precarious pre-IPO financial position, the Company faced financial difficulties rendering it unable to pay bills as they became due. ¶43. The Company's finance department began delaying payment of its vendors to keep cash on hand. Virgin Mobile was "very effective in dragging its feet and not paying the bills" and would "do all that was possible not to pay." ¶43. Company employees had difficulties in getting vendors paid as early as July 2007 (three months before the IPO). ¶44. Payments were being delayed because the Company needed to increase its cash flow in anticipation of the IPO. ¶44. Many projects were being put on hold -- likely to cut spending until the IPO. ¶44.

Despite rosy representations in the Registration Statement about "marketing efforts," "targeted marketing [and] advertising," and the "goal to attract and retain customers," in truth, exacerbating Virgin Mobile's already dismal position months before the IPO, Defendant Schulman informed employees that the Company was forced to trim manpower by about 100 employees. ¶¶7, 45. As it turned out, many employees cut from the rolls were directly involved on the marketing side of the business. The Company fired several high-level employees as well as several marketing staff members located at Company headquarters. ¶7. The Company initiated a large, undisclosed layoff of between 30 and 50 employees in July 2007 -- just three months before the IPO. ¶46. The Company continued layoffs in August 2007 by firing approximately 12 people from Virgin Mobile's New Jersey headquarters -- about half of whom were marketing personnel. ¶46.

Furthermore, in spite of representations regarding "marketing efforts," "targeted marketing [and] advertising," and the "goal to attract and retain customers," in truth, but undisclosed to investors in the Registration Statement and Prospectus, advertising expenditures significantly decreased beginning in early 2007. ¶47. Less advertising necessarily meant that Virgin Mobile reduced its ability to market itself and attract customers. The resulting customer decline is evidenced by both a decline in subscriber growth and a drop in customer service calls. Specifically, call volume registered at one of Virgin Mobile's customer service centers dropped dramatically and customer growth decreased. ¶48. Thus, as Lead Plaintiffs have alleged, the foregoing statements were rendered materially untrue and misleading in light of the dismal financial situation that existed at the Company at the time of the IPO, as reflected by the third quarter 2007 results.

The Registration Statement and Prospectus also contained statements regarding competitive strengths that purportedly allowed the Company to compete effectively in the domestic wireless market. ¶35. Defendants stated, for example, that Virgin Mobile was "one of the lowest cost operators in the wireless industry" and that "we have a highly variable cost structure, which we believe has allowed us to reach profitability faster than if we were to maintain our own network." ¶35. This subsequently allowed the Company to

free itself from "related capital expenditures and [allowed it] to focus [it's] resources and compete effectively against the major national wireless providers in [the] target market." ¶36. Such statements, however, omitted to disclose the material adverse fact that that the Company was unwilling or unable, even in the fourth quarter of 2007, to lower prices to remain competitive with other providers. ¶39. The Company could not afford to do so because: (a) customer turnover remained steady or increased; (b) there was a rapid decline in net customer additions; and, (c) the Company experienced a loss each time a new customer was added. ¶39.

When the full truth was revealed, Virgin Mobile stock dropped 80%. ¶14. On November 15, 2007, the Company announced poor third quarter results and fourth quarter guidance just one month after the IPO had touted Virgin Mobile's business and prospects. The Company's stock dropped 30% the next day. ¶76. Furthermore, on January 16, 2008 the Company stated that its Chief Marketing Officer would resign. ¶¶8, 77-78. Defendants also admitted, two weeks later, on February 4, 2008, that the Company had low preliminary fourth quarter and year end results, failed to meet its own guidance, and had net customer additions of only 210,000, rather than the 350,000 to 400,000 it had expected. ¶¶11, 73 79-80. Finally, on March 12, 2008, Defendants admitted that customer turnover had risen for the fourth quarter and that the Company expected to attain just 5,000 to 20,000 new customers, down from a whopping 300,000 the same quarter the prior year. ¶¶12, 82. Also on March 12, 2008, the Company conceded that it was unwilling to engage in aggressive pricing tactics of its competitors to attain new customers. ¶¶12, 83.

Section 11 ensures compliance with the disclosure provisions of the Securities Act of 1933 by imposing a ***stringent standard of liability*** on the parties who play a direct role in a registered offering. Liability against the issuer of a security is "***virtually absolute***, even for innocent misstatements." *Herman & MacLean v. Huddleston, et al.*, 459 U.S. 375, 382 (1983) (emphasis added) (a Section 11 action can be brought against the issuer, its directors or partners, underwriters, and accountants); *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 269 (3d Cir. 2006) ("Section 11 is a 'virtually absolute liability provision[], which do[es] not require plaintiffs to allege that defendants possessed any scienter.'") (citation omitted). There is a "relatively minimal burden" on a Section 11 plaintiff. *Huddleston, supra.*

Defendants may seek to prove an affirmative defense (such as due diligence or negative causation), but such a burden is for Defendants to bear and it is a heavy one. *See also In re Worldcom, Inc. Sec. Litig.*, 346 F. Supp. 2d 628, 659 (S.D.N.Y. 2004) ("A defendant's [Section 11(e)] burden in establishing this defense is heavy since 'the risk of uncertainty' is allocated to defendants."); *In re Avant-Garde Computing, Inc. Sec. Litig.*, No. 85-4149, 1989 U.S. Dist. LEXIS 10483, at*4 (D.N.J. Sept. 5, 1989) (denying motion for summary on the Section 11(e) defense, noting "a defendant seeking to achieve summary judgment on the basis of a Section 11(e) defense bears 'an especially high burden' to show that the decline in value was completely unrelated to the allegations of misstatements or omissions in the registration statement."). Indeed, a district court in the Third Circuit recently denied motions for summary judgment on the negative causation defense. *In re Adams Golf, Inc.*, No. 99-371, 2009 U.S. Dist. LEXIS 45728 (D. Del. May

26, 2009) (denying defendants' motion for summary judgment after case was remanded from the Third Circuit, which had earlier reversed the lower court's dismissal of the complaint for failure to state a claim).   The court concluded that "there exists a jury question as to how much, if any, of the company's stock price decline was caused by issues other than the two class-period disclosures." *Id.*, at *12

With regard to the Section 15 controlling person claims, discovery will confirm that Sprint Nextel and Corvina exercised the day-to-day affairs and corporate actions of Virgin Mobile.   Approximately 87% of Corvina Holdings Limited is held by Virgin Group Holdings Limited ("Virgin Group"), and the remaining 13% of Corvina Holdings Limited is owned jointly by Gamay Holdings Limited and certain senior executives of the Virgin Group -- including Sir Richard Branson, the Virgin Group's founder.  ¶20.  Furthermore, at the time of the IPO, Corvina and Sprint were the Company's largest shareholders; controlling 46.41% and 46.63% of the voting power, respectively.  ¶19.  The IPO Prospectus also clearly disclosed that "Sprint Nextel and the Virgin Group *together control us and will continue to control or significantly influence us after this offering.*" (Prospectus at 37).  In addition, other significant facts such as Virgin Group and Sprint Nextel's status as creditors of the Company, comingling of former executives and directors, the Company's dependence on Virgin Group for its brand, and Virgin Mobile's dependence on Sprint for its cellular network will all serve to establish the requisite level of control over Virgin Mobile's day-to-day operations and corporate actions.

2.  **Have settlement discussions taken place? Yes __xxxxx__ No _____**
   **If so, when?**

Unsuccessful mediation took place in New York before the Hon. Layn R. Phillips (Ret.) on June 12, 2009.

3.  **The parties [have _____ -have not __xxxxx__ ] exchanged the information required by Fed. R. Civ. P. 26(a)(1). If not, state the reason therefor.**

Lead Plaintiffs received copies of the relevant insurance policies maintained by the Company that putatively provides coverage the directors and officers.  No other documents have been produced by Defendants as part of their initial disclosure obligations.

The parties have agreed that documents will be produced during the course of discovery in response to any particular request served upon the parties.  The parties have also agreed that the names and contact of information of individuals likely to have discoverable information will be served no later than July 8, 2009.  The parties have further agreed that revelation of damages and computation thereof will be subject to the [Docket Control Order] to be entered by the Court relating to the timing and disclosure of expert witnesses and their reports.

4.  **Describe any discovery conducted other than the above disclosures.**

In accord with the Court's Letter Order of March 18, 2009, indicating that "the parties shall immediately serve interrogatories...and requests for production of documents[,]" Lead Plaintiffs have served Interrogatories directed to Virgin Mobile and the Underwriter Defendants on May 28, 2009.

In addition, Lead Plaintiffs served requests for documents on the following Defendants:

- Virgin Mobile on May 5, 2009;

- Individual Defendants (Daniel H. Schulman, John D. Feehan, Jr., Frances Brandon-Farrow, Mark Poole, Robert Samuelson, and Douglas B. Lynn) on May 21, 2009;

- Underwriter Defendants (Merrill Lynch Pierce Fenner & Smith, Inc., Bear, Stearns & Co., Inc., Raymond James & Assoc., Inc., and Thomas Weisel Partners, LLC) on May 15, 2009; and,

- Controlling Corporate Defendants (Corvina Holdings Limited and Sprint Nextel Corp.) on May 15, 2009.

The parties agreed that responses to discovery would be served after mediation and the parties have met and conferred on a discovery schedule. On June 15, 2009, Lead Plaintiffs re-served all discovery upon the parties and indicated that responses would be due by July 15, 2009 (in accordance with the 30-day requirement of the Federal Rules of Civil Procedure).

**5. Generally, dispositive Motions cannot be filed until the completion of discovery. Describe any Motions any party may seek to make prior to the completion of discovery. Include any jurisdictional Motions and Motions to Amend.**

Lead Plaintiffs may seek to file a motion for class certification pursuant to Fed. R. Civ. P. 23, prior to the completion of discovery, and may also seek to file a motion to amend the complaint.

**6. The parties propose the following:**

**(a) Discovery is needed on the following subjects:**

It is expected that Discovery will encompass the issues alleged in the Complaint (and will include the production of electronic mail messages and other electronic data). For example, Lead Plaintiffs anticipate that discovery will generally be needed related to the IPO, including, but not limited to, minutes of Board meetings, the drafting of and information contained in the Registration

Statement and Prospectus, third quarter 2007 results, widening financial loss, subscriber additions, nonpayment of vendors, invoices and bills, churn, pricing strategy, revenues, accounting and financial statements, budgets, advertising and budgetary cuts, employee terminations and layoffs, overall competition, macroeconomic conditions, any purported due diligence undertaken in connection with the IPO by the Underwriter Defendants and their own investigation of the Company prior to the IPO, and the extent and level of involvement of the Controlling Corporate Defendants upon the affairs of Virgin Mobile.

**(b) Should discovery be conducted in phases? If so, explain.**

Lead Plaintiffs believe all discovery, except expert discovery, should be conducted in tandem. Plaintiffs do not believe breaking discovery into phases would be appropriate, efficient or cost effective, particularly in a complex litigation of this size. "Conducting discovery on overlapping issues in tandem will ultimately reduce the expenses and time of this litigation for both parties." *Netflix, Inc. v. Blockbuster, Inc.*, No. C 06-02361, 2006 U.S. Dist. LEXIS 63154 (N.D. Cal. Aug. 22, 2006).

While Defendants would like to conduct class discovery before fact discovery on the merits[5], discovery on these two points overlaps substantially and attempting to bifurcate these issues would result in substantially increased costs, needless battles over what constitutes class versus merits discovery, and delays and inefficiencies. Indeed, the Court may need "to analyze the elements of the parties' substantive claims and review facts revealed in discovery in order to evaluate whether the requirements of Rule 23 have been satisfied," *Wilson v. County of Gloucester*, 256 F.R.D. 479, 485 (D.N.J. 2009) (citations omitted), because "the class determination generally involves considerations that are 'enmeshed in the factual and legal issues comprising the plaintiff's cause of action.'" *Coopers & Lybrand v. Livesay*, 437 U.S. 463, 469, 98 S.Ct. 2454, 57 L.Ed.2d 351 (1977) (citation omitted). Lead Plaintiffs research has revealed no cases in this district that allow for this kind of bifurcation.

Predictable problems that may arise from bifurcation of class and merits discovery include:

- Disputes over whether discovery served is class or merits-based;

---

[5]  The parties initially intended to submit a Joint Discovery Plan. A draft was circulated by Lead Plaintiffs to Defendants on Monday, June 15, the first business day after the failed mediation. Defendants emailed their revised version on Wednesday, June 17, at 9:00pm. On Thursday, June 18, the parties held a conference call to meet and confer. At Defendants' request, Lead Plaintiffs circulated a proposed revised schedule of dates that same day. After the parties exchanged drafts of a Joint Discovery Plan on Friday, June 19, Defendants advised Plaintiffs that they would not sign the Joint Plan and indicated that the parties should file separate Discovery Plans. As a result, Plaintiffs do not know precisely what positions Defendants may take in their final submission. Plaintiffs' discussions herein of Defendants' positions are based upon the draft Joint Report they circulated on Wednesday, June 17, and the telephonic meet and confer session on June 18. To the best of Lead Plaintiffs' knowledge, the only dispute is as to whether fact discovery and class discovery should be bifurcated.

- Coordination of electronic production such as search terms and parameters;
- The necessity of rerunning searches on potentially millions of documents;
- Significantly increased costs and related inefficiencies; and
- Repeated trips to the Court for resolution of these many issues, resulting in wasted judicial resources.

<u>Lead Plaintiffs' Response to Underwriter Defendants' Unprecedented Request To Stay Discovery as To Them:</u>

Underwriter Defendants seek to impose a stay of discovery with respect to "certain topics," including but not limited to due diligence "until after the Court has rendered a decision with respect to the Company's claimed misrepresentations or omissions." Of course, for the purposes of the scope of discovery, the Court has already rendered a decision, denying Defendants' motions to dismiss in its entirety. Now that Plaintiffs have survived the motion to dismiss in full, the discovery stay of the Private Securities Litigation Reform Act ("PSLRA") has been lifted and the door is open for full discovery.

Underwriter Defendants' argument -- a creative but baseless request that the Underwriter Defendants be excused from participating in discovery until such time as Plaintiffs have proved their case in chief -- has no precedent in law. Significantly, Underwriter Defendants' "due diligence" documents are relevant to Plaintiffs' case in chief and there is no basis for delay of this discovery.

Any purported reliance of one Underwriter Defendant on another does not excuse the Underwriter Defendants from liability for a Section 11 claim. *In re: Security America Corporation Securities Litigation,* 1985 U.S. Dist. LEXIS 17024, at *16 (N.D. Ill. Aug. 9, 1985) ("the duty of due diligence is imposed on all underwriters regardless of their agreements inter se") (cited by *Special Situations Fund, III, L.P. v. Cocchiola,* 2007 U.S. Dist. LEXIS 56627 (D.N.J. Aug. 3, 2007)).

It is plain from Underwriter Defendants' own position that they believe they need discovery -- including of former Lehman and Bear employees. They indicate that they "anticipate difficulty securing time and attention" regarding these former employees. That is what the discovery process is for, and the fact that relevant information may be in the hands of third parties -- as it is in every litigation of this type -- does not provide any excuse for Underwriter Defendants to delay or be excused from addressing these issues until a time of their choosing. Those same former employees have information relevant to Plaintiffs' case in chief. There is nothing to prevent Underwriter Defendants from issuing a subpoena to the former Lehman employees, or from applying to the bankruptcy Court for access to Lehman documents. Underwriter Defendants' inability to prove their affirmative defense of due diligence -- for whatever reason -- simply means that affirmative defense does not apply.

Underwriter Defendants' position that this situation is unique is just untrue. There is nothing unusual about an underwriter or other key player in an IPO going bankrupt prior to or during the pendency of a class action and it does not result in any special protections from discovery for the remaining defendants. The Lehman bankruptcy is highly complex and could last well beyond the trial in this case; Underwriter Defendants cannot use it as a shield to protect them and to prevent Lead Plaintiffs from proceeding with discovery against the Underwriter Defendants who are not in bankruptcy (*e.g.*, all Underwriter Defendants except Lehman). Further, the purported disruption of the financial markets carries no weight – there is no exemption from discovery that applies to defendants impacted by the financial markets, short of bankruptcy.

**(c) Number of Interrogatories by each party to each other party:**

Lead Plaintiffs have served Interrogatories on Virgin Mobile (11) and the Underwriter Defendants (4 each) in accord with Fed. R. Civ. P. 33, which provides for the service of 25 interrogatories upon a party. Lead Plaintiffs request the Court's leave to be permitted to serve up to a total of 50 interrogatories on each party, in light of the highly complex and document-intensive nature of this litigation involving numerous large corporations.

**(d) Number of Depositions to be taken by each party:**

At the present time, the number of depositions and identities of deponents are not known. Lead Plaintiffs anticipate taking, at a minimum, 25 depositions to include the following:

- A representative of the Company who is knowledgeable about third quarter 2007 results, widening financial loss, subscriber additions, nonpayment of vendors, advertising and budgetary cuts, and overall competition, among other things;

- A representative of Raymond James, Merrill Lynch, Thomas Weisel Partners, Bear Stearns, Sprint Nextel, and Corvina Holdings, regarding *inter alia* any pre-IPO due diligence investigation;

- Each of the Individual Defendants (Daniel H. Schulman, John D. Feehan, Jr., Frances Brandon-Farrow, Mark Poole, Robert Samuelson, and Douglas B. Lynn) with respect to, *inter alia*, their roles in the Company and in the IPO;

- Sir Richard Branson regarding issues, for example, related to the exertion of control upon Virgin Mobile either personally or through Corvina Holdings;

- Analysts who covered Virgin Mobile with respect, *inter alia*, to their coverage of the Company and its stock, as well as any forecasts and guidance they provided to investors;

- Employees and former employees of the Company who can, in part, discuss the Company's financial and operational condition, and who can elaborate on the allegations contained in the Complaint; and,

- Representatives of vendors with whom Virgin Mobile contracted who are able to discuss the nonpayment of invoices prior to the IPO, among other things.

(e) **Expert reports (and disclosure of identities of testifying experts) for Plaintiff and Parties with the burden of proof on an issue due on August 16, 2010.**

(f) **Defendants' and Parties without the burden of proof on an issue expert report (and disclosure of identities of testifying experts) due on October 15, 2010. Rebuttal opinions thereto by the testifying expert identified in subparagraph (e), above, due on November 15, 2010.**

(g) **Motions to Amend or to Add Parties to be filed by October 23, 2009.**

(h) **Dispositive motions are to be served within 45 days of completion of [Expert] discovery, by January 31, 2011. Any other pretrial motions/ motions *in limine* (including *Daubert/Kumho* motions) are due by February 18, 2011.**

(i) **The parties disagree as to fact discovery and class certification motion deadlines:**

*Lead Plaintiffs propose the following*:

All discovery (including for class certification, but excluding expert discovery) to be completed by June 23, 2010.

Lead Plaintiffs' Motion for Class Certification shall be served by July 23, 2010. Memoranda of Law in Opposition to Lead Plaintiffs' Motion for Class Certification shall be served by August 23, 2010. Reply Memorandum of Law in Further Support of Lead Plaintiffs' Motion shall be served by September 23, 2010.

(j) **Expert discovery to be completed by December 15, 2010.**

(k) **Set forth any special discovery mechanism or procedure requested, including data preservation orders or protective orders:**

None at this time.

**(l)  A pretrial conference may take place on January 31, 2011.**

**(m)Trial by jury or non-jury Trial?**

Jury Trial

**(n) Trial date:** Trial date: March 21, 2011.

7.  **Do you anticipate any discovery problem(s)? Yes  _xxxxx_____    No  _____.   If so, explain.**

Not at this time.

8.  **Do you anticipate any special discovery needs (i.e., videotape/telephone depositions, problems with out-of state witnesses or documents, etc.)? Yes _____  No _xxxxx_. If so, explain.**

9.  **State whether this case is appropriate for voluntary arbitration (pursuant to L. Civ. R. 201.1 or otherwise), mediation (pursuant to L. Civ. R. 301.1 or otherwise), appointment of a special master or other special procedure.  If not, explain why and state whether any such procedure may be appropriate at a later time (i.e., after exchange of pretrial disclosures, after completion of depositions, after disposition of dispositive motions, etc.).**

The parties attempted unsuccessfully to mediate this dispute on June 12, 2009 before the Hon. Layn R. Phillips (Ret.).  As discovery progresses, the parties anticipate that further attempts at mediating this dispute may be possible.

10. **Is this case appropriate for bifurcation? Yes _____  No _____**

All parties, other than Underwriter Defendants, as noted above, believe this case is not appropriate for bifurcation.

**11. We [do _____ do not  xxxxx ] consent to the trial being conducted by a Magistrate Judge.**

Respectfully submitted,

Kim E. Miller
Melissa Ryan Clark
**KAHN SWICK & FOTI, LLC**
12 East 41st Street, 12th Floor
New York, NY 10017
Tel: 212-696-3730
kim.miller@ksfcounsel.com
melissa.clark@ksfcounsel.com

Lewis S. Kahn
Paul S. Balanon
**KAHN SWICK & FOTI, LLC**
650 Poydras Street, Suite 2150
New Orleans, LA 70130
Tel: 504-455-1400
lewis.kahn@ksfcounsel.com
paul.balanon@ksfcounsel.com

James E. Cecchi
A. Richard Ross
**CARELLA, BYRNE, BAIN, GILFILLAN,
CECCHI, STEWART & OLSTEIN, P.C.**
5 Becker Farm Road
Roseland, NJ 07068
Tel: 973-994-1700
JCecchi@CarellaByrne.com
RRoss@CarellaByrne.com

*Counsel for Lead Plaintiffs the Volpe Group
(Aaron Cheng, Zhao Li, John Mekari, Michael
Volpe and Alan Whiting) and the Class*