# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| IN RE VIRGIN MOBILE USA IPO LITIGATION | Civil Action No. 07- 5619 (SDW) |

-------------------------------------------------------------------------------

## MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR FINAL APPROVAL OF SETTLEMENT AND PLAN OF ALLOCATION

-------------------------------------------------------------------------------

James E. Cecchi
Lindsey H. Taylor
CARELLA, BYRNE, CECCHI,
OLSTEIN, BRODY & AGNELLO, P.C
5 Becker Farm Road
Roseland, New Jersey 07068
(973) 994-1700

Kim E. Miller
Melissa Ryan Clark
KAHN SWICK & FOTI, LLC
500 Fifth Avenue, Suite 1810
New York, New York 10110
(212) 696-3730

-and-

Lewis S. Kahn
Paul S. Balanon
Sarah Cate Boone
KAHN SWICK & FOTI, LLC
206 Covington Street
Madisonville, Louisiana 70447
(504) 455-1400

*Co-Lead Counsel for Lead Plaintiffs and the Class*

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................ iv

PRELIMINARY STATEMENT .........................................................................1

FACTUAL AND PROCEDURAL BACKGROUND ........................................2

   I.   Procedural and Case History .......................................................................3

     A.  Pre-Filing Investigation...............................................................................3

     B.  Co-Lead Counsel Files Initial Complaint and Issues Statutory Notice .......4

     C.  Multi-District Litigation...............................................................................5

     D.  Appointment of Lead Plaintiffs and Co-Lead Counsel.................................6

     E.  The Amended Complaint ..............................................................................7

       1.  Core Allegations in the Amended Complaint .........................................7

     F.  Lead Plaintiffs Defeat Defendants' Motions to Dismiss ...........................11

     G.  First Mediation...........................................................................................12

     H.  Merits Discovery........................................................................................13

     I.  Co-Lead Counsel Establishes Discovery Procedures and Protocols .........14

     J.  Discovery Disputes and Court Hearings....................................................14

     K.  Lead Plaintiffs' Review and Analysis of Over Three Million Pages of
Documents Produced by Defendants and Third Parties ..............................16

     L.  Depositions.................................................................................................17

     M.  Second Mediation and Settlement Reached Thereafter...........................19

LEGAL ARGUMENT......................................................................................20

THE PROPOSED SETTLEMENT IS FAIR, REASONABLE AND ADEQUATE
...........................................................................................................................20

   I.   Standard of Review.....................................................................................20

II.    The *Girsh* Factors ...................................................................................22

   A.   Complexity, Expense, and Likely Duration of the Litigation...................23

   B.   The Reaction of the Class to the Settlement ...............................................25

   C.   The Stage of Proceedings and the Amount of Discovery .........................26

   D.   Risks of Establishing Liability and Damages ............................................30

   E.   Risks of Maintaining Class Action Status through Trial ..........................32

   F.   Ability to Withstand Greater Judgment .....................................................34

   G.    The Range of Reasonableness of the Settlement Fund in Light of the
   Best Possible Recovery and All the Attendant Risks of Litigation .................35

THE PLAN OF ALLOCATION IS FAIR, REASONABLE, AND ADEQUATE 38

CONCLUSION ......................................................................................................40

# TABLE OF AUTHORITIES

**Cases**

*Dewey v. Volkswagen of* America, Nos. 07-2249 and 07-2361, 2010 WL 3018305 (D.N.J. July 30, 2010) ..........................................................................................22

*Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336 (2005) .................................31

*Ehrheart v. Verizon Wireless,* No. 08-4323, 2010 WL 2365867 (3d Cir. June 15, 2010)....................................................................................................................20

*Girsh v. Jepson*, 521 F.2d 153 (3d Cir. 1975) ........................................... 20, 22, 32

*In re Am. Investors Life Ins. Co.*, 263 F.R.D. 226 (E.D. Pa. 2009) ........................26

*In re American Family Enterprises,* 256 B.R. 377, 421 (D.N.J. 2000)...................22

*In re American Int'l Group, Inc. Sec. Litig.*, 265 F.R.D. 157 (S.D.N.Y. 2010) 31, 33

*In re Apollo Group, Inc. Sec. Litig.,* No. 04-2147, 2008 WL 3072731 (D. Ariz. Aug. 4, 2008) .......................................................................................................31

*In re AremisSoft Corp. Sec. Litig.*, 210 F.R.D. 109 (D.N.J. 2002).........................39

*In re Cendant Corp. Litig.*, 264 F.3d 201 (3d Cir. 2001) ... 21, 22, 23, 26, 30, 34, 38

*In re Cmty. Bank of N. Virginia*, 418 F.3d 277 (3d Cir. 2005)................................20

*In re Crazy Eddie Sec. Litig*., 792 F. Supp. 197 (E.D.N.Y. 1992) ..........................33

*In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768 (3d Cir. 1995) .............................................................. 20, 22, 23, 27, 30, 32, 36

*In re Gilat Satellite Networks, Ltd.*, No. 02-1510, 2007 WL 2743675 (E.D.N.Y. Sept. 18, 2007)....................................................................................................21

*In re Ikon Office Solutions, Inc., Sec. Litig*, 194 F.R.D. 166 (E.D. Pa. 2000).. 38, 39

*In re Initial Public Offerings Sec. Litig.*, 471 F.3d 24 (2d Cir. 2006) .............. 33, 34

*In re Insurance Brokerage Antitrust Litig.*, 579 F.3d 241 (3d Cir. 2009) ........ 21, 26

*In re Livent, Inc. Noteholders Sec. Litig.*, 151 F. Supp. 2d 371 (S.D.N.Y. 2001)...33

*In re Lucent Techs., Inc. Sec. Litig.*, 307 F. Supp. 2d 633 (D.N.J. 2004)... 27, 29, 39

*In re Merck & Co, Vytorin Erisa Litig.*, 2010 WL 547613 (D.N.J. Feb. 9, 2010) ..38

*In re Prudential Insurance Co. of America Sales Practices Litigation*, 962 F.Supp. 450 (D.N.J. 1997) .......................................................................... 22, 25, 30, 36

*In re Remoron Direct Purchase Antitrust Litig.*, No. 03-0085, 2005 WL 3008808 (D.N.J. Nov. 9, 2005) ........................................................................................29

*In re Rentway Sec. Litig.*, 305 F. Supp. 2d 491 (W.D. Pa. 2003) ...........................37

*In re Schering-Plough/Merck Merger Litigation,* No. 09-1099, 2010 WL 1257722, at *10 (D.N.J. Mar. 26, 2010)....................................................... 21, 23, 26, 28, 35

*In re Toys-R-Us Antitrust Litig.*, 191 F.R.D. 347, 352 (E.D.N.Y. 2000) ...............38

*In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516 (3d Cir. 2004) . 20, 21, 22, 23, 35, 36

*In re Warner Commc'ns Sec. Litig.*, 618 F. Supp. 735 (S.D.N.Y. 1985), *aff'd*, 798 F.2d 35 (2d Cir. 1986) ...........................................................................................30

*Louisiana Mun. Police Employees Retirement Sys. v. Sealed Air Corp.,* No. 03-4372, 2009 WL 4730185 (D.N.J. Dec. 4, 2009) . 23, 24, 25, 26, 27, 30, 31, 34, 37

*McCoy v. Health Net, Inc.*, 569 F.Supp.2d 448, 461 (D.N.J. 2008) ........... 30, 39, 40

*Milliron v. T-Mobile USA, Inc.*, No. 08-4149, 2009 WL 3345762 (D.N.J. Sept. 10, 2009) ......................................................................................................................38

*Trief v. Dun & Bradstreet Corp.*, 840 F. Supp. 277 (S.D.N.Y. 1993).....................21

*Varacallo v. Mass. Mut. Life Ins. Co.*, 226 F.R.D. 207, 240 (D.N.J. 2005)............22

*Weiss v. Mercedes-Benz of North America,* 899 F.Supp. 1297 (D.N.J. 1995)........30

*West Virginia v. Chas. Pfizer & Co.*, 314 F. Supp. 710, 743-44 (S.D.N.Y. 1970), *aff'd*, 440 F.2d 1079 (2d Cir. 1971) ...................................................................30

**Statutes**

15 U.S.C. § 77k(a) ......................................................................................................3

15 U.S.C. § 77k(e) ...........................................................................................38

15 U.S.C. § 77z-1(a)(3)(B)(iii)(I) ....................................................................6

**Other Authorities**

7 Conte & Newberg, *Newberg on Class Actions* §22.91 at 386-387 (4th ed. 2002)
............................................................................................................21

**Rules**

Fed. R. Civ. P. 12(b)(6).....................................................................................11

Fed. R. Civ. P. 8 ...............................................................................................12

Fed. R. Civ. P. 9(b) .................................................................................... 11, 12

Fed.R.Civ.P. 23 .......................................................................................... 20, 21

## **PRELIMINARY STATEMENT**

Lead Plaintiffs Aaron Cheng, Zhao Li, John Mekari, and Alan Whiting respectfully seek final approval of the $19,500,000 cash Settlement and the Plan of Allocation.   Lead Plaintiffs and Co-Lead Counsel submit that the proposed Settlement is not only fair, reasonable, and adequate for the reasons discussed herein, in accordance with the Third Circuit's *Girsh* factors, but also provides a truly exceptional result in which Lead Plaintiffs recovered nearly one-third of the maximum recoverable damages for the Class and avoided the serious risks of continued litigation in the face of unique and novel issues in uncertain economic times.

The Settlement is the product of three years of hard-fought, intensive litigation, culminating in a settlement achieved on the brink of the discovery cut-off, only after millions of pages of documents had been produced by Defendants and analyzed by Co-Lead Counsel, sixteen depositions taken, and after numerous discovery and scheduling disputes had been resolved by Magistrate Judge Arleo.

Prior to settlement, Lead Plaintiffs had a comprehensive understanding of the factual and legal underpinnings of this complex securities class action based upon:

- In-depth informal investigation before formal discovery commenced, which included retention and supervision of multiple highly-trained investigators who identified and interviewed former employees and other sources with knowledge;

- Research and drafting of the Amended Complaint, which included analysis of analyst reports, Securities and Exchange Commission ("SEC") filings, news articles, press releases, and announcements by and relating to the Company;

- Extensive briefing and oral argument on Defendants' motions to dismiss, which the Court denied in full;

- Intensive discovery involving Lead Plaintiffs' review and analysis of more than three million pages of documents;

- Taking and/or defending depositions of at least sixteen fact witnesses, which generated more than 2,400 pages of transcript testimony;

- Working with economists and causation and damages consultants; and,

- Addressing multiple discovery and scheduling disputes at numerous in-Court conferences before Magistrate Judge Arleo.

The Settlement represents an extraordinary outcome for the Class in the form of a $19.5 million cash recovery now and providing significant relief to Virgin Mobile stockholders in trying economic times. For the reasons discussed herein, Lead Plaintiffs respectfully request that this Court approve the Settlement and the Plan of Allocation and enter the proposed Order and Final Judgment.

## **FACTUAL AND PROCEDURAL BACKGROUND**

This case is a federal securities class action brought on behalf of the purchasers of Virgin Mobile common stock pursuant to its October 10, 2007,

initial public offering ("IPO").[1] Through the IPO, Defendants sold 27.5 million shares of common stock to raise gross proceeds of at least $412.5 million. The action was brought pursuant to Sections 11 and 15 of the Securities Act, seeking remedies for damages caused to the Class when Defendants issued, as part of the IPO, a registration statement and prospectus ("Registration Statement") that allegedly "contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading." 15 U.S.C. § 77k(a).

## I.   <u>Procedural and Case History</u>

### A.   Pre-Filing Investigation

In preparation for the initiation of this lawsuit, Co-Lead Counsel undertook a preliminary, pre-filing investigation (regarding the Company's products, customers, and prospects, as well as causation and the timing and significance of the various drops in stock price); reviewed and analyzed Virgin Mobile's SEC and

---

[1]      This settlement resolves all claims against Defendants: Virgin Mobile USA, Inc. ("Virgin Mobile" or the "Company"); Daniel H. Schulman, John D. Feehan, Jr., Frances Brandon-Farrow, Mark Poole, Robert Samuelson, Douglas B. Lynn (the "Individual Defendants"); Sprint Nextel Corporation and Corvina Holdings Limited (the "Entity Defendants"); and, Merrill Lynch, Pierce, Fenner & Smith, Inc., Bear, Stearns & Co., Inc., Raymond James & Associates, Inc., and Thomas Weisel Partners LLC (the "Underwriter Defendants").   In connection with the settlement, on July 23, 2010, the parties stipulated to the dismissal of Defendant Lehman Brothers, Inc. ("Lehman"), which is in bankruptcy proceedings pursuant to the Securities Investor Protection Act, and the Court so ordered its dismissal on July 27, 2010. *See* Docket Entry ("DE") 134.

other public filings and data concerning the Company; assessed the Company's operational and financial condition; and researched the applicable law regarding the claims asserted and potential defenses thereto.[2]

**B.     Co-Lead Counsel Files Initial Complaint and Issues Statutory Notice**

Co-Lead Counsel prepared, drafted, and, on November 21, 2007, filed the first complaint in this action, *Volpe v. Schulman, et al.*, Civil Action No. 07-5619(SDW)(MCA), on behalf of named plaintiff Michael Volpe. Co-Lead Counsel subsequently issued the statutory notice pursuant to the Private Securities Litigation Reform Act of 1995 ("PSLRA") alerting the public to the filing. Subsequent actions were filed in the Southern District of New York: *Ellen Brodsky*

---

[2]     Submitted herewith are the following supporting documents: (i) Declaration of Kim E. Miller in Support of the Motion for Final Approval of Settlement and Plan of Allocation, Motion for Award of Attorneys' Fees and Expenses and Reimbursement of Lead Plaintiffs' Costs ("Miller Decl."); (ii) Declaration of Mediator Hon. Layn R. Phillips in Support of Motion for Approval of Settlement ("Mediator Decl."), attached as Exhibit A to the Miller Decl.; (iii) Affidavit of Jason Zuena Regarding the Mailings of the Notice and Proof Of Claim and the Publications of the Summary Notice ("Zuena Aff.") and supporting documents and affidavits thereto, attached *in globo* as Exhibit B to the Miller Decl.; (iv) Declaration of Alan Whiting in Support of the Settlement and for PSLRA Reimbursement ("Whiting Decl."), attached as Exhibit C to the Miller Decl.; (v) Declaration of Manhin Aaron Cheng in Support of the Settlement and for PSLRA Reimbursement ("Cheng Decl."), attached as Exhibit D to the Miller Decl.; (vi) Declaration of Zhao Li in Support of the Settlement and for PSLRA Reimbursement ("Li Decl."), attached as Exhibit E to the Miller Decl.; and, (vii) Declaration of John Mekari in Support of the Settlement and for PSLRA Reimbursement ("Mekari Decl.") attached as Exhibit F to the Miller Decl.

*v. Virgin Mobile USA, Inc., et al.*, Docket No. 07-cv-10589-TPG (filed November 26, 2007); *Roger Joseph, Jr. v. Virgin Mobile USA, Inc., et al.*, Docket No. 07-cv-11060-UA (filed December 6, 2007); and, *2 West, Inc. v. Virgin Mobile USA, Inc., et al.*, Docket No. 07-cv-11625-UA (filed December 28, 2007).

### C.      Multi-District Litigation

On January 7, 2008, certain Defendants filed a motion with the Judicial Panel on Multidistrict Litigation ("JPML") for coordinated or consolidated pretrial proceedings in the Southern District of New York. *See* JPML, MDL No. 1931, Docket Entry ("DE") 1; *see also* Miller Decl. at ¶16.  Co-Lead Counsel opposed that request and instead sought centralization in the District of New Jersey. Co-Lead Counsel contended that New Jersey – not New York – was the most convenient forum because it was where the first of the cases was filed, where the corporate headquarters of Virgin Mobile were located, the locale from which the materially false and misleading representations emanated, where the bulk of the documents sought in discovery would be located, and where most of the witnesses who would be deposed, lived, or were employed. Co-Lead Counsel attended a hearing on the issue in Austin, Texas on March 27, 2008, and argued for centralization in this District. On April 7, 2008, the JPML ordered this case centralized for consolidated pretrial proceedings in this Court. *See* DE 12.

D.        **Appointment of Lead Plaintiffs and Co-Lead Counsel**

On January 22, 2008, Co-Lead Counsel reviewed the applicable law (including calculating and assessing the alleged losses of proposed Lead Plaintiffs), and filed a motion seeking appointment Lead Plaintiffs' appointment and approval of their selection of Co-Lead Counsel, filed in both this District and the Southern District of New York. *See* Miller Decl. at ¶17. Co-Lead Counsel contended that Lead Plaintiffs – pursuant to the PSLRA – sustained the largest losses and, thus, had "the largest financial interest in the relief sought by the class and who otherwise satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure." 15 U.S.C. § 77z-1(a)(3)(B)(iii)(I). The lead plaintiff motion was contested by another movant and Co-Lead Counsel, on behalf of Lead Plaintiffs, filed an opposition on February 4, 2008, asserting that the competing movant had lower financial losses than Lead Plaintiffs.

On March 17, 2008, the Court appointed Aaron Cheng, Zhao Li, John Mekari, Michael Volpe[3], and Alan Whiting to serve as Lead Plaintiffs and approved their selection of Kahn Gauthier Swick, LLC (now Kahn Swick & Foti, LLC ("KSF")) and Carella, Byrne, Cecchi, Olstein, Brody & Agnello, P.C. ("Carella Byrne") to serve as Co-Lead Counsel. *See* DE 24.

---

[3]      On April 26, 2010, the Court approved the withdrawal of Michael Volpe as a lead plaintiff. DE 121.

### E.   The Amended Complaint

Co-Lead Counsel then undertook an extensive investigation of Virgin Mobile to prepare the Consolidated Amended Complaint ("Amended Complaint"). *See* Miller Decl. at ¶19. During the investigative phase, Co-Lead Counsel engaged highly experienced private investigators who conducted interviews of a number of former employees of Virgin Mobile, including those cited in the Amended Complaint as CWs. *Id.* Co-Lead Counsel also investigated whether the movement of Virgin Mobile's stock price correlated with any disclosures of truth and consulted with economists who performed an events study regarding these issues. *Id*. These stock analyses formed an essential component in ensuring that Lead Plaintiffs could rebut any potential loss causation affirmative defense. Co-Lead Counsel further reviewed and analyzed additional SEC and other public filings of the Defendants. On May 16, 2008, Lead Plaintiffs filed the Amended Complaint. *See* DE 28.

#### 1.   Core Allegations in the Amended Complaint

Lead Plaintiffs allege that, in connection with the IPO, Defendants issued a Registration Statement that included material misstatements regarding the financial and business strengths of Virgin Mobile including that:

- Virgin Mobile "[had] continued to grow [its] customer base rapidly." *See* Amended Complaint at ¶29[4];

---

[4]     References to ¶___ are to the Amended Complaint.  DE 28.

- Total operating revenue and net income had increased year over year and from the first six months of 2006 to the first six months of 2007. ¶30;

- Virgin Mobile was "one of the lowest cost operators in the wireless industry" with a "highly variable cost structure" allowing Virgin Mobile to "reach profitability faster." ¶35;

- Virgin Mobile "is the number one brand for prepaid wireless services in the United States in awareness and purchase consideration among 14-34 year-olds." ¶40;

- Virgin Mobile "aim[ed] to maintain and strengthen a vibrant brand image that resonates with [its] customers and distinguishes [it] from other wireless service providers." ¶40;

- Virgin Mobile "[would] continue to enhance [its] brand through targeted marketing, advertising, product packaging, point-of-sale materials and innovative services." ¶40; and,

- Virgin Mobile's "consolidated financial statements [were] prepared in accordance with GAAP." ¶55.

The Amended Complaint alleges that the foregoing statements failed to disclose that Virgin Mobile had already experienced poor results for the third quarter of 2007 (3Q:07) – the period that ended nearly two weeks prior to the IPO. ¶4. Despite the poor results being allegedly in hand at the time, the Registration Statement touted Virgin Mobile's current business condition and future prospects. The Amended Complaint alleges that the Registration Statement also omitted to disclose the allegedly true, adverse fact that Virgin Mobile would be unable to experience strong customer additions – including in the crucial fourth quarter –and

was unwilling or unable to lower prices as necessary to remain competitive. ¶66.

Lead Plaintiffs allege that Virgin Mobile was struggling financially, had cut television advertising, and laid off many employees, including core marketing personnel. *Id.*, ¶7. Virgin Mobile allegedly lacked cash and began delaying and refusing to pay vendors. Months before the IPO, Virgin Mobile CEO Defendant Schulman allegedly told employees personnel would need to be reduced by about 100 employees. The Amended Complaint asserts these allegations were confirmed by confidential witnesses referred to therein. ¶7. While the Complaint pleads that Defendant Schulman told employees the reduction would be made through natural attrition, Virgin Mobile instead is alleged to have conducted layoffs and fired several high-level employees and marketing staff members at headquarters. *Id.*

The Amended Complaint further asserts that Virgin Mobile was unable to attract new customers and unable to compete with other service providers because of weak marketing and Virgin Mobile's inability to offer the discounts and subsidies provided by other companies. Television advertising was also allegedly cut prior to the IPO, further contributing to the decline of customer additions. *Id.* According to Plaintiffs, Virgin Mobile was thus unable to compete in the market with its competitors and could not lower prices to become competitive because of cash flow problems and declining new subscriber rates. ¶9. Plaintiffs allege that Defendants neglected to state in the Registration Statement that Virgin Mobile had

been experiencing multiple financial stresses that were indicative of an inability to reduce prices for service and/or increase subsidies. ¶¶35-39.

The Amended Complaint also claims that the market eventually became aware of the truth about Virgin Mobile through a series of partial disclosures, including: (i) a November 15, 2007 announcement regarding Virgin Mobile's allegedly poor third quarter results and fourth quarter guidance, just one month after the IPO (¶6) that allegedly caused Virgin Mobile's opening stock price of $11.09 to drop to a close that day at $9.10 (¶76); and (ii) a January 16, 2008 announcement that Virgin Mobile's Chief Marketing Officer would resign (¶¶8, 77-78) which is alleged to have revealed grave problems with Virgin Mobile's customer accrual and retention (¶77) and to have highlighted problems within the marketing and advertising departments. ¶66.

On February 4, 2008, Virgin Mobile reported preliminary fourth quarter and year end results which the Amended Complaint alleges (i) failed to meet Virgin Mobile's own guidance, and (ii) showed net customer additions of only 210,000, rather than the allegedly expected additions of up to 400,000. ¶¶11, 73, 79-80. The Amended Complaint also asserts that on March 12, 2008, Virgin Mobile announced that customer turnover had risen for the fourth quarter and that Virgin Mobile expected to attain just 5,000 to 20,000 new customers, down from 300,000 the same quarter the prior year. ¶¶12, 82.

Plaintiffs claim that on March 12, 2008, Virgin Mobile conceded it was unwilling to engage in aggressive pricing tactics of its competitors to attain new customers. ¶¶12, 83. These disclosures were alleged to be symptomatic of the weakened brand strength by the time of the IPO that Defendants failed to disclose in the Registration Statement. Lead Plaintiffs allege these problems continued through the first quarter of 2008 as a consequence of undisclosed financial stresses that led to Virgin Mobile's lack of continuing growth, decreased marketing, and brand erosion. ¶¶40-48. Virgin Mobile shares dropped from the IPO price of $15.00 per share to a closing price of $2.46 per share on March 12, 2008. ¶14.

### F.   Lead Plaintiffs Defeat Defendants' Motions to Dismiss

In accordance with the PSLRA, discovery is stayed during the pendency of a motion to dismiss. On July 15, 2008, Defendants filed motions to dismiss the Amended Complaint pursuant to Fed. R. Civ. P. 12(b)(6). Defendants argued, among other things: that the particularity standard of Fed. R. Civ. P. 9(b) for pleading fraud applied; that Defendants did not make any material misstatements or omissions; that Lead Plaintiffs should not be permitted to rely on confidential witnesses cited in the Complaint; and that Defendants had no duty to disclose the third quarter 2007 results. *See* Miller Decl. at ¶27.

On October 6, 2008, Lead Plaintiffs filed their oppositions to Defendants' motions to dismiss. *See* Miller Decl. at ¶28. Lead Plaintiffs contended *inter alia*:

that the Complaint sounded in strict liability or negligence in accord with a Section 11 action and was not subject to the particularity pleading requirements of Fed. R. Civ. P. 9(b) and the PSLRA; that even if the particularity requirements applied, Lead Plaintiffs' allegations had met that burden; that the Complaint sufficiently identified numerous material misstatements and omissions (regarding a widened financial loss, increased expenses, and falling subscriber growth rates); that the pleading of confidential witnesses surpassed the standards for negligence and strict liability claims; and that Defendants had heightened duties to disclose in the context of IPOs. Defendants filed their replies on November 5, 2008.

On March 9, 2009, the Court heard oral argument on the motions to dismiss. Arguments by both sides addressed in detail a number of complex legal issues, some but not all of which were addressed in the briefing. *See* Miller Decl. at ¶29.

Thereafter, the Court issued a bench ruling and denied the motions to dismiss in full. *See* DE 52. Defendants filed their Answers in June 2009 and asserted numerous affirmative defenses.

### G.   First Mediation

The parties discussed the possibility of private mediation soon after the decision on the motions to dismiss and agreed to attend a full-day mediation before the Hon. Layn R. Phillips (Ret.), a former Federal District Court Judge, on June 12, 2009, in New York City. The parties briefed their respective positions, provided

presentations at the mediation, and answered questions. The mediation was unsuccessful. *See* Miller Decl. at ¶31; Mediator Decl. at ¶¶5-6.

### H.   Merits Discovery

The parties then commenced merits discovery. *See* Miller Decl. at ¶32-35. In the initial stages of discovery, the parties communicated continually over the course of several months to negotiate such fundamental issues as electronic search terms, custodians, scope of discovery, and means of electronic production. In particular, Co-Lead Counsel initially tendered a comprehensive list of over 200 individual search terms, after which the parties spent a considerable amount of time devising appropriate term limitations. The parties conferred over such issues as the generation of false hits and over-inclusiveness of particular terms. *See* Miller Decl. at ¶51. In addition, the parties conferred numerous times and exchanged multiple drafts to eventually reach agreement on appropriate language for the Discovery Confidentiality Order. *See* DE 81.

The parties, however, could not agree on certain terms for a Joint Discovery Plan, and, in particular, disagreed regarding whether to bifurcate class and merits discovery; Defendants sought bifurcation, which Lead Plaintiffs opposed. *See* Miller Decl. at ¶¶45-47. On June 23, 2009, the parties appeared before Judge Arleo in the initial case management conference. Judge Arleo ordered that she was "going to let merits discovery go forward at this juncture." 6/23/09 Hr'g Tr. at

28:14-20. Rolling electronic document production began in August 2009.

### I.   Co-Lead Counsel Establishes Discovery Procedures and Protocols

During the early stage of discovery, Co-Lead Counsel devised internal procedures related to document review protocol and analysis, which included review procedures and regular meetings and conferences about documents identified and issues encountered, and the ways in which the evidence supported and/or failed to support Plaintiffs' claims. *See* Miller Decl. at ¶¶34-35.

Co-Lead Counsel also dealt with issues related to creation of a document review database. Co-Lead Counsel worked closely with computer consultants on discovery database preparation, management, and review, including such issues as: file formats and method of delivery; storage and organization of produced files; customization of discovery software; maintenance of discovery databases and software; user support for document review and tagging; report generation; and, document collation for analysis. *See* Miller Decl. at ¶35.

### J.   Discovery Disputes and Court Hearings

The parties engaged in numerous disputes about various discovery-related issues. *See* Miller Decl. at ¶47. This resulted in several in-person Court appearances, prefaced by the parties' submissions of voluminous and frequent letter briefs analyzing the issues and containing appropriate references to controlling and persuasive authority. On October 6, 2009, for instance, the parties

appeared before Judge Arleo to set a document production schedule and to address Lead Plaintiffs' request for the production of terminated employee lists and organizational charts. *See* Miller Decl. at ¶¶49-52. The Court granted Lead Plaintiffs' request. From these lists, Co-Lead Counsel contacted and spoke with numerous additional former employees in their continuing investigative efforts.

On January 21, 2010, the Court held a hearing on Lead Plaintiffs' request for document production from additional custodians from Virgin Mobile. *See* Miller Decl. at ¶¶53-55. Virgin Mobile originally designated 18 document custodians; Lead Plaintiffs believed this number to be too limited. Additionally, Lead Plaintiffs requested leave to take 30 depositions and requested the production of telephone numbers of former employees, and Virgin Mobile requested Lead Plaintiffs' tax returns and trading history records. The Court granted Lead Plaintiffs' request for ten additional custodians, 20 depositions, and contact information for employees. The Court granted in part Virgin Mobile's request, ordering that Lead Plaintiffs identify certain IPO purchases prior to the Virgin Mobile IPO.

On February 11, 2010, the Court convened a telephonic conference with the parties to address the Underwriter Defendants' request for the entry of a protective order to defer the deposition of a Merrill Lynch Managing Director. *See* Miller Decl. at ¶56. Judge Arleo ordered the deposition to take place and this Director was deposed on March 4, 2010.

On April 20, 2010, the parties again appeared before Judge Arleo to discuss case scheduling, production of documents in the possession of the bankruptcy trustee for Lehman Brothers, and Defendants' production of privilege logs. *See* Miller Decl. at ¶57. The Court set a schedule for discovery and for Defendants to produce privilege logs.

### K. Lead Plaintiffs' Review and Analysis of Over Three Million Pages of Documents Produced by Defendants and Third Parties

During discovery, Defendants produced over three million pages of responsive documents, which Co-Lead Counsel reviewed and analyzed to elicit the key facts supporting each of the claims asserted in the Amended Complaint and to rebut Defendants' affirmative defenses. *See* Miller Decl. at ¶¶36-37. In addition, Lead Plaintiffs obtained documents from the Underwriter Defendants of the now-bankrupt Lehman Brothers, Inc., who served as one of the lead underwriters for the IPO. Lead Plaintiffs also issued third-party document subpoenas to various entities, including Pricewaterhouse Coopers, LLP; Citigroup, Inc.; Bank of America, N.A.; and Credit Suisse Securities (USA) LLC.  Lead Plaintiffs had numerous meet and confer sessions with representatives of these entities, who lodged objections to the subpoenas. Co-Lead Counsel obtained documents from Soleil Securities and Credit Suisse Securities (USA) LLC, and Citigroup, Inc. asserted that it had no responsive documents.  With respect to the other outstanding subpoenas, Lead Plaintiffs were in the midst of meet and confer calls regarding limiting the scope of the requests or

the discovery protocol at the time the parties reached a settlement. *See* Miller Decl. at ¶37.

### L.    Depositions

The parties also took and/or defended sixteen depositions that generated thousands of pages of transcribed testimony. *See* Miller Decl. at ¶39. Depositions of former and present Virgin Mobile employees were taken by Co-Lead Counsel on behalf of Lead Plaintiffs on the following dates and locations:

February 3, 2010 (California)      Matthew Krichbaum
                                   Former VP of IT Operations

February 4, 2010 (California)      Georgeanna Ubois
                                   Former Director of Finance

March 5, 2010      (New York)      David Trimble
                                   (Virgin Mobile Corporate Deposition)
                                   Vice-President of Customer Care
                                   (title during relevant time period)

March 5, 2010      (New York)      Robert Stohrer
                                   (Virgin Mobile Corporate Deposition)
                                   Vice-President    of    Brand    and
                                   Integrated    Marketing    (title    during
                                   relevant time period)

April 16, 2010 (New York)          Joel Silverman
                                   Former Vice-President of Sales

May 21, 2010 (New York)            Howard Handler
                                   Former Chief Marketing Officer

June 7, 2010 (New York)            David Messenger
                                   Chief People Officer
                                   (title during relevant time period)

June 8, 2010 (Colorado)          David Parkhill
                                 Former Chief Information Officer

June 10, 2010 (New York)         Daniel Cipoletti
                                 Vice-President of Voice Offers

In addition, Co-Lead Counsel took the following depositions in New York of employees of Defendant Merrill Lynch who were part of the working group for the IPO:

March 4, 2010          Frank Maturo
                       Managing Director of Merrill Lynch

May 10, 2010           Mandar Donde
                       Director of Merrill Lynch

Virgin Mobile took the deposition of each of the Lead Plaintiffs, represented by Co-Lead Counsel, in New York on the following dates:

April 2, 2010          Lead Plaintiff Zhao Li

April 5, 2010          Lead Plaintiff Aaron Cheng

April 9, 2010          Lead Plaintiff John Mekari

May 24, 2010           Lead Plaintiff Alan Whiting

Notably, the Lead Plaintiff depositions took place in New York, where none of the Lead Plaintiffs resides. Each of the Lead Plaintiffs was obligated to travel to New York in advance of their deposition dates to meet with Co-Lead Counsel and prepare for their depositions. *See* Miller Decl. at ¶43.

Virgin Mobile began scheduling the depositions of the various CWs

identified in the Complaint and deposed CW David Allen, a former Virgin Mobile employee who worked as a Fraud and Accounts Receivable Analyst, on May 27, 2010. Co-Lead Counsel represented Mr. Allen at his deposition. *See* Miller Decl. at ¶44.

**M.    Second Mediation and Settlement Reached Thereafter**

While intensive discovery was continuing, on May 19, 2010, the parties attended a second all-day private mediation session before Judge Phillips in Newport Beach, California. *See* Miller Decl. at ¶59; Mediator Decl. at ¶¶8-10. Co-Lead Counsel made a presentation on damages and merits, including an assessment of the evidence. *See* Miller Decl. at ¶60; Mediator Decl. at ¶¶9, 11. Co-Lead Counsel also answered a battery of questions posed by Defendants and the insurance carrier representatives in attendance. *See* Miller Decl. at ¶¶59-60; Mediator Decl. at ¶¶9, 11. Similarly, Defendants made a presentation regarding their numerous defenses and answered questions. *See* Miller Decl. at ¶60; Mediator Decl. at ¶9. Although the parties did not reach a settlement at the end of the mediation session, the parties engaged in ongoing intensive negotiations in the following weeks, with and without Judge Phillips' involvement. *See* Miller Decl. at ¶61; Mediator Decl. at ¶10. This settlement was the product of those extensive negotiations. *See* Miller Decl. at ¶11.

# LEGAL ARGUMENT

## THE PROPOSED SETTLEMENT IS FAIR, REASONABLE AND ADEQUATE

## I.   Standard of Review

Federal Rule of Civil Procedure 23(e) provides that before a class action may be settled, the compromise must be approved by the court and notice of the proposed compromise must be provided to the class. The decision to approve a proposed settlement is within the Court's discretion, *Girsh v. Jepson,* 521 F.2d 153, 156 (3d Cir. 1975), although "[t]here is an overriding public interest in settling class action litigation, and it should therefore be encouraged."[5] *In re Warfarin Sodium Antitrust Litig*., 391 F.3d 516, 535 (3d Cir. 2004). Thus, "[t]he strong judicial policy in favor of class action settlement contemplates a circumscribed role for the district courts in settlement review and approval proceedings." *Ehrheart v. Verizon Wireless,* No. 08-4323, 2010 WL 2365867, at *3 (3d Cir. June 15, 2010). This is especially so in the securities litigation context because "of the notable unpredictability of result and the potential for litigation

---

[5]      *See also In re General Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 785 (3d Cir. 1995) ("the law favors settlement, particularly in class actions and other complex cases where substantial judicial resources can be conserved by avoiding formal litigation"); *In re Cmty. Bank of N. Virginia*, 418 F.3d 277, 299 (3d Cir. 2005) ("all Federal Circuits recognize the utility of … 'settlement classes' as a means to facilitate the settlement of complex nationwide class actions").

spanning up to a decade or more." 7 Conte & Newberg, *Newberg on Class Actions* §22.91 at 386-387 (4th ed. 2002) (citations omitted); *In re Gilat Satellite Networks, Ltd.*, No. 02-1510, 2007 WL 2743675, at *10 (E.D.N.Y. Sept. 18, 2007) (citations omitted); *Trief v. Dun & Bradstreet Corp.*, 840 F. Supp. 277, 281 (S.D.N.Y. 1993) (same).

In the final approval setting, Fed. R. Civ. P. 23(e) requires a determination that the proposed settlement is "fair, reasonable and adequate." *In re Insurance Brokerage Antitrust Litig.*, 579 F.3d 241, 258 (3d Cir. 2009) (citation omitted). But a proposed class action settlement "will enjoy a presumption of fairness" where "(1) the settlement negotiations occurred at arm's length; (2) there was sufficient discovery; (3) the proponents of the settlement are experienced in similar litigation; and (4) only a small fraction of the class objected." *Warfarin,* 391 F.3d at 535 (citing *In re Cendant Corp. Litig.*, 264 F.3d 201, 232 n.18 (3d Cir. 2001)). This settlement only came to fruition after counsel experienced in securities class actions mediated before a former federal judge two different times, and engaged in follow-up negotiations after the second mediation. As Judge Hayden concluded in *In re Schering-Plough Corp. Sec. Litig.*, No. 08-0829, 2009 WL 5218066, at *3 (D.N.J. Dec. 31, 2009), "[i]n choosing mediation rather than a jury trial, the parties showed their respect for the difficulty of predicting a trial outcome given the matters in contention[.]" Furthermore, this case has been marked by extensive

merits discovery involving the production of over three million pages of documents and the taking of 16 depositions. No objections to date have been received from class members and only a single Class Member has sought exclusion from the Class. *See* Miller Decl. at ¶6. This settlement should thus be accorded a presumption of fairness.

Co-Lead Counsel's approval of the settlement is also "entitled to considerable weight." *Dewey v. Volkswagen of* America, Nos. 07-2249 and 07-2361, 2010 WL 3018305, at *14 (D.N.J. July 30, 2010).[6]

## II.  The *Girsh* Factors

To determine whether a settlement is "fair, reasonable, and adequate," the Third Circuit looks to the following factors:

> (1) the complexity and duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining a class action; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement in light of the best recovery; and (9) the range of reasonableness of the settlement in light of all the attendant risks of litigation.

*Warfarin*, 391 F.3d at 534-535 (citing *Girsh*, 521 F.2d at 157); *General Motors*, 55

---

[6]    *See also Varacallo v. Mass. Mut. Life Ins. Co.*, 226 F.R.D. 207, 240 (D.N.J. 2005) ("Class Counsel's approval of the Settlement also weighs in favor of the Settlement's fairness."); *In re American Family Enterprises,* 256 B.R. 377, 421 (D.N.J. 2000); *In re Cendant Corp. Sec. Litig.*, 109 F. Supp. 2d 235, 255 (D.N.J. 2000) (affording "significant weight" to counsel's recommendation); *see also In re Prudential Ins. Co. of America Sales Practices Litig.*, 962 F. Supp. 450, 535 (D.N.J. 1997).

F.3d at 785. These factors serve as a guide for the Court, and the absence of one or more factors does not automatically render the settlement unfair. *Louisiana Mun. Police Employees Retirement Sys. v. Sealed Air Corp.* (hereafter, "*LMPERS*"), No. 03-4372, 2009 WL 4730185, at *3 (D.N.J. Dec. 4, 2009) (citation omitted). Furthermore, "[t]he Court is in no way limited to considering only those enumerated factors and is free to consider other relevant circumstances and facts involved in this settlement." *In re Schering-Plough/Merck Merger Litig.*, No. 09-1099, 2010 WL 1257722, at *5 (D.N.J. Mar. 26, 2010).

### A.    Complexity, Expense, and Likely Duration of the Litigation

The first *Girsh* factor "captures the probable costs, in both time and money, of continued litigation." *Cendant*, 264 F.3d at 233. "By measuring the costs of continuing on the adversarial path, a court can gauge the benefit of settling the claim amicably." *General Motors*, 55 F.3d at 812. In *Warfarin*, the parties litigated the case for three years and the Third Circuit found that the first *Girsh* factor was satisfied under the following circumstance:

> We agree with the District Court's conclusion that this factor favors settlement because continuing litigation through trial would have required additional discovery, extensive pretrial motions addressing complex factual and legal questions, and ultimately a complicated, lengthy trial. Moreover, it was inevitable that post-trial motions and appeals would not only further prolong the litigation but also reduce the value of any recovery to the class. In a class action of this magnitude... the time and expense leading up to trial would have been significant.

391 F.3d at 536.

In this litigation, the path from the current stage of the litigation to a final judgment would likely be much longer and significantly more expensive. *See LMPERS*, 2009 WL 4730185, at *4 (recognizing that complex securities cases are "expensive to litigate"). Although extensive discovery has already taken place, even more discovery and expert retention (and expert depositions) would be necessary to prepare the case for trial.

As discussed further herein below, were this case not to settle, Lead Plaintiffs would also have to obtain and maintain class certification. Without a certified class, this case would not be economically feasible for most class members. Class certification is a significant hurdle in securities class action, and is not only subject to interlocutory appeal but may be revisited at *any point* in the litigation, making maintenance of the certification particularly difficult. The parties have also yet to file dispositive motions and other pre-trial motions, including *Daubert/Kumho* motions and anticipated cross-motions for summary judgment; oppositions and replies would necessarily follow.

Furthermore, any trial on this matter would last for weeks, if not longer. Prior to trial, Co-Lead Counsel would have to draft and prepare motions *in limine* (and oppositions and replies thereto) related to exclusions of exhibits, evidence, or testimony. Co-Lead Counsel would also have to prepare deposition designations

(and objections), draft the pre-trial order and trial memorandum, create jury charges and jury interrogatories, prepare for *voir dire*, prepare witnesses (facing the inherent difficulties of securing witnesses for trial), and undertake overall trial preparation. Jury instructions would also need to be prepared and drafted, and Lead Plaintiffs would likely have engaged the services of a jury consultant and technological consultants to assist with courtroom audio-visual presentations.

Lead Plaintiffs have detailed some of the major milestones for this case, but the aforementioned discussion in no way encompasses the entirety of what would be required to take this case through to trial and through eventual appeals. The likely further expense and duration of this Action in the absence of settlement are therefore demonstrably great, a factor weighing heavily in favor of final approval.

### B.    The Reaction of the Class to the Settlement

The second *Girsh* factor "attempts to gauge whether members of the class support the settlement." *In re Prudential Ins. Co. of Am.,* 148 F.3d 283, 318 (3d Cir.1998). This factor is an "especially critical" aspect of the fairness analysis. *LMPERS*, 2009 WL 4730185, at *5 (citations omitted).

The deadline for objections and exclusions has not yet passed: Class Members have until November 15, 2010, giving them ample opportunity to examine the documents already filed in this action as well as the current motion and accompanying Motion for Award of Attorneys' Fees and Expenses and

Reimbursement of Lead Plaintiffs' Costs. However, to date, no objections have been filed and only one request for exclusion has been lodged. *See* Miller Decl. at ¶6; *Schering-Plough/Merck Merger Litig.*, 2010 WL 1257722, at *4 ("Case law in this Circuit establishes that the absence of objections, or a small number of objections, is strong evidence that the settlement is fair and reasonable."); *LMPERS,* 2009 WL 4730185, at *4 (noting that no class member objected to the settlement or application for attorneys' fees, although two members opted out, but "[t]his low number supports a finding that the Settlement terms are reasonable."). Thus, the "disparity between the number of potential class members and the number of objectors creates a strong presumption in favor of the settlement." *In re Am. Investors Life Ins. Co.*, 263 F.R.D. 226, 239 (E.D. Pa. 2009) (noting that only 12 out of 387,263 class members objected to the settlement and only 840 were excluded; also citing other cases in the Third Circuit with similarly low objections and exclusions); *In re Insurance Brokerage Antitrust Litig.*, No. 04-5184, 2009 WL 411877, at *5 (D.N.J. Feb. 17, 2009).

### C.    The Stage of Proceedings and the Amount of Discovery

The third *Girsh* factor, relating to the stage of proceedings, "captures the degree of case development that class counsel [had] accomplished prior to settlement. Through this lens, courts can determine whether counsel had an adequate appreciation of the merits of the case before negotiating." *Cendant*, 264

F.3d at 235; *General Motors*, 55 F.3d at 813; *LMPERS*, 2009 WL 4730185, at *5 (citations omitted). Prior to and during this litigation, Co-Lead Counsel conducted extensive discovery regarding the allegations in the Amended Complaint. *See* Miller Decl. at ¶19. The parties here reached an agreement in principle to settle this litigation approximately a month before the August 1, 2010, fact discovery deadline, *see* DE 121, a deadline that had been previously extended two times.

Lead Plaintiffs served on Defendants a combined total of 661 specific requests for production of documents, resulting in the production of more than three million pages, which Co-Lead Counsel carefully reviewed and analyzed. *See* Miller Decl. at ¶36; *see In re Lucent Techs., Inc. Sec. Litig.*, 307 F. Supp. 2d 633, 638 (D.N.J. 2004) (considering plaintiffs' "review and analysis of more than three million pages of documents produced by Defendants and third parties"). The parties met and conferred repeatedly to ensure that responsive documents were produced in their entirety and to resolve the myriad objections to production. As a result, prior to settlement the vast majority of discovery had been completed, totaling electronic production of over three million pages of documents. *See* Miller Decl. at ¶37. Indeed, not only was Co-Lead Counsel undertaking a comprehensive review of formal discovery served by Defendants, but also continued conducting informal investigations and discovery on their own by contacting and interviewing potential witnesses. *See* Miller Decl. at ¶49; *Schering-Plough/Merck Merger Litig.*,

27

2010 WL 1257722, at *10 (considering discovery from "formal" and "informal" discovery, and discovery from third-parties, experts, witnesses, depositions, and documents obtained in litigation).

Pursuant to the Court's Order, the parties were allotted up to 20 depositions per side, with the possibility of seeking leave to take additional depositions if necessary. *See* DE 108. The sixteen depositions taken in this case resulted in over 2,400 pages of transcript testimony. Co-Lead Counsel took eleven depositions, including those of Virgin Mobile's former Chief Marketing Officer, a Managing Director of Defendant Merrill Lynch, a corporate deposition of Virgin Mobile, the Vice-President of IT Operations for Virgin Mobile, and the Chief Information Officer and Chief People Officer of Virgin Mobile. *See* Miller Decl. at ¶39. At the time of the settlement, additional depositions of CWs and former and current employees of Defendants had been or were in the process of being scheduled by the parties in Washington, California, New Jersey, New York, and North Carolina.

Co-Lead Counsel also took steps to seek the deposition of Virgin Mobile's former Chief Operating Officer, who resides in Australia. *See* Miller Decl. at ¶40. Co-Lead Counsel engaged and worked with an Australian law firm to assist with international judicial process. *See* Miller Decl. at ¶41. Co-Lead Counsel was also in the process of researching English law relative to seeking the potential deposition of a key witness located in Great Britain. *See* Miller Decl. at ¶42.

Defendants have also taken the depositions of each of the four Lead Plaintiffs and one of eight confidential witnesses cited in the Complaint. *See* Miller Decl. at ¶¶43-44.

This case was also marked by extensive motion practice, including the motions to dismiss and near-constant discovery letter briefs and responses to the Court. *See In re Remoron Direct Purchase Antitrust Litig.*, No. 03-0085, 2005 WL 3008808, at *6 (D.N.J. Nov. 9, 2005) (considering extent of motion practice that allowed plaintiffs "to preview some of the defenses that Defendants would advance"); *Lucent*, 307 F. Supp. 2d at 644 ("The briefing on the motions to dismiss and discovery disputes as well as the lengthy settlement negotiations shed further light on the strengths and weaknesses of the case, the risks of litigation, and the issues the Class would face at trial."). These letters not only contained significant discussion about the case status as it stood at the time of their submissions, but typically included extensive analysis of the relevant law. *See* Docket Entries 82, 83, 84, 87, 88, 89, 90, 92, 98, 99, 103, 110, 111, 113, and 119.

There is no question that Co-Lead Counsel had an in-depth and detailed understanding of the case, from both a legal and factual perspective, prior to the negotiations which resulted in this settlement, as a result of discovery, investigations, consultations with experts, detailed briefings, multiple mediation sessions, and even through disputes arising in discovery. As a result of the

foregoing, Lead Plaintiffs strongly believe that the action had reached a stage where "the parties certainly [had] a clear view of the strengths and weaknesses of their cases." *In re Warner Commc'ns Sec. Litig.*, 618 F. Supp. 735, 745 (S.D.N.Y. 1985), *aff'd*, 798 F.2d 35 (2d Cir. 1986); *LMPERS*, 2009 WL 4730185, at *5; *McCoy v. Health Net, Inc.*, 569 F. Supp. 2d 448, 461 (D.N.J. 2008). This factor thus weighs in favor of approving the Settlement.

### D.    Risks of Establishing Liability and Damages

"By evaluating the risks of establishing liability, the district court can examine what the potential rewards (or downside) of litigation might have been had class counsel elected to litigate the claims rather than settle them." *General Motors*, 55 F.3d at 319. "The risks surrounding a trial on the merits are always considerable." *Weiss v. Mercedes-Benz of North America,* 899 F.Supp. 1297, 1301 (D.N.J. 1995); *See also, e.g., West Virginia v. Chas. Pfizer & Co.*, 314 F. Supp. 710, 743-44 (S.D.N.Y. 1970), *aff'd*, 440 F.2d 1079 (2d Cir. 1971) ("No matter how confident one may be of the outcome of litigation, such confidence is often misplaced."). The "inquiry [regarding damages] attempts to measure the expected value of litigating the action rather than settling it at the current time." *Cendant*, 264 F.3d at 238. The court looks at the potential damage award if the case were taken to trial against the benefits of immediate settlement. *Prudential*, 148 F.3d at 319.

Lead Plaintiffs were faced with substantial risks of establishing liability in this Action, particularly with regard to defeating Defendants' negative causation affirmative defense and proving damages. *See* Miller Decl. at ¶¶63, 72, 78. Defendants argued extensively in their motion to dismiss briefing and at the mediations that Lead Plaintiffs would be unable to recover for the decline in VMU share value that occurred in connection with three of the four alleged disclosures. Defendants argued that those disclosures were barred from recovery because they were made after the first complaint was filed. If Defendants prevailed on this theory, the damages in this action and the number of shares with a recognized claim would have been drastically reduced. *See LMPERS*, 2009 WL 4730185, at *6 (recognizing that the jury would be faced with competing damages opinions, and the risks of post-trial motions, appeals, and reversals of any judgment obtained) (citing *In re Apollo Group, Inc. Sec. Litig.,* No. 04-2147, 2008 WL 3072731 (D. Ariz. Aug. 4, 2008) (granting Fed. R. Civ. P. 50(b) motion, following lengthy trial, notwithstanding the $280 million jury verdict)).

Lead Plaintiffs alleged four corrective disclosures in the Amended Complaint. *See* Miller Decl. at ¶63. Defendants argued strenuously that there could be no recovery under Section 11 for three of those disclosures.[7] This proposed

---

[7]        *See, e.g., Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 344 (2005) (citing M. Bigelow, Law of Torts 101 (8th ed. 1907) (damage "must already have been suffered before the beginning of the suit"); *In re American Int'l Group, Inc.*

Settlement offsets the significant risk that those disclosures would be excluded at summary judgment or trial, and provides that class members who suffered net loss damages will have some measure of recovery. This factor favors approval of the settlement.

### E.    Risks of Maintaining Class Action Status through Trial

Because the prospects for obtaining certification have a great impact on the range of recovery one can expect to reap from the class action, *General Motors*, 55 F.3d at 817, the Court should measure the likelihood of obtaining and maintaining a certified class if the action were to proceed to trial. *Girsh*, 521 F.2d at 157. Here, given the nature of Lead Plaintiffs' claims, the ability to maintain (or avoid significant narrowing of) a class action poses a meaningful risk, and settlement now obviates those risks. *See* Miller Decl. at ¶¶65-67, 73. Lead Plaintiffs also faced significant issues regarding traceability, challenges regarding recovery on three of the four disclosures, and the possibility of Defendants' affirmative defenses prevailing at the class certification stage. While Plaintiffs are confident in their ability to obtain class certification pursuant to Fed. R. Civ. P. Rule 23,

---

*Sec. Litig.*, 265 F.R.D. 157, 166 (S.D.N.Y. 2010) ("Consequently, because Lead Plaintiffs were necessarily aware of the allegations in the original Complaint, including the false and misleading financial information in the Class Period financial statements, they cannot now plausibly contend that they were unaware that the Registration Statement and Prospectus contained false and misleading financial information at the time that they purchased AIG's 4.25% Notes on and after March 15, 2005.").

Defendants had already indicated that in the event they could not avoid certification entirely, they would vigorously seek to narrow the class based on the timing of certain of the alleged corrective disclosures.

At the class certification stage, Lead Plaintiffs would also face significant hurdles regarding traceability (*see, e.g., In re Crazy Eddie Sec. Litig.*, 792 F. Supp. 197, 202 (E.D.N.Y. 1992) (plaintiffs must demonstrate that shares were in fact traceable to the IPO")) and challenges regarding Defendants' affirmative defenses (including one related to "knowledge of alleged untruths or omissions"). *See, e.g., In re Initial Public Offerings Sec. Litig.*, 471 F.3d 24, 43-44 (2d Cir. 2006) (reversing order certifying a Section 11 class because press reports and other sources of "widespread knowledge…would precipitate individual inquiries as to the knowledge of each member of the class"); *American Int'l*, 265 F.R.D. at 166 (denying class certification due to named plaintiff's knowledge); *In re Livent, Inc. Noteholders Sec. Litig.*, 151 F. Supp. 2d 371, 441 (S.D.N.Y. 2001) (same). Of course, Lead Plaintiffs would further have had to demonstrate that the class representatives are adequate and typical to represent the Class. While at the outset of the litigation, five Lead Plaintiffs oversaw this litigation, Mr. Volpe was withdrawn as a Lead Plaintiff and potential class representative, demonstrating an inherent risk of certification.

Significantly, Fed. R. Civ. P. 23 allows for interlocutory appeals of class

33

certification decisions, and interlocutory appeal would be expected here, further delaying the progress of the case and increasing the risks of maintaining class certification.

### F.    Ability to Withstand Greater Judgment

The seventh *Girsh* factor considers "whether the defendants could withstand a judgment for an amount significantly greater than the [s]ettlement." *Cendant*, 264 F.3d at 240. "Defendants ability to withstand a larger judgment may be less certain in the current economic environment." *LMPERS*, 2009 WL 4730185, at *7. Indeed, one of the former Underwriter Defendants in this case, an underwriter for the Virgin Mobile IPO, Lehman Brothers, is currently enmeshed in one of the most high-profile bankruptcy proceedings in American history. To be sure, a settlement achieved today represents an immediate and present value, without having to wait many years down the road for Class members to recover, if they reach a settlement or receive a judgment at all. As Judge Scheindlin noted in considering a settlement in *In re Initial Public Offering Sec. Litig.*, 260 F.R.D. 81, 119 (S.D.N.Y. 2009), and which is equally apt here:

> *Finally,* it cannot be discounted that the current economic environment has changed the "ball game" with respect to what plaintiffs could expect even with a verdict. As noted, one of the underwriters has filed for bankruptcy while a number of others have escaped a similar fate only because of government intervention. Simply put, plaintiffs cannot expect to receive a similar recovery to that they had hoped to receive during more bullish years.

Regardless, even "the fact that [defendants] could afford to pay more does not mean that [they are] obligated to pay any more than what the [] class members are entitled to under the theories of liability that existed at the time the settlement was reached." *Warfarin*, 391 F.3d at 538; *see also Schering-Plough Corp. Sec. Litig.*, 2009 WL 5218066, at *4 ("pushing for more in the face of risks and delay would not be in the interests of the class."). Here, Defendants' ability to pay was a key consideration in the settlement of this Action. A key component of the of the May 2010 mediation before Judge Phillips was the applicable insurance coverage, policies which were wasting in the face of years-long, intensive litigation. *See* Miller Decl. at ¶61. Co-Lead Counsel and Defendants had several frank discussions about the relationship of the likely damages in this case to the resources available for settlement or satisfaction of judgment should Plaintiffs prevail at trial. Lead Plaintiffs and Co-Lead Counsel are satisfied that an appropriate balance was struck and that this Settlement represents an excellent result in light of those circumstances. As such, the seventh *Girsh* factor weighs heavily in favor of approval of this Settlement.

### G. The Range of Reasonableness of the Settlement Fund in Light of the Best Possible Recovery and All the Attendant Risks of Litigation

The last two *Girsh* factors, "whether the settlement is reasonable in light of the best possible recovery and the risks the parties would face if the case went to

trial," are usually considered together. *Prudential*, 148 F.3d at 322; *see also Warfarin*, 391 F.3d at 538 (considering "whether the settlement represents a good value for a weak case or a poor value for a strong case"). As Judge Becker explained in *General Motors*, "[t]he evaluating court must ... guard against demanding too large a settlement based on its view of the merits of the litigation; after all, settlement is a compromise, a yielding of the highest hopes in exchange for certainty and resolution." 55 F.3d at 806.

Here, the parties formally mediated twice in person. *See* Mediator Decl. at ¶¶5, 8. First, shortly after the Court's decision on the motions to dismiss in June 2009, prior to the actual commencement of discovery, the parties met before Judge Phillips. The parties briefed and presented their respective positions at the mediation, but could not come to terms on a reasonable compromise as the parties had yet to undertake any formal discovery. *See* Miller Decl. at ¶¶31, 58-61; Mediator Decl. at ¶¶5-6.

Eleven months later, on May 19, 2010, the parties attended the second all-day private mediation session before Judge Phillips. *See* Miller Decl. at ¶59; Mediator Decl. at ¶8. Several points of contention were briefed, including issues related to recoverable damages, merits, and causation. The parties made presentations and responded to questions. *See* Mediator Decl. at ¶9. Although the parties did not reach a settlement by the conclusion of the mediation session, the

parties engaged in further informal negotiations during the following weeks while discovery, including further depositions, continued. *See* Miller Decl. at ¶61; Mediator Decl. at ¶10.

In light of causation and damages risks addressed by Lead Counsel with their consultants and with the mediator, Lead Plaintiffs and Lead Counsel believe that the most likely maximum Class-wide damages scenario is approximately $60.2 million. *See* Miller Decl. at ¶78. The settlement fund of $19.5 million represents approximately 33% of these estimated maximum recoverable damages. This greatly surpasses the "average settlement amounts in securities fraud class actions where investors sustained losses-over the past decade [which] have ranged from 3% to 7% of the class members' estimated losses." *LMPERS*, 2009 WL 4730185, at *7 (citing cases and studies); *see also In re Rentway Sec. Litig.*, 305 F. Supp. 2d 491, 501 n.4 (W.D. Pa. 2003) (collecting cases discussing reasonable ranges of recoveries from 1.6% to 14% of damages). In light of this, the settlement fund is well within the range of reasonableness and this factor thus favors approval.

Settlement negotiations, furthermore, took place at arm's length. *See* Mediator Decl. at ¶¶4, 12. Nothing suggests that the settlement reached is the product of fraud, collusion, or overreaching. The parties engaged the services of an impartial mediator to assist in reaching a compromise. *See* Mediator Decl. at ¶¶1-3.

"[T]he use of a mediator with respect to the present settlement is persuasive evidence that the negotiations were hard-fought, arms-length affairs." *Milliron v. T-Mobile USA, Inc.*, No. 08-4149, 2009 WL 3345762, at *5 (D.N.J. Sept. 10, 2009); *see also In re Toys-R-Us Antitrust Litig.*, 191 F.R.D. 347, 352 (E.D.N.Y. 2000) (citing cases).

## THE PLAN OF ALLOCATION IS FAIR, REASONABLE, AND ADEQUATE

The "[a]pproval of a plan of allocation of a settlement fund in a class action is governed by the same standards of review applicable to approval of the settlement as a whole: the distribution plan must be fair, reasonable and adequate." *In re Merck & Co, Vytorin Erisa Litig.*, 2010 WL 547613 (D.N.J. Feb. 9, 2010) (citing *In re Ikon Office Solutions, Inc., Sec. Litig*, 194 F.R.D. 166, 184 (E.D. Pa. 2000)); *see also Cendant*, 264 F.3d at 248. The Plan of Allocation, fully described in the Notice, was formulated by Co-Lead Counsel in consultation with an expert damages consultant, ensuring its fairness and adequacy. *See* Miller Decl. at ¶ 112. The Plan was formulated in accordance with the statutory damages provisions of Section 11 of the Securities Act. 15 U.S.C. § 77k(e).

Here, the $19.5 million cash settlement amount and the interest earned thereon, less all taxes, approved costs, fees, and expenses (the "Net Settlement Fund") shall be distributed to Class Members who submit acceptable Claim Forms. *See* Miller Decl. at ¶ 111. Each Authorized Claimant will receive a *pro rata* share

of the Net Settlement Fund with that share to be determined by the ratio that the Authorized Claimant's Recognized Claim bears to the total Recognized Claims of all Authorized Claimants. *See In re AremisSoft Corp. Sec. Litig.*, 210 F.R.D. 109, 127 (D.N.J. 2002) ("Each Authorized Claimant will be allocated a *pro rata* share of the Net Settlement Securities based on his, her or its Recognized Claim as compared to the total Recognized Claims of all Authorized Claimants.").

Lead Plaintiffs' damages consultant analyzed allocation issues such as the per-share inflation during each Class Period interval, the statistical significance of the alleged misrepresentations and subsequent disclosures, and the resulting varying alleged damages Class Members suffered depending on their share purchase and sale dates. *See* Miller Decl. at ¶ 112.

"In general, a plan of allocation that reimburses class members based on the type and extent of their injuries is reasonable." *McCoy*, 569 F. Supp. 2d at 469 (citing *Ikon*, 194 F.R.D. at 184-85). The Plan of Allocation here is a weighted calculation, taking into account the differing losses attributable to each share based on relative inflations at time of purchase and sale. *See, e.g., Lucent*, 307 F. Supp. 2d at 649 (approving a plan where the calculation "depends on the dates on which the stock was purchased and whether the stock was sold or held through the various alleged partial disclosures that occurred during the Class Period... or through the end of the Class Period."). Thus, the Plan provides proportional

allocation to all Class Members eligible to claim, and is "consistent with Plaintiffs' theory of the case." *McCoy,* 569 F. Supp. 2d at 470.

Plaintiffs submit that the proposed Plan of Allocation, which is based on the statutory damages requirements and consultation with an expert consultant, is designed to fairly and rationally allocate the proceeds of the Settlement among Class Members. Accordingly, Co-Lead Counsel respectfully submits that the proposed Plan of Allocation is fair, reasonable, and adequate, and should be approved.

## **CONCLUSION**

For the foregoing reasons, Lead Plaintiffs respectfully request that the Court grant final approval to the proposed Settlement and Plan of Allocation.

**Dated:** November 5, 2010

**CARELLA, BYRNE, CECCHI, OLSTEIN, BRODY & AGNELLO, P.C**

By: ___ s/ James E. Cecchi _____
        JAMES E. CECCHI

*Co-Lead Counsel for Lead Plaintiffs and the Class*

Kim E. Miller
Melissa Ryan Clark
**KAHN SWICK & FOTI, LLC**
500 Fifth Avenue, Suite 1810
New York, NY 10110
Tel: 973-696-3730

Lewis S. Kahn

Paul S. Balanon
Sarah Cate Boone
**KAHN SWICK & FOTI, LLC**
206 Covington Street
Madisonville, Louisiana 70447
Tel: (504) 455-1400

*Co-Lead Counsel for Lead Plaintiffs
and the Class*